Daniel A. Frishberg, *Pro Se*[1]
Georges Georgiou, *Pro Se*
Immanuel J. Herrmann, *Pro Se*
Kulpreet Khanuja, *Pro Se*
Christopher J. Little, *Pro Se*
Luke P. Nowak, *Pro Se*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.,*[2] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |

_____

**NOTICE OF APPEAL AND STATEMENT OF ELECTION**

**Part 1: Identify the Appellant(s):**

Daniel A. Frishberg, Georges Georgiou, Immanuel J. Herrmann, Kulpreet Khanuja, Christopher J. Little, and Luke P. Nowak, *pro se* Celsius Network LLC, *et al.* creditors ("the *pro se* Appellants") file this joint notice of appeal, pursuant to FRBP 8002 (a)(1), 8003(a)(1) and 8003(b)(1).

---

[1] Mr. Frishberg still maintains that he should not be a creditor, but for judicial economy, and efficiency/ease of reading, he will be referred to as a Creditor, all rights reserved.

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**Part 2: Identify the subject of this appeal:**

This appeal is from the *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* (the "Earn Decision.")

The Order was rendered on January 4, 2023. A copy of the order is attached as Exhibit A.

**Part 3: Identify the other parties to the appeal**

The names of all other parties to the Decision[3], and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

KIRKLAND & ELLIS LLP
*Attorneys for the Celsius Debtors*
601 Lexington Avenue
New York, NY 10022
By:      Joshua Sussberg, Esq.
         Patrick J. Nash, Jr., Esq.
         Ross M. Kwasteniet, Esq.
         Christopher S. Koenig, Esq.
         Dan Latona, Esq.
         Phone: 212-446-4800

WHITE & CASE LLP
*Attorneys for the Official Committee of Unsecured Creditors*
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
By:      Gregory Pesce, Esq.
         Andrea Amulic, Esq.
         Michael Andolina, Esq.
         Aaron Colodny, Esq. Samuel P. Hershey, Esq.
         David Turetsky, Esq.
         Keith Wofford, Esq.
         Phone: 312-881-5400

OFFICE OF THE UNITED STATES TRUSTEE
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014

---

[3] Numerous *pro se* parties made or joined in objections. The names of these creditors are identified in the *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets.*

By:      Shara Cornell, Esq.
         Brian Masumoto, Esq.
         Mark Bruh, Esq.
         Phone: 212-510-0500

MILBANK LLP
*Attorneys for Community First Partners,*
*LLC Celsius SPV Investors, LP, and*
*Celsius New SPV Investors, LP*
55 Hudson Yards New York, NY 10001
By:      Dennis F. Dunne, Esq.
         Nelly Almeida, Esq.
         Phone: 212-530-5000

1850 K Street, NW, Suite 1100
Washington, DC 20006
By:      Andrew M. Leblanc, Esq.
         Melanie Westover Yanez, Esq.
         Phone: 202-835-7500

JONES DAY
*Attorneys for CDP Investissements, Inc.*
555 South Flower Street, 50th Fl.
Los Angeles, CA 90071
By:      Joshua M. Mester, Esq
         Phone: 213-489-3939

TEXAS STATE SECURITIES BOARD AND THE TEXAS DEPARTMENT OF BANKING
P. O. Box 12548
Austin, Texas 78711
By:      Layla D. Milligan, Esq.
         Abigail R. Ryan, Esq.
         Roma N. Desai, Esq.
         Phone: 512-305-8300

VERMONT DEPARTMENT OF FINANCIAL REGULATION
*Attorneys for the State of Vermont*
89 Main Street
Montpelier, VT 05620
By:      Jennifer Rood, Esq.

Phone: 802-828-3301

MCELROY, DEUTSCH, MULVANEY & CARPENTER LLP
*Attorneys for the New Jersey Bureau of Securities*
570 Broad Street
Newark, NJ 07102
By:    Jeffrey Bernstein, Esq.
        Phone: 973-622-7711

225 Liberty Street, 36th Fl. New York, NY 10281
By:    Nicole Leonard, Esq.
        Phone: 212-483-9490

THE STATE OF WASHINGTON
P.O. Box 40100
Olympia, WA 98504
By:    Robert Ferguson, Esq.
        Stephen Manning, Esq.
        Phone: 360-357-2852

NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
*Attorneys for the States of Alabama, Arkansas, California, District Of Columbia, Hawaii, Idaho, Maine, North Dakota, Oklahoma, and South Carolina*
1850 M St., NW, 12th Fl.
Washington, DC 20036
By:    Karen Cordry, Esq.
        Phone: 301-933-3640

COAN, PAYTON & PAYNE, LLC
*Attorneys for Joe Breher*
999 18th Street, Suite S3100
Denver, CO 80202
By:    Steven T. Mulligan, Esq.
        Phone: 303-861-8888

BERNSTEIN-BURKLEY, P.C.
*Attorneys for Stuart McLean, Keith Ryals, Jennifer Ryals, Kim David Flora, Brett Flora, and Courtney Burks Steadman*
601 Grant Street, 9th Fl.
Pittsburgh, PA 15219

By:     Mark A. Lindsay, Esq.
        Phone: 412-456-8100

FOX ROTHSCHILD LLP
*Attorneys for Nuno Saraiva*
49 Market Street
Morristown, NJ 07960
By:     Michael R. Herz, Esq.
        Phone: 973-992-4800

WEIR GREENBLATT PIERCE LLC
*Attorneys for Matthew Pinto*
1339 Chestnut Street, Suite 500
Philadelphia, PA 19107
By:     Bonnie R. Golub, Esq.
        Jeffrey S. Ciancuilli, Esq.
        Michael P. Broadhurst, Esq.
        Phone: 215-735-1600

MILES & STOCKBRIDGE P.C.
*Attorneys for Josh Tornetta*
100 Light Street, 10th Fl.
Baltimore, MD 21202
By:     Joel L. Perrell Jr., Esq.
        Phone: 410-727-6464

VENABLE LLC
*Attorneys for Ignat Tuganov*
1270 Avenue of the Americas, 24th Fl.
New York, NY 10020
By:     Jeffrey S. Sabin, Esq.
        Carol Weiner Levy, Esq.
        Arie Peled, Esq.
        Phone: 212-307-5500

600 Massachusetts Avenue, NW
Washington, DC 20001
By:     Andrew J. Currie, Esq.
        Phone: 202-344-4000

**Part 4: Optional election to have appeal heard by District Court:**

Appellants elect to have the appeal heard by the United States District Court.

**Part 5: Sign below**

*/s/ Immanuel Herrmann*
Immanuel Herrmann
*Pro Se*
January 18, 2023

*/s/ Daniel A. Frishberg*
Daniel A. Frishberg
*Pro Se*
January 18, 2023

*/s/ Christopher J. Little*
Christopher J. Little
*Pro Se*
January 18, 2023

*/s/ Luke P. Nowak*
Luke P. Nowak
*Pro Se*
January 18, 2023

*/s/ Georges Georgiou*
Georges Georgiou
*Pro Se*
January 18, 2023

*/s/ Kulpreet Khanuja*
Kulpreet Khanuja
*Pro Se*
January 18, 2023

*Each appellant electronically signed on behalf of themselves.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[4] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |

## <u>MOTION TO AUTHORIZE CERTAIN PROCEDURAL RELIEF, AND, IF NEEDED,</u>

## <u>FOR LEAVE TO APPEAL</u>

      Daniel A. Frishberg,[5] Georges Georgiou, Immanuel J. Herrmann, Kulpreet Khanuja,

Christopher J. Little, and Luke P. Nowak (together, the "*pro se* Appellants," "Us," "We")

respectfully file this *Motion To Authorize Certain Procedural Relief, and, if Needed, for Leave to

Appeal* (the "Motion") as an attachment to our notice of appeal, for consideration by the District

Court.

      The *Pro Se* Appellants file this motion primarily to ask for certain procedural relief, while

we ask for leave to appeal only out of an abundance of caution. We believe this is clearly a final

and immediately appealable order, as is explained below, but file this motion in the event that the

---

[4] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[5] Mr. Frishberg still maintains that he should not be a creditor, but for judicial economy, and efficiency/ease of reading, he will be referred to as a Creditor, all rights reserved.

Debtors or other parties attempt to argue that this order is not a final order, and for additional relief with respect to service requirements, and to request virtual hearings.

## **RELIEF REQUESTED**

We request that the District Court:

1. Treat the attached Earn Decision in Exhibit A as a final order that is immediately appealable under FRBP 8003–as we believe it clearly is.[6]

2. In the alternative, treat this as a motion for leave to appeal under FRBP Rule 8004.

3. In either case, grant us the following procedural relief:

   a. Electronic service by email on all matters (and the *pro se Appellants* waive all paper service requirements and do not want paper service of anything, or to expose our mailing addresses.)

   b. Allow all service to be done electronically, following rules identical to, or substantially similar to, the attached *Amended Final Order (I) Establishing Certain Notice, Case Management, And Administrative Procedures, And (II) Granting Related Relief* approved by the Bankruptcy Court in the Southern District of New York. (Exhibit B)

   c. Redact the *pro se* Appellants' mailing addresses from the Court's public docket, and from the entry of any orders and decisions–which is consistent with Chief Judge Glenn's *Memorandum Opinion and Order on the Debtors' Sealing Motion* (Exhibit C), which grants sealing of mailing addresses of Celsius Creditors; *pro se*

---

[6] We believe this is a final order because it **clearly** rules that any coins in the Debtor's Earn program are not property of the bankruptcy estate under 11 USC § 541.

filers have not provided them during the pendency of these cases, including in court filings. We can file our addresses with the Clerk's Office, if needed.

d.  Provide virtual hearings by Zoom or other telephonic hearings on this motion and on all matters related to this appeal, because the appellants are geographically disbursed, and other creditors and their counsel, and objecting regulators, are not all in the New York area[7]. (This is consistent with the Celsius case so far, which has more than 300,000 creditors.)

e.  Grant PACER access to file documents directly (but, if not granted, we can file electronically with the clerk via email, using the District Court's *pro se* rules.)

## THE ATTACHED ORDER IS A FINAL ORDER

We believe that the attached Earn Decision unambiguously qualifies as a final order, it appears to conclusively answer the question "Who owns the cryptocurrency assets deposited in Earn Accounts (defined below) by Celsius's account holders before the July 13, 2022 petition date?" with a final determination that "the cryptocurrency assets remaining in the Earn Accounts on the Petition Date became property of the Debtors' bankruptcy estates"[8] and additionally states that "the Court finds that Earn Assets in Earn Accounts constitute property of the Estates, and that the Debtors may sell stablecoins outside of the ordinary course of business."[9] Additionally,

---

[7] And in the case of Mr. Frishberg, who is a college freshman in Florida, cannot afford to travel as it would not only place an undue burden on him financially, but take away from school/his education.

[8] *Memorandum Opinion and Order Regarding Ownership of Earn Assets,* Exhibit A (p. 4)

[9] *Ibid.* (p. 45)

the order unequivocally states that "Account Holders have **_unsecured claims_** against the Debtors in dollars or in kind (depending on the terms of any confirmed plan)."[10] (Emphasis added.)

The motion also authorizes the Debtor, without additional approvals, to sell stablecoin, which, again, makes it a final order. The findings sought by the Amended Motion and granted in the Order, however, go **much** further than the 363 sale.

The Bankruptcy Court and the Celsius Debtors both _appear_, from the record thus far, to be treating this as a final order, with respect to property rights claims for Earn account assets under 11 USC § 541. A recent order based upon the Earn Decision, the _Order Denying Kowk Mei Po's Motion Seeking a Ruling of Full Ownership of Funds_ (Exhibit D) states that any claim by Earn Account holders "that Celsius breached its contract . . . or otherwise committed actionable wrongs . . . would not affect the ownership of cryptocurrency deposited in [their] Earn Accounts." Kwok Order p. 4. (See Exhibit D for the order itself, with the Brackets and the word "[their]" added by the Celsius Debtors in Exhibit E, p. 6; this language, the Debtors' interpretation of it in particular, appear to extinguish all plausible _property rights_ claims for any assets that happened to be recorded in the Debtors' schedules as being in Earn accounts on the petition date _regardless_ of why or how they got there, or whether that was authorized by users or contracts–and replace such claims with claims for claims for unsecured damages.)

Celsius, in referring to the Kwok order, further states (with their brackets added in Exhibit E) that, "As the Earn Opinion explains, **the cryptocurrency deposited in Earn**

---

[10] In other words, this is a final order and likely a declaratory judgment that Earn account holders do not **own** their coins and that all coins and other claims related to Earn accounts are now unsecured claims against the Debtors.

**Accounts became property of Celsius.** If [a creditor] believes [they have] compensable claims against Celsius (beyond the amount on deposit in [their] accounts) . . . [they] can file a proof of claim and assert such claims in the claims-allowance process. **But the cryptocurrency in [a creditor's] Earn Account[] was and remains property of the estate.**" (Emphasis added by *pro se* Appellants, brackets added by Celsius in Exhibit E.)

The Debtors, on page 23 of the *Debtors' Omnibus Objection to Certain Motions Set for the January 24, 2023 Omnibus Hearing* (Exhibit E) appear to assert that this is a final order with respect to property rights for Celsius Earn customer deposits, further stating in Exhibit E that, *even* in a case where a user argues that the terms of use stated that Celsius "should have returned the collateral to his custody account after April 14, 2022," but Celsius instead deposited the coins into an "Earn" account in breach of contract when he paid off his loan, when they should have gone into a Custody account contractually, such coins are property of the Debtors' Estates. (This is Mr. Herrmann's situation as well; in his case, the loan contract he signed affirmatively stated that the coins were his property and that he was the "sole owner" of the coins and the Terms of Use stated that "Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius."

The Debtors are taking the position now even coins which were never authorized to be "Earn" coins to begin with, by the depositor or by the contract, are property of the estate. In fact, the Debtors appear to argue that, as a consequence of this order, *all* "Earn" assets (regardless of how they initially ended up in "Earn", or, conversely, if the Debtors were contractually required to release assets from Earn pre-petition but failed to do so) are property of the Bankruptcy Estates and, and the order seems to convert any coins that don't belong in "Earn" to begin with,

whether based upon intentional wrongdoing or mistaken allocation by the Debtor, into claims for

unsecured damages.


**STATEMENT OF FACTS NECESSARY TO UNDERSTAND THE QUESTIONS**

**PRESENTED**

      Celsius is a cryptocurrency platform that has filed for Chapter 11 protection in the

Southern District of New York. It had a clickwrap contract which governed the terms of its

interest-bearing "Earn" accounts. Celsius also has "Custody" accounts, where title stays with the

depositor for U.S. users..


      Chief Judge Glenn, in *Memorandum Opinion and Order Regarding Ownership of Earn*

*Assets* (the "Earn Decision," Exhibit A) ruled that the vast majority of customers clicked on the

clickwrap agreement.


      It appears that–at least according to the Celsius Debtors and the positions they are taking

in their latest court filing attached in Exhibit E–the Court further determined that "Earn"

customers granted "all rights and title" to **all** assets that happened to be in the "Earn" program on

the bankruptcy petition date by the Debtors (regardless of how they got there and regardless of

whether users consented to them being there on the petition date, under the Terms of Use.) We

ask the court to review these findings, and the finding that property rights could be extinguished

without an Adversary Proceeding pursuant to FRCP 7001, among other questions, *de novo.*

It is not broadly disputed that nearly all customers agreed to some version of the terms of use via clickwrap and/or signup *at one time or another*. But it is widely disputed who agreed to the contract with respect to which specific deposits; whether the contract was modified and superseded by other contracts, oral, and written statements; whether certain users authorized the *initial placement* of returned loan collateral into an "Earn" account (in the cases of Immanuel Herrmann and Georges Georgiou); whether assets that Celsius held onto in a pre-petition breach of contract (when the contract said should have been returned) are, contractually, Earn assets at all (in the cases of Daniel Frishberg[11], Georges Georgiou, Kulpreet Khanuja and Luke Nowak); and whether the contract was ambiguous, legal and/or unconscionable overall, or if Celsius was a Ponzi scheme, all of which could very well render the entire contract illegal and unenforceable (in the case of all *pro se* Appellants.)

The *pro se* Appellants dispute that the contract was, overall, clear and unambiguous as to ownership. There are not just individual defenses, but group defenses to the purported contract with the Debtors, including, but not limited to, colorable arguments of: fraudulent inducement into the contract, fraudulent conveyance, breach of contract, that Celsius was a Ponzi scheme (which is under investigation) and that the contract was unconscionable[12]. Others, such as appellant Immanuel Herrmann alleges that his Earn contract was amended and superseded by other written agreements (in Mr. Herrmann's case, a loan contract under Delaware law which stated he was the "sole owner" of all of his Earn assets, and, in particular, his collateral, which the Debtors placed into Earn without Mr. Herrmann's consent and in violation of the contracts he

---

[11] In Mr. Frishberg's case, he instructed Celsius to close his account (as was his "right" in the TOS) pre-petition. The only requirements for an account closure listed in the TOS was to instruct it to be closed, and after that email was sent (per depositions with Celsius declarants), the contractual requirements of an account to be considered closed were met.

[12] *Memorandum Opinion and Order Regarding Ownership of Earn Assets* (p. 43)

signed).

Appellant Daniel Frishberg alleges that his "Earn" contract was materially breached/voided by the Debtors when they did not close his account as required by the contract terms prepetition; instead of closing his account, the Debtors refused to close his account and held his assets for weeks until filing for bankruptcy (see ECF Docket No. 1652)[13].

Appellant Kulpreet Khanuja, in his motion (see ECF Docket No. 1816)[14] alleges that access to his account was intentionally blocked in Celsius "HODL" mode, preventing withdrawal before petition date. Kulpreet Khanuja further argues that asset ownership decision without resolving the tax impact and liabilities will be incomplete.

The *pro se* Appellants further allege that the Terms of Service are ambiguous, and that to the extent they are unambiguous, the contract is illegal and unconscionable and cannot be deemed binding over customers, and that any claim to ownership of customer coins is not legal. (See *inter alia* ECF Docket No. 1463)[15]

*Pro Se* creditor Luke Nowak allegedly had his contract materially breached/voided by the Debtors, who are currently in possession of his assets after Mr. Nowak requested account termination and release of assets pre-petition. The Debtor failed to adhere to the contract agreed upon by the TOS. If the TOS is deemed unambiguous, and all of the terms of the contracts are

---

[13] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174912092280000000016.pdf
[14] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174901032380000000114.pdf
[15] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174911282280000000009.pdf

followed, then his account should be closed and assets removed from the bankruptcy estate.

Some of the assets that are purportedly Earn deposits (according to the Debtor's schedules) were *initially* placed into "Earn" via breach of contract, conversion, or other wrongdoing, never should have been there to begin with, and there are colorable claims that, since all assets were commingled and that specific property rights only exist on the basis of contracts, that they *never were* in Earn to begin with. As in Mr. Herrmann's case, where his bitcoin collateral from a paid-off loan was placed (by the Debtors, and not by him) into Earn, but the contract said the coins would go into the Debtor's Custody program, making them, in his view, Custody deposits, even though they were placed into Earn by the Debtors without his consent and without any contractual basis for doing so. It appears that claims even such as this one may be converted into some kind *unsecured* breach of contract claim via this order (at least according to the Debtors), even though the contracts Mr. Herrmann signed stated that he was the "sole owner" of his collateral when he took out his lown, and the Terms of Use stated that that deposits after 4/15/2022 would go into the Custody program and that Custody deposits would at all times remain Mr. Herrmann's property. (See ECF Docket No. 1519, p. 16)[16]

In other cases, assets were *kept* in the "Earn" program via breach of contract, conversion, or other wrongdoing, but the contracts said they should be returned, or at least no longer in Earn.

When Mr. Frishberg requested to close his account and the request was not honored, which all took place weeks before Celsius filed for bankruptcy, he argues that Celsius ceased to own the coins, but this claim would be converted into an unsecured breach of contract claim by

---

[16] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174911302280000000070.pdf

this order, which is unconscionable. Since Mr. Frishberg's claim is below the $7,575 preference limit, there is no argument for the Debtors to make about holding onto the assets *on the off chance* that they decide to *at some point in the future* bring preference claims (as they have argued in the Custody and Withhold Adversary Proceedings).

*Pro Se* creditor Georges Georgiou exercised his option to withdraw coins from his Earn account both pre-pause and pre-petition. (For background, the Debtors initiated a withdrawal pause, known as "The Pause," on June 13.) These coins were in fact removed from his Earn account pre-pause and placed in a "Pending" account status but were never received to his external wallet even after assurances from Debtors that all security review documents and video were successfully provided to complete his request and his withdrawal had been initiated. They remained in a "Pending status" and not in an Earn account from the pre-pause date of June 12, 2022 until approximately October 6, 2022 at which time they again appeared in his Earn account. Mr. Georgiou argues that Celsius ceased to own the coins, but this claim would be converted into an unsecured breach of contract claim by this order (See ECF Docket No. 1517.)[17]

Finally, there are some assets (the majority of assets) which are undisputedly in the "Earn" program, and were deposited by users there. However, there are disputes about whether the contract for such users is ambiguous, and disputes as to the overall formation of the contract, in particular, based on public claims made by Celsius that may have amended or voided the contract under different legal theories, such as oral modification and the fact that, if Celsius is a Ponzi scheme, the contract is illegal.

---

[17] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174911302280000000045.pdf

Minimal evidence was entered into the record for the hearing on the Debtors Amended Motion which led to the Earn Decision. Although objectors were offered a extremely short, surprise opportunity to enter evidence into the record at the hearing itself, had there been appropriate procedural protections under FRCP 7001, objectors would have had much more time to conduct their own discovery, enter evidence into the record, and negotiate for what would be included. Additionally, an examiner has been appointed in this case, and the timeline did not permit objectors to receive the examiner's report, which is now due on January 30, 2023.

As the Texas Board of Securities stated in its objection to the Motion, "The Debtors improperly seek to establish ownership of assets in the Earn program through an amended motion on an expedited basis, rather than an adversary proceeding pursuant to Bankruptcy Rule 7001. While the Debtors allege an unsubstantiated 'urgent' need to establish ownership of the assets in question, procedural safeguards are in place through the Bankruptcy Rules that should be followed to allow all parties in interest to participate and be heard through the bankruptcy process." (Exhibit F) We are now seeing the consequences of this "urgent" need, and the corresponding rush that ensued.

## STATEMENT OF QUESTIONS AND RELIEF SOUGHT

A designation and statement of questions for the appeal will be submitted separately. We reserve all rights to amend, supplement, and re-word questions. We are filing this motion primarily to request procedural relief, along with asking for leave to appeal only out of an abundance of caution.

Possible questions include, but are not limited to:

- Did the Debtors improperly seek to establish ownership of assets in the Earn program through an amended motion on an expedited basis, rather than an adversary proceeding pursuant to Bankruptcy Rule 7001? (Notably, the process of doing this via a motion was done over the objections of creditors and regulators.)[18]

- Because there may be significant defenses to the issue of whether the Terms of Use were a binding contract, must a determination of whether the Terms of Use are a viable, enforceable contract be done through an Adversary Proceeding, with the appropriate procedural safeguards in place?

- Were procedural due process requirements met based upon the timeline[19] and proposed scheduling order (which was never entered but was followed and was, practically speaking, the only discovery that was allowed in this case.)[20]

- Did the Bankruptcy Court err, with respect to matters of law, in issuing a ruling that (it appears) all assets that were purportedly Earn deposits (according to the Debtors) on the petition date are now property of the Debtors' estates pursuant to 11 USC § 541–and was it appropriate to relegate remedies for pre-petition wrongdoing to unsecured claims, while

---

[18] This was **not** an issue of form over substance; the motion was *not* treated as an adversary proceeding and there were *significant* differences in the procedures and protections from this expedited process versus an Adversary Proceeding. There were objections to the procedural shortcuts afforded the Debtors, including objections to the Debtors' proposed scheduling order–which was ultimately not ever signed by Chief Judge Glenn, creditor requests to do additional discovery above and beyond what was in the draft scheduling order were ignored (and would have been impossible on the timeline of this motion, in any case), and the 7001 issue was raised by the Texas State Securities Board and Department of Banking in their objection and several other creditors, as Chief Judge Glenn acknowledges in his order. Immanuel Herrmann, one of the appellants, and Daniel Frishberg, another of the appellants, verbally joined in these 7001 objections in court.

[19] In one instance, during Mr. Frishberg's deposition of Mr. Oren Blonstein, Mr. Frishberg had a several hour notice of the deposition. Which as it should be noted was only ordered by Judge Glenn after the Debtors refused (contrary to their promises in court filings) to allow Mr. Frishberg to depose Mr. Oren Blonstein during the first deposition.

[20] At one point during the pendency of this motion, the Debtor announced depositions with a one business day turnaround time to register.

extinguishing 541 claims, without considering defenses to purported contract formation with respect to *property rights* questions?

- As the Texas Board of Securities stated in their objection, "The multiple variations of the Terms of Use filed by the Debtors are confusing and inconsistent at best, and the agreement of the parties to the terms is unclear. Because there may be significant defenses to the issue of whether the Terms of Use were a binding contract, a determination of whether the Terms of Use were a viable, enforceable contract without consideration of those defenses is premature." (Exhibit F)

- If the contracts said that a depositor held title to certain crypto assets, but those assets were nonetheless placed into an Earn account pre-petition, do those coins become Celsius' property?

- If the contracts said that certain crypto assets were no longer in the Earn program, did the title transfer to the customer?

- Additional questions, and clarifications to the above questions, will be determined and forwarded to the court along with the designation.

Relief sought:

- Immediate appeal of the attached Earn Decision in Exhibit A.

- A decision that property of the estate issues for Earn account holders must be made via an Adversary Proceeding under FRBP 7001, with the appropriate procedural safeguards in place, so that Earn customers to enter evidence into the record, including the upcoming

examiner's report and other evidence (such as public statements that, in an Adversary

Proceeding, we would agree upon.)[21]

- A *de novo* review of whether the Terms of Use are ambiguous with respect to at least

  some Earn deposits (both in general, and with respect to certain fringe/edge cases, some

  of which are outlined in this filing.)

- Clarity on how to preserve claims under 11 USC § 541 for deposits that are in the Earn

  program and are unadjudicated, both in general, and for edge cases.

- If this ruling is upheld in part, i.e. for most Earn deposits, we ask that it be modified to

  clarify the treatment of defenses to contracts that may result in a claim that certain

  customer deposits, which were in the Earn program according to the Debtor's schedules

  on the petition date, are not property of the estate under 11 USC § 541.

- Other relief as requested on appeal.

## STATEMENT OF WHY AN APPEAL SHOULD BE GRANTED

As an initial matter, we believe this is a final order, and so leave is not required and

appeal is granted as a matter of right; we include this motion only out of an abundance of

---

[21] Issues required to be brought as an adversary proceeding under Fed. R. Bankr. P. 7001 include a "(1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under §554(b) or §725 of the Code, Rule 2017, or Rule 6002; **(2) a proceeding to determine the validity, priority, or extent of a lien *or other interest* in property, but not a proceeding under Rule 3012 or Rule 4003(d)**; (3) a proceeding to obtain approval under §363(h) for the sale of both the interest of the estate and of a coowner in property; (4) a proceeding to object to or revoke a discharge, other than an objection to discharge under §§727(a)(8),1 (a)(9), or 1328(f); (5) a proceeding to revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan; (6) a proceeding to determine the dischargeability of a debt; (7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief; and (8) a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination; **(9) a proceeding to obtain a declaratory judgment relating to any of the foregoing;** or (10) a proceeding to determine a claim or cause of action removed under 28 U.S.C. § 1452." Emphasis added.

caution.

That said, the decision is certainly important enough to be immediately appealable under
FRBP rule 8003. Even if it were found to be interlocutory, a ruling that **all** cryptocurrency assets
which were in Celsius Earn accounts on the petition date–which represent billions of dollars in
crypto assets and are the *vast majority* of Celsius' overall assets are property of the Celsius
bankruptcy estates–is a controversial question of first impression, given that cryptocurrency
bankruptcies are so new, and this is the first cryptocurrency ruling on property of the estate
issues to be appealed in the Second Circuit, to the best of our knowledge.[22]

As just one example of the controversy, it's highly debatable (and was widely debated
within the case) whether such a sweeping requires an adversary proceeding. As Chief Judge
Glenn noted, the motion elicited responses "from nearly thirty creditors, fourteen states, the
Committee, the U.S. Trustee, and other parties," including several regulator and creditor
objections regarding the Rule 7001 question. The Bankruptcy Court also noted that hundreds of
creditors signed letters in the case, including objecting to the UCC's representation during the
pendency of the motion, so it is *clearly* extremely controversial.

This is a case of first impression because property rights for cryptocurrency deposits are
an extremely new area of law, and because there are plenty of coins that, contractually, do not
belong in Earn according to the contracts users signed as a matter of law and contract

---

[22] See BLACK'S LAW DICTIONARY 243 (9th ed. 2004) (defining "case of first impression" as: "A case
that presents the court with an issue of law that has not previously been decided by any controlling legal
authority in that jurisdiction."); see also Path of Precedent, 80 NYU L. Rev. at 1129 ("A case of first
impression is, by definition, one that presents a novel legal question and is not ruled by prior precedent.").

interpretation (but are nonetheless recorded as Earn deposits on the Debtors' schedules and in users' accounts.) A key question is: Are such coins Celsius' property, and users only have unsecured claims for U.S. dollars, even where the contract said they were supposed to have title? Appellate review would advance resolution of the litigation, because a final determination on which "Earn" deposits are actually property of the bankruptcy estates are necessary for a 363 sale of substantially all of the Debtors' assets to move forward.

As the Earn Decision itself stated, the status of Earn deposits is "a gating issue at the center of many disputes in this case." Earn deposits are the *vast majority* of the entire bankruptcy estates. If the Earn Decision is not reviewed immediately, it will cause extreme uncertainty in these cases, and inevitably lead to serious problems with any reorganization plan, including lower bids from bidders under any 363 sales–since, if we can only appeal once there is a *final* reorganization plan or 363 sale for substantially all of the Debtors' assets, bidders will be concerned that an *entire plan of reorganization* could be held up on appeal (and possibly overturned or reversed on appeal) based on which assets are, and are not, property of the bankruptcy estates. On the other hand, a final ruling (either way) on property of the estate for Earn customers will help drive a resolution in these cases, by allowing the parties to find some alternative path to confirming a plan if the *pro se* Appellants prevail, and by providing more certainty to bidders if the Celsius Appellees prevail.

Respectfully submitted,

_/s/ Immanuel Herrmann_
Immanuel Herrmann
_Pro Se_
January 18, 2023


_/s/ Daniel A. Frishberg_
Daniel A. Frishberg
_Pro Se_
January 18, 2023


_/s/ Christopher J. Little_
Christopher J. Little
_Pro Se_
January 18, 2023


_/s/ Luke P. Nowak_
Luke P. Nowak
_Pro Se_
January 18, 2023


_/s/ Kulpreet Khanuja_
Kulpreet Khanuja
_Pro Se_
January 18, 2023


_/s/ Georges Georgiou_
Georges Georgiou
_Pro Se_
January 18, 2023


_Each appellant electronically signed on behalf of themselves._

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.,*[23] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## CERTIFICATE OF SERVICE

I certify that on Wednesday, January 18, 2023, a true and correct copy of the *Joint Notice of Appeal and Statement of Election* and the *Motion to Authorize Certain Procedural Relief, and, If Needed, For Leave to Appeal,* along with related exhibits, were filed with the Clerk of the United States Bankruptcy Court in the Southern District of New York served upon the Core/2002 service list by electronic mail, in accordance with the *Amended Final Order (I) Establishing Certain Notice, Case Management, And Administrative Procedures, And (II) Granting Related Relief* (ECF Docket No. 1181 / Exhibit B.)

*/s/ Immanuel Herrmann*
Immanuel Herrmann, *Pro Se*
Dated: Silver Spring, MD
January 18, 2023

---

[23] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) **FOR PUBLICATION** |
| | ) |
| | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*, | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## MEMORANDUM OPINION AND ORDER
## <u>REGARDING OWNERSHIP OF EARN ACCOUNT ASSETS</u>

*A P P E A R A N C E S*[1]:

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors*
601 Lexington Avenue
New York, NY 10022
By:     Joshua Sussberg, Esq.
        Patrick J. Nash, Jr., Esq.
        Ross M. Kwasteniet, Esq.
        Christopher S. Koenig, Esq.
        Dan Latona, Esq.

WHITE & CASE LLP
*Attorneys for the Official Committee of Unsecured Creditors*
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
By:     Gregory Pesce, Esq.
        Andrea Amulic, Esq.
        Michael Andolina, Esq.
        Aaron Colodny, Esq.
        Samuel P. Hershey, Esq.
        David Turetsky, Esq.
        Keith Wofford, Esq.

---

[1]     Numerous *pro se* creditors made or joined in objections.  The names of these creditors are identified in footnotes 4, 6, 8, 11, 14, 18, 20, and 22.

OFFICE OF THE UNITED STATES TRUSTEE
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014
By:     Shara Cornell, Esq.
        Brian Masumoto, Esq.
        Mark Bruh, Esq.

MILBANK LLP
*Attorneys for Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV
Investors, LP*
55 Hudson Yards
New York, NY 10001
By:     Dennis F. Dunne, Esq.
        Nelly Almeida, Esq.

1850 K Street, NW, Suite 1100
Washington, DC 20006
By:     Andrew M. Leblanc, Esq.
        Melanie Westover Yanez, Esq.

JONES DAY
*Attorneys for CDP Investissements, Inc.*
555 South Flower Street, 50th Fl.
Los Angeles, CA 90071
By:     Joshua M. Mester, Esq.

TEXAS STATE SECURITIES BOARD AND THE TEXAS DEPARTMENT OF BANKING
P. O. Box 12548
Austin, Texas 78711
By:     Layla D. Milligan, Esq.
        Abigail R. Ryan, Esq.
        Roma N. Desai, Esq.

VERMONT DEPARTMENT OF FINANCIAL REGULATION
*Attorneys for the State of Vermont*
89 Main Street
Montpelier, VT 05620
By:     Jennifer Rood, Esq.

MCELROY, DEUTSCH, MULVANEY & CARPENTER LLP
*Attorneys for the New Jersey Bureau of Securities*
570 Broad Street
Newark, NJ 07102
By:     Jeffrey Bernstein, Esq.

225 Liberty Street, 36th Fl.
New York, NY 10281
By:     Nicole Leonard, Esq.

THE STATE OF WASHINGTON
P.O. Box 40100
Olympia, WA 98504
By:     Robert Ferguson, Esq.
        Stephen Manning, Esq.

NATIONAL ASSIOCIATION OF ATTORNEYS GENERAL
*Attorneys for the States of Alabama, Arkansas, California, District Of Columbia, Hawaii, Idaho, Maine, North Dakota, Oklahoma, and South Carolina*
1850 M St., NW, 12th Fl.
Washington, DC 20036
By:     Karen Cordry, Esq.

COAN, PAYTON & PAYNE, LLC
*Attorneys for Joe Breher*
999 18th Street, Suite S3100
Denver, CO 80202
By:     Steven T. Mulligan, Esq.

BERNSTEIN-BURKLEY, P.C.
*Attorneys for Stuart McLean, Keith Ryals, Jennifer Ryals, Kim David Flora, Brett Flora, and Courtney Burks Steadman*
601 Grant Street, 9th Fl.
Pittsburgh, PA 15219
By:     Mark A. Lindsay, Esq.

FOX ROTHSCHILD LLP
*Attorneys for Nuno Saraiva*
49 Market Street
Morristown, NJ 07960
By:     Michael R. Herz, Esq.

WEIR GREENBLATT PIERCE LLC
*Attorneys for Matthew Pinto*
1339 Chestnut Street, Suite 500
Philadelphia, PA 19107
By:    Bonnie R. Golub, Esq.
        Jeffrey S. Ciancuilli, Esq.
        Michael P. Broadhurst, Esq.

MILES & STOCKBRIDGE P.C.
*Attorneys for Josh Tornetta*
100 Light Street, 10th Fl.
Baltimore, MD 21202
By:    Joel L. Perrell Jr., Esq.

VENABLE LLC
*Attorneys for Ignat Tuganov*
1270 Avenue of the Americas, 24th Fl.
New York, NY 10020
By:    Jeffrey S. Sabin, Esq.
        Carol Weiner Levy, Esq.
        Arie Peled, Esq.

600 Massachusetts Avenue, NW
Washington, DC 20001
By:    Andrew J. Currie, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Who owns the cryptocurrency assets deposited in Earn Accounts (defined below) by Celsius's account holders before the July 15, 2022 petition date (the "Petition Date")? This is a gating issue at the center of many disputes in this case. As explained below, the Court concludes, based on Celsius's unambiguous Terms of Use, and subject to any reserved defenses, that when the cryptocurrency assets (including stablecoins, discussed in detail below) were deposited in Earn Accounts, the cryptocurrency assets became Celsius's property; and the cryptocurrency assets remaining in the Earn Accounts on the Petition Date became property of the Debtors' bankruptcy estates (the "Estates").

At the Petition Date, Celsius had approximately 600,000 accounts in its Earn program ("Earn Program," and such assets, including any proceeds thereof, the "Earn Assets" and such accounts, the "Earn Accounts"). These Earn Accounts held cryptocurrency assets with a market value of approximately $4.2 billion as of July 10, 2022. (*Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions*, "Mashinsky Declaration," ECF Doc. 23, ¶ 49.) Included in the Earn Accounts at the Petition Date were a type of cryptocurrency known as stablecoins, valued at $23 million as of September 2022. (*Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief*, "Original Motion," ECF Doc. # 832, ¶ 9.)

The issue of ownership of the assets in the Earn Accounts is a contract law issue. The Debtors and Committee argue that the cryptocurrency assets deposited in Earn Accounts were owned by the Debtors and are now property of the Estates. Many Earn account holders ("Account Holders") argue that the Account Holders, rather than Celsius, own the cryptocurrency assets in the Earn Accounts and that cryptocurrency assets should promptly be returned to them.

Celsius adopted eight versions of the Terms of Use (collectively, the "Terms of Use" and each a version (e.g., "Terms Version 8"), which are detailed as exhibits A-1 through A-8 to the *Declaration of Alexander Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms Dating Back to February 18, 2018* ("Terms Affidavit," ECF Doc. # 393). For the avoidance of doubt this opinion refers to the "Terms of Use" identified in the Amended Motion as "Terms Version 8," and Terms Version 8 (effective April 15, 2022) is the controlling document for this memorandum opinion.

The Debtors and the Official Committee of Unsecured Creditors ("Committee") contend that under unambiguous provisions in Terms Version 8, a clickwrap contract governed by New York law, Celsius held "**all right and title to such Eligible Digital Assets, including ownership rights**" in the cryptocurrency assets (including stablecoins) in the Earn Accounts. (*See* ECF Doc. # 1325 ¶ 39 (citing Terms Version 8 § 13) (emphasis added)).  The Debtors' uncontroverted evidence shows that 99.86% of the Earn Account holders accepted Terms Version 6 or a later version. ("Original Blonstein Declaration," ECF Doc. # 1327, ¶ 20.)  Earlier Terms Versions 1–5 of the Terms of Use, in effect beginning on February 1, 2018, and updated at various dates by new versions, were also clickwrap contracts accepted by the overwhelming percentage of Earn Account holders.

If the cryptocurrency assets in the Earn Accounts are owned by the Debtors, the Account Holders are unsecured creditors and their recovery depends on the distributions to unsecured creditors under a confirmed chapter 11 plan, or under the Bankruptcy Code's priority rules in the event of liquidation.  A fundamental principle of the Bankruptcy Code is equality of distribution. There simply will not be enough value available to repay all Account Holders in full.  If only some Account Holders prevail with their arguments that they own the cryptocurrency assets in their accounts, they hope to recover 100% of their claims, while most of the Account Holders are left as unsecured creditors and may recover only a small percentage of their claims.

The Debtors and the Committee argue that under settled legal precedent the unambiguous language of the Terms of Use controls the ownership issue, making extrinsic evidence inadmissible, and, therefore, the cryptocurrency assets in the Earn Accounts are property of the estate.  The objecting Account Holders argue that the Terms of Use are either clear that the Account Holders own the assets in the Earn Accounts, or the Terms of Use are ambiguous,

6

preventing the Court from resolving the issue of ownership without considering extrinsic evidence. The objectors say that numerous statements by Celsius's former Chief Executive Officer ("CEO"), Alex Mashinsky, and possibly other extrinsic evidence, demonstrate that the Account Holders have always owned the assets in the Earn Accounts.

The Debtors filed an amended motion[2] that "only seeks two broadly applicable rulings: (i) that the plain language of the Terms of Use unambiguously provides that the cryptocurrency assets in the Earn Program are the property of the Debtors' estates and (ii) that the Terms of Use are an enforceable contract (subject to certain individualized contract formation defenses). In other words, the Amended Motion seeks a presumption that each Account Holder is party to a binding contract with the Debtors, which presumption is rebuttable to the extent an Account Holder succeeds on an individual contract formation defense in the future." (*Debtors' Reply in Support of Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* ("Debtors' Reply," ECF Doc. # 1578, ¶ 3.))

The Amended Motion also seeks authority for the Debtors to sell approximately $18 million (in value) of stablecoins in the Earn Accounts, arguing that such stablecoins are property of the Estates and that a sale by the Debtors is permissible under section 363(c)(1) of the Bankruptcy Code in the ordinary course of business, or alternatively, under section 363(b)(1) other than in the ordinary course of business. The United States Trustee ("U.S. Trustee") and multiple state securities regulators argue that a sale of stablecoins should not be approved at the present time because the Debtors have sufficient liquidity at least over the next few months. The

---

[2]     *Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (ii) Permitting the Sale of Stablecoin in the Ordinary Course and (iii) Granting Related Relief* ("Amended Motion," ECF Doc. # 1325).

Committee argues that the proposed sale would not be in the ordinary course of business (under

section 363(c)(1)) but should be approved under section 363(b)(1) because the Debtors have

shown a good business reason for the sale (to pay ongoing administrative expenses). The Court

concludes it is unnecessary to resolve whether the proposed sale of stablecoins would be in the

ordinary course of business because the sale should be approved outside the ordinary course of

business. In the exercise of its business judgment, the Debtors have established a good business

reason to permit the sale.

## I.   BACKGROUND

### A.   The Original Motion

On September 15, 2022, the Debtors filed the Original Motion seeking authority to sell

certain stablecoins in their possession in the ordinary course of business to fund operating

expenses, including the costs of administering these chapter 11 cases. (*See generally* Original

Motion.) The Debtors received numerous responses to the Original Motion, most of which

raised concerns regarding the title and ownership status of the stablecoins the Debtors proposed

to sell. The Original Motion did not explicitly seek a determination on the ownership of Earn

Assets.

### B.   The Amended Motion

Subsequently, on November 11, 2022, the Debtors submitted the Amended Motion with a

broader scope, seeking entry of an order (i) establishing ownership of assets in the Debtors' Earn

Program (as defined below) (ii) permitting the sale of stablecoins in the ordinary course and (iii)

granting related relief. In support of the Amended Motion the Debtors submitted declarations of

Chris Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial

Officer ("Ferraro Declaration," ECF Doc. # 1326); Oren Blonstein, Head of Innovation and

Chief Compliance Officer ("Original Blonstein Declaration," ECF Doc. # 1327 and the

"Supplemental Blonstein Declaration, ECF Doc. # 1584); and Robert Campagna, Managing

Director of Alvarez & Marsal North America, LLC, a restructuring advisory firm ("Campagna

Declaration," ECF Doc. # 1328).

Prior to the filing of the Amended Motion, on October 21, 2022, the Court entered the

*Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management*

*System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing*

*Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Related*

*Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III)*

*Granting Related Relief* ("Final Cash Management Order," ECF Doc. # 1152).  Pursuant to

paragraph 5 of the Final Cash Management Order, the Debtors cannot liquidate or convert any

cryptocurrency into cash absent an order of the Court.  The Court observed that the Debtors'

liquidity is anticipated to tighten significantly in the new year.  (*See generally* Campagna

Declaration; *Memorandum Opinion and Order Granting Motion to Approve Bidding Procedures*

*in Connection with the Sale of Substantially All the Debtors' Assets,* ECF Doc. # 1167, at 19)

("[T]he reality is that the Debtors will have significant liquidity issues to continue operating in

2023.").

The Amended Motion garnered a significant response from individual creditors, state

regulatory agencies, the U.S. Trustee, and the Committee.  In total, the Court received over thirty

fives responses to the Amended Motion.

The Amended Motion seeks two categories of relief.  First, the Amended Motion seeks to

establish the Debtors' title and ownership rights over the cryptocurrency assets placed into the

Earn Program and any proceeds thereof.  If the Debtors own the Earn Assets, the Earn Assets

became property of the Debtors' bankruptcy estates ("Estates") when the Debtors filed for relief

under Chapter 11 of the Bankruptcy Code on the Petition Date. Second, the Amended Motion

also seeks authority to sell multiple variations of a cryptocurrency called "stablecoin" in the

ordinary course of business to create liquidity to fund the Debtors' business. Each issue is

discussed in turn.

### 1. Ownership of Earn Assets

The Debtors' Amended Motion seeks a determination that under the Terms of Use,

accepted by Celsius Account Holders when they opened their accounts (and, accepted

modifications thereof), the cryptocurrency assets in the Earn Accounts presumptively are

property of the estate.

The Debtors assert that ownership of the Earn Assets is an issue of contract interpretation

and that the Terms of Use constituted a valid and enforceable contract between Celsius and its

Account Holders. (Amended Motion, ¶ 3.) The Amended Motion relies on the elements of

contract formation (mutual assent, consideration, and an intent to be bound by the contract) and

submits that each amendment to the Terms of Use was binding on Account Holders who

transferred their assets to the platform before the effectiveness of the subsequently amended

Terms of Use (e.g., an Account Holder who deposited coins in July 2020 is bound by the Terms

of Use version currently in effect). (*See generally id.* ¶¶ 18–37.)

The Debtors contend that the Terms Version 8 are explicit and unambiguous with respect

to the ownership of Earn Assets. (Amended Motion ¶ 3.) Terms Version 8 states the following:

> In consideration for the Rewards payable to you on the Eligible Digital
> Assets using the Earn Service . . . and the use of our Services, **you grant
> Celsius . . . all right and title to such Eligible Digital Assets, including
> ownership rights, and the right, without further notice to you, to hold
> such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to
> pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise**

**transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion**. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1. You will not be able to exercise rights of ownership;

2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

3. **In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws**.

(*Id.* (quoting Terms Version 8) (emphasis added).)

The Debtors state that the above excerpt is in addition to at least four other references (express or implied) to Earn Assets (including income thereon) being the Debtors' property. (Amended Motion ¶ 40 (citing Terms Version 8 §§ 2, 4, 10, 12).)

Moreover, the Debtors assert that, to the extent prior versions of the Terms of Use are relevant, they also support the Debtors' position. (*Id.* ¶ 41.) The Debtors represent that every version of the Terms of Use has (i) allowed the Debtors to make unilateral updates to the Terms of Use and (ii) been clear that the Debtors had the right to "pledge and repledge from time to time" assets transferred to the Debtors. (*Id.* ¶ 43.) Celsius states that, starting with Terms Version 2, each iteration explicitly stated that the Debtors had "all attendant rights of ownership" to such assets. (*Id.*)

11

2. <u>Sale of Stablecoins</u>

The Debtors contend that because the Earn Assets, including stablecoins, are property of the Estates, the Debtors can sell stablecoins to create liquidity to fund administrative expenses associated with these bankruptcy cases. (*Id.*) The Ferraro Declaration asserts that, before the Petition Date, the Debtors monetized stablecoin assets as needed to fund operations in the ordinary course of business. (Ferraro Declaration ¶ 25.) As of the filing of the Amended Motion, the Debtors or their affiliates held eleven different forms of stablecoins totaling approximately $23 million in their "Fireblocks account." (Campagna Declaration ¶ 10.) The Amended Motion seeks Court authority to sell approximately $18 million worth of stablecoins free and clear of another party's interests and maintains that the stablecoins are not subject to any encumbrances defined under section 363(f) of the Bankruptcy Code (discussed in further detail below). (Amended Motion ¶¶ 49, 54.)

The Debtors assert that although cryptocurrency presents a novel issue, the relief it requests—to sell assets akin to unencumbered inventory—is not. (*Id.* ¶ 50.) The Amended Motion submits that the sale of stablecoins is a reasonable exercise of the Debtors' business judgment to fund the significant cost of administering the Estates while the Debtors' income has been substantially reduced. (*Id.* ¶ 53.) The Debtors assert that selling stablecoins would meaningfully extend its liquidity runway. (Campagna Declaration ¶ 9.) Furthermore, the Debtors note that they have reserved sufficient stablecoins to avoid prejudice to any creditors of the Custody Program, Withhold Program, or Borrow Program whose rights are reserved pending a ruling on ownership of these assets. (*Id.* ¶ 10.)

C.       **Summary of Responses**

The Amended Motion garnered responses from nearly thirty creditors, fourteen states, the Committee, the U.S. Trustee, and other parties.  The creditors' responses share common features and arguments, as do the responses from states.  Those filings are each discussed as a group.

1.   Objection of the U.S. Trustee

The U.S. Trustee filed a limited objection to the Amended Motion.  Most significantly, the U.S. Trustee takes no position on whether the cryptocurrency assets in the Earn Accounts are property of the Estates.  The U.S. Trustee's limited objection argues only that the Court should not permit the Debtors to sell stablecoins at the present time.  ("U.S. Trustee Objection," ECF Doc. # 1489, at 2–3.)  The U.S. Trustee contends that the Original and Amended Motions lack the required evidentiary basis showing that (1) the Debtors own and therefore have the authority to sell the stablecoins and, if they do, (2) what the proceeds of the sale of stablecoins will fund. (U.S. Trustee Objection at 2.)

First, the U.S. Trustee asserts, the Debtors commingled assets of their customers in such a way that it is unclear how the Debtors can accurately identify the owners of the stablecoins.  (*Id.*) Even if the Debtors can establish ownership, the U.S. Trustee also questions how a stablecoins sale may impact the Debtors' ability to make distributions "in kind" to customers.  (*Id.*)

Second, the U.S. Trustee states that the Original and Amended Motions fail to explain how the proceeds of the sale of $18 million worth of stablecoins will be used.  (*Id.*)  The U.S. Trustee submits that the sale will provide one month of additional liquidity beginning in March 2023 based on the Ferraro and Campagna declarations.  (*Id.* at 2–3.)  The U.S. Trustee contends that the Debtors must explain how this future liquidity justifies a current sale, and further claims that the Amended Motion should state that it intends to use the proceeds solely for administrative

13

expenses, if that is indeed the case. (*Id.* at 3.) Finally, the U.S. Trustee asserts that the Debtors fail to explain the extent to which the proceeds of any stablecoins will be used to fund the mining business or GK8, an affiliate. (*Id.*)

### 2. Limited Objection of the Committee

The Committee filed a Limited Objection to the Amended Motion ("Committee Objection," ECF Doc. # 1502). The Committee noted that 55% of the Debtors' currently existing customers were already customers prior to July 22, 2022. (*Id.* ¶ 3.) The Committee contended that the unambiguous Terms of Use are binding on these customers considering the Debtors' screen shots and testimony demonstrating how these customers accepted Terms Version 6. (*Id.*) However, the Committee asserted that the Debtors had not provided any evidence or testimony showing how the 44% of account holders who created accounts after July 22, 2021 accepted the Terms of Use, notwithstanding the Committee requests that the Debtors do so. (*Id.*) The Committee stated the Court cannot determine whether the Terms of Use is binding on this latter 44% of customers until the Debtors cure this evidentiary gap. (*Id.*)

Notably, the Committee asserted that the Terms Version 8 unambiguously provides that Account Holders who elected to participate in the Earn Program transferred title to their relevant digital assets to Celsius and authorized Celsius to sell or otherwise use such digital assets in its sole discretion without further permission from the Account Holders. (Committee Objection ¶ 4.) Furthermore, each version of the Terms of Use since September 2020 contained a similar, unambiguous statement. (*Id.*) Therefore, the Committee argued that to the extent that the Court determines that a customer entered an enforceable contract through any version of the Terms of Use after September 2020, that customer agreed to transfer ownership of digital assets to Celsius. (*Id.* ¶ 5.)

14

In evaluating the Debtors' Terms of Use and various arguments relating to the use of the word "loan," the Committee contended that the transfer of title and the creation of a loan are not mutually exclusive concepts. (*Id.*) More importantly, the Committee asserted, reading the reference to a "loan" in the Terms of Use to mean that title did not transfer would require the reader to ignore several provisions from the Terms of Use, including provisions regarding the transfer of title and Celsius's ability to sell or otherwise transfer digital assets (including rights of ownership). (*Id.*) The Committee stated that it is a bedrock principle of contract interpretation that courts should not adopt an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should seek to read contractual provisions in harmony. (*Id.* ¶ 6.)

The Committee's primary objection was to the disposal of proceeds from a sale of stablecoins for purposes other than to fund the Estates. Although the Committee argued that a sale would not be in the ordinary course of business, it believes the Debtors have established cause to sell stablecoins outside of the ordinary course of business to fund these cases provided that they are being operated for the benefit of the Estates. (*Id.* ¶ 7.)

3. <u>Objections of States</u>

a. *State of Vermont*

The State of Vermont filed a limited objection to the extent that the Amended Motion seeks to spend proceeds from a sale of stablecoin because (i) ownership of Earn Assets has not been determined; (ii) as demonstrated by the Examiner's[3] Interim Report (ECF Doc. # 1411), the

---

[3] On August 18, 2022, the United States Trustee filed a *Motion for Entry of an Order Directing the Appointment of an Examiner.* (ECF Doc. # 546.) On September 14, 2022, this Court entered an order directing the United States Trustee to appoint an examiner. (ECF Doc. # 820.) On September 29, 2022, the United States Trustee filed a Notice of Appointment. (ECF Doc. # 920.) That same day, this Court entered an order appointing an Examiner. (ECF Doc. # 923.)

Debtors did not segregate Earn Assets from Custody and Withhold Assets; and (iii) the Debtors should not spend funds unnecessarily while the future of these Chapter 11 proceedings remains unclear. ("Vermont Objection," ECF Doc. # 1484, ¶ 8.) Should the Court permit the Debtors to sell stablecoins, Vermont requests that any proceeds be placed in escrow. (*Id.* at 3.)

As a practical matter, Vermont is concerned that the Debtors' commingling of Earn Assets with Custody and Withhold Assets will make it difficult to determine who owns which assets. (*Id.* ¶ 12.) Vermont states that it does not take a position on the ownership of Earn Assets, but notes that it is not clear, based on the Terms of Use provided by the Debtors, how ownership could be conveyed from Account Holders to Celsius in a temporary fashion. (*Id.* ¶ 11.) The State of Washington joins in the Vermont Objection. ("Washington Joinder," ECF Doc. # 1497.)

### b. *State of New Jersey*

The State of New Jersey filed an objection and reservation of rights ("New Jersey Objection," ECF Doc. # 1498). New Jersey asserts that Celsius operated in violation of the state's securities laws by selling unregulated securities. It contends that any determination on the ownership of Earn Assets is premature while the Examiner completes her investigation, and that any determination of ownership should be made with the procedural safeguards present in an adversary proceeding. (New Jersey Objection at 2.) New Jersey takes the position that the Earn Assets are owned by Celsius's customers. (*Id.*) To the extent the Court permits the sale of stablecoins, New Jersey requests that the proceeds be held in escrow subject to a determination of ownership and until after the Examiner providers her final report. (*Id.*)

### c. State of Texas

The Texas State Securities Board and Department of Banking (collectively, "Texas") objects to the Amended Motion because it asserts that the Debtors' process for the Amended Motion is expedited, premature, and should be done through an adversary proceeding with the appropriate safeguards provided by the Bankruptcy Rules. ("Texas Objection," ECF Doc. # 1496, ¶ 1.) Texas contends that a contract may not have been formed between the Debtors and its customers because the Debtors have not offered sufficient documentation to show that Account Holders actually agreed to the Terms of Use. (*Id.* ¶¶ 16–17.) Should the Court find that the stablecoins are property of the Estates, Texas objects to the use of any proceeds from a sale to pay administrative costs, and instead contends that proceeds should be held for the benefit of creditors and addressed through a confirmable reorganization plan or liquidation. (*Id.* ¶ 25.)

### d. Coordinating States Objection

The States of Alabama, Arkansas, California, Hawaii, Idaho, Maine, North Dakota, Oklahoma, and South Carolina, and the District of Columbia (collectively, the "Coordinating States") object to the Amended Motion ("Coordinating States Objection," ECF Doc. # 1492). The Coordinating States assert that the Terms of Use have evolved over time, and it is not clear that customers really understood the nature of these changes. (Coordinating States Objection at 3.) The Coordinating States note that the Debtors are under investigation in several states for marketing securities without necessary registrations and without complying with state regulatory frameworks and federal law, and therefore the Debtors cannot rely on the arguably unlawful Terms of Use to determine the purported ownership of these assets and what rights they have in them. (*Id.*)

With respect to the language in the Terms of Use, the Coordinating States note that "loan" was used ubiquitously, and that the Terms of Use states that "you grant Celsius, . . . for the duration of the period during which the Eligible Digital Assets are *loaned* to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights." (*Id.* at 4 (emphasis added in the Coordinating States Objection).) The Coordinating States contend that Account Holders would not meaningfully understand the Terms of Use to be a transfer of ownership because customers could withdraw their assets without notice or conditions whenever and in the same form as the initial deposit. (*Id.* at 4–5.)

Finally, the Coordinating States submit that an actual transfer of ownership would have constituted a taxable event, yet the Debtors paid no taxes on these transactions. (*Id.* at 4.) Washington joins in the Coordinating States Objection. (*See* Washington Joinder.)

### 4. Creditor Responses

The Court received over twenty responses from creditors, some *pro se* and some represented by counsel, objecting to the Amended Motion (collectively, "Creditor Responses"). A common objection is that the Terms of Use are ambiguous within the four corners of the document because the Terms of Use, despite the key transfer of title and ownership clause that the Debtors rely on, ubiquitously use the terms "loan" and "lending" to describe the transaction whereby Account Holders deposit assets into Earn Accounts.[4] Therefore, a layperson would understand the Terms of Use to leave title and ownership of Earn Assets to Account Holders while temporarily providing use of the assets to Celsius. (*Id.*)

---

[4]     "Gallagher Objection," ECF Doc. # 1416; Wohlwend Objection; "Little Objection," ECF Doc. # 1463; "Flora Objection," ECF Doc. # 1464; "Saraiva Objection," ECF Doc. # 1485; "Breher Joinder," ECF Doc. # 1486; "Ryals Objection," ECF Doc. # 1490; "McLean Objection," ECF Doc. # 1491; Tornetta Joinder; "Hoffing Objection," ECF Doc. # 1506; "Pinto Joinder," ECF Doc. # 1499; "Herrmann Omnibus Objection," ECF Doc. # 1519; Frishberg Joinder; "Steadman Joinder," ECF Doc. # 1537; "Flora Joinder," ECF Doc. # 1538; "Jelbert Objection," ECF Doc. # 1545 (the Jelbert Objection was untimely).

Creditors also assert that Celsius's statements on its website, social media, and particularly the statements of former Chief Executive Officer Alexander Mashinsky in his "Ask Mashinsky Anything" videos constituted an oral modification of the contract such that, notwithstanding the written Terms of Use, the transactions between the Account Holders and Debtors did not transfer title and ownership to the Earn Assets.[5]

Several creditors, in addition to the Coordinating States and Washington, contend that if Account Holders transferred title to their assets to Celsius then the transaction would have created a taxable event, yet Celsius did not pay taxes on these transactions or issue tax documents to Account Holders.[6] As a procedural matter, several creditors believe this issue should be handled via an adversary proceeding, rather than by motion practice.[7] Others submit that a decision determining Earn Asset ownership is premature at this stage of the Debtors' bankruptcy proceedings because the Debtors' business was a Ponzi scheme, which the Examiner's forthcoming final report may demonstrate.[8] If so, they assert that the underlying contract formed by the Terms of Use is void as a matter of public policy.[9] Creditors state that a decision is also premature because the Debtors' liquidity will not run out until March 2023.[10] Finally, some creditors believe that a decision at this stage is premature because the expedited

---

[5] Gallagher Objection; Saraiva Objection; Ryals Objection; McLean Objection; Tornetta Joinder; Pinto Joinder; Frishberg Joinder; Steadman Joinder; Flora Joinder.

[6] Wohlwend Objection; Saraiva Objection; Breher Joinder; Tornetta Joinder; Pinto Joinder, "Georgiou Objection," ECF Doc. # 1517; Herrmann Omnibus Objection; Frishberg Joinder.

[7] Saraiva Objection; Tornetta Joinder; Pinto Joinder; Frishberg Joinder.

[8] "Tuganov Objection," ECF Doc. # 1495; Herrmann Omnibus Objection.

[9] *Id.*

[10] Ubierna Objection.

schedule to determine ownership of the Earn Assets violated the creditors' individual due process rights.[11]

The Creditor Responses contend that they have several defenses to contract formation and modification that apply to creditors as a class, which render the contract void and unenforceable, including that (i) the contract lacked consideration[12]; (ii) the contract was unconscionable, because Celsius, a company with access to sophisticated legal advice, obtained title and ownership to significant assets of laypersons via a complex Terms of Use document and modifications thereto[13]; (iii) Celsius failed to uphold its fiduciary duties under the contract established by the Terms of Use[14]; (iv) Account Holders lacked the requisite intent to transfer ownership[15]; (v) when Account Holders agreed to updated Terms of Use they may not have understood that they were agreeing to a contract and instead may have wanted to see the balance of their account(s)[16]; (vi) Celsius fraudulently misrepresented its product and finances, therefore the Account Holders should not be bound by the Terms of Use[17]; and (vii) Celsius operated illegally by violating the securities laws of several states.[18]

---

[11] "Frishberg Objection," ECF Doc. # 1400.

[12] Ryals Objection; McLean Objection; Tornetta Joinder; Pinto Joinder; Frishberg Joinder; Steadman Joinder; Flora Joinder.

[13] Ryals Objection; McLean Objection; Tornetta Joinder; Pinto Joinder; Herrmann Omnibus Objection; Frishberg Joinder; Steadman Joinder; Flora Joinder.

[14] "Medley Objection," ECF Doc. # 1507.

[15] Altunbay Objection.

[16] Ubierna Objection.

[17] Gallagher Objection.

[18] Gallagher Objection; Little Objection; Saraiva Objection; Ryals Objection, McLean Objection; Tornetta Joinder; Pinto Joinder; "Altunbay Objection," ECF Doc. # 1511; Frishberg Joinder; "Ubierna Objection," ECF Doc. # 1535; Steadman Joinder; Flora Joinder.

Finally, several responses raise breach of contract claims[19], some of which raise

individual contract claims regarding the creditor's specific account circumstances.[20]  Additional

responses assert that Celsius commingled assets, therefore, there is no factual difference between

Earn, Custody, and Withhold Accounts and this Amended Motion relies on a factually inaccurate

premise (i.e., that the Earn Assets are legally different from the Custody and Withhold Assets).[21]

At least one creditor argues that to the extent that Celsius issued withdrawals while it was

insolvent, those transactions were funded by incoming deposits and were therefore fraudulent

conveyances, which should be returned to the depositing Account Holder.[22]

In addition to Creditor Responses, creditor Immanuel Herrmann submitted three letters

signed by creditors.  Four hundred fifty-two (452) creditors join the objections of creditors Eric

Wohlwend and Rebecca Gallagher.  (*See* "452 Creditor Joinder," ECF Doc. # 1599, joining the

Wohlwend Objection and Gallagher Objection.)  Three hundred forty (340) creditors join the

objection of Keith and Jennifer Ryals.  (*See* "340 Creditor Joinder, ECF Doc. # 1602, joining

Ryals Objection.)  Three hundred ninety-seven (397) creditors signed a statement of

dissatisfaction with the Committee Objection, asserting that the Committee, through its

objection, abdicated its responsibility to represent creditors interests.  (*See* "397 Creditor

Statement," ECF Doc. # 1559.)  The 397 Creditor Statement also calls for the Court to add

creditors to the Committee to better represent the interests of unsecured creditors.  (*Id.*)

---

[19]      Frishberg Objection; Saraiva Objection; Pinto Joinder.

[20]      *See, e.g.,* Medley Objection; Altunbay Objection (asserting that the "clickwrap" style agreement is not
enforceable because it was not in the Account Holder's native language, therefore the Account Holder could not
fully understand the terms); "Romauld Objection," ECF Doc. # 1554 (same) (this objection was untimely); Georgiou
Objection; Ubierna Objection.

[21]      Altunbay Objection.

[22]      "Crews Objection," ECF Doc. # 1515.

5.  The Debtors' Reply

On December 2, 2022 the Debtors filed the Debtors' Reply and the Supplemental

Blonstein Declaration, which substantially responded to the Committee Objection.  The Debtors'

Reply maintains that a valid, enforceable contract was formed by the Terms of Use between

Celsius and each Account Holder who accepted the Terms of Use (Debtors' Reply ¶¶ 15–17),

and that the Terms of Use unambiguously state that Earn Assets are the Debtors' property and

therefore became property of the Estates when the Debtors filed for bankruptcy (*id.* ¶¶ 18–19).

Finally, the Debtors reassert that they may sell stablecoins in the ordinary course of business and,

if the Court disagrees, that the Court should nonetheless approve the sale as an exercise of the

Debtors' sound business judgment.  (*Id.* ¶¶ 21–23.)

The Debtors rebut explicit and implicit statements by creditors regarding the Debtors'

motives (*see, e.g.,* Debtors' Reply ¶ 5) and reject certain creditors' arguments that the Amended

Motion is procedurally improper and should be addressed in an adversary proceeding.  (*Id.* ¶ 24.)

The Debtors reiterate that they seek a declaratory judgment establishing a presumption that each

Account Holder is party to a binding contract with the Debtors, which presumption is rebuttable

to the extent an Account Holder succeeds on an individual contract formation defense in the

future.  (*Id.* ¶ 25.)

## II.  <u>LEGAL STANDARD</u>

### A.  **Property of the Bankruptcy Estate Under the Bankruptcy Code**

The Debtors contend that the Earn Assets are property of the Estates.  Section 541 of the

Bankruptcy Code provides, in relevant part, that:

> (a)  The commencement of a case under section 301, 302, or 303 of this title
> creates an estate.  Such estate is comprised of all the following property,
> wherever located and by whomever held:
>
> (1) Except as provided in subsections (b) and (c)(2) of this section, all
> legal or equitable interests of the debtor in property as of the
> commencement of the case.

11 U.S.C. § 541(a)(1).

The Estates therefore consist of "all legal or equitable interests of the debtor in property

as of the commencement of the case."  *In re Lehman Bros. Holdings. Inc.*, 422 B.R. 407, 418

(Bankr. S.D.N.Y. 2010) (emphasis removed) (citing 11 U.S.C. § 541(a)(1)).

Section 363(c)(1) of the Bankruptcy Code allows a debtor to enter certain transactions in

the ordinary course of business, and provides:

> If the business of the debtor is authorized to be operated under
> section 721, 1108, 1183, 1184, 1203, 1204, or 1304 of this title and unless
> the court orders otherwise, the trustee may enter into transactions, including
> the sale or lease of property of the estate, in the ordinary course of business,
> without notice or a hearing, and may use property of the estate in the
> ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

The Court may approve transactions which are not in the ordinary course of business if

the debtor demonstrates a "sound business purpose" for the transaction.  *See* 11 U.S.C. §

363(b)(1); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1071 (2d Cir. 1983) (holding that judicial approval under section 363 of the Bankruptcy Code

requires a showing that there is a good business reason); *see also In re Glob. Crossing Ltd.*, 295

B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same).

With respect to the procedural requirements governing disputes over estate property

ownership, the Bankruptcy Rules do not require every declaratory action to be brought as an

adversary proceeding, only those that relate to a subject that is already required to be brought as

23

an adversary proceeding. FED. R. BANKR. P. 7001(9) (requiring an adversary proceeding for any matters "relating to any of the foregoing" issues described in sections 1–8 of Rule 7001[23] that must be brought as an adversary proceeding under this rule).

### B. Elements of a Valid, Enforceable Contract

The Terms of Use expressly provide that they are governed by New York law. (Terms Version 8 § 33.) No one argues to the contrary. The governing legal principles do not appear to vary substantially even if the law of other states applied. In the absence of any asserted conflict in legal rules, the Court can, in any event, apply New York law as the forum state law. *See Paypolitan OU v. Marchesoni*, 21-CV-5397 (RA) (RWL), at *8 n.6 (S.D.N.Y. Aug. 26, 2022); *see also Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221, 307 (S.D.N.Y. 2019).

The Debtors assert that the Earn Assets are property of the Estates because the Terms of Use that Account Holders accepted constituted a valid, enforceable contract which accorded title to and ownership of the Earn Assets to the Debtors. A contract requires an offer and acceptance thereof (mutual assent), consideration, and an intent to be bound. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (reciting the requirements for formation of a contract).

---

[23] Issues required to be brought as an adversary proceeding under Fed. R. Bankr. P. 7001 include a "(1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under §554(b) or §725 of the Code, Rule 2017, or Rule 6002; (2) a proceeding to determine the validity, priority, or extent of a lien or other interest in property, but not a proceeding under Rule 3012 or Rule 4003(d); (3) a proceeding to obtain approval under §363(h) for the sale of both the interest of the estate and of a co-owner in property; (4) a proceeding to object to or revoke a discharge, other than an objection to discharge under §§727(a)(8),1 (a)(9), or 1328(f); (5) a proceeding to revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan; (6) a proceeding to determine the dischargeability of a debt; (7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief; and (8) a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination; (9) a proceeding to obtain a declaratory judgment relating to any of the foregoing; or (10) a proceeding to determine a claim or cause of action removed under 28 U.S.C. § 1452." Rule 7001(10), requiring an adversary proceeding to determine a claim or cause of action removed under 28 U.S.C. §1452, is not relevant here.

These requirements are not different for electronic contracts, and courts have adapted traditional principles of contract formation to fit the digital era. *See id.* at 403 ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."); *see, e.g.*, *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 384–85 (E.D.N.Y. 2015) ("Most Americans now do some business over the Internet—whether making purchases or participating in a community at the pleasure of a forum host. When we do, we are almost always presented (clearly or opaquely) with contractual terms governing our use of the site. The studies conducted to date and their implications reinforce the need to reconsider principles underlying contract law, developed in an age of paper and orality.") (internal citations omitted).

### 1. Mutual Assent (Offer and Acceptance)

Traditionally, mutual assent was conceptualized as the culmination of a bargaining process, with an emphasis on both parties' intent to be bound following an active negotiation of terms. Donald P. Harris, *Trips and Treaties of Adhesion Part II: Back to the Past or a Small Step Forward?*, 2007 Mich. St. L. Rev. 185, 191 ("Adhesion Contracts") ("The exemplary contract is one between parties of relatively equal bargaining power, and achieved through a negotiation process that reflects this power balance.") (citing E. Allan Farnsworth, Contracts § 4.26 (4th ed. 2004)).

Digital contracts between companies and consumers—here, Account Holders—often involve a fundamentally different process, where consumers' participation is limited to deciding if they will participate. *See Register.com*, 356 F.3d at 403 ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the

terms, which accordingly become binding on the offeree."); *see also* Adhesion Contracts at 192

("The only alternative to complete adherence is outright rejection.").

     Given consumers' passive role in negotiating many electronic contracts, the issue of

mutual assent often turns on whether a consumer should have been aware that they were being

bound by the relevant terms. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74–75 (2d Cir. 2017)

("Where there is no evidence that the offeree had actual notice of the terms of the agreement, the

offeree will still be bound by the agreement if a reasonably prudent Account Holder would be on

inquiry notice of the terms."). To determine what a "reasonably prudent Account Holder" would

have been aware of, courts generally evaluate the method of manifesting acceptance and the

conspicuousness of the terms that were purportedly accepted. *See Valelly v. Merrill Lynch,*

*Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (discussing the means

for manifesting acceptance); *Uber Techs.*, 868 F.3d at 75–78 (evaluating the conspicuousness of

a Terms of Service hyperlink).

     With respect to the first inquiry, courts have categorized electronic contracts based

on the process for accepting their terms. The primary categories are (i) "scrollwrap" agreements,

(ii) "clickwrap" agreements, and (iii) "browsewrap" agreements.[24] Under this framework, the

Debtors' Terms of Use are a "clickwrap" agreement, which require an Account Holder to

manifest assent by clicking a button confirming that they accept the terms or a button that

implies that they have accepted the terms, but do not necessarily require the Account Holder to

---

[24]    *See Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 548 (S.D.N.Y. 2020) ("Clickwrap agreements are generally defined by the requirement that Account Holders 'click' some form of 'I agree' after being presented with a list of terms and conditions. Browsewrap agreements, on the other hand, are usually found 'where a website's terms and conditions are . . . posted on the website via a hyperlink at the bottom of the screen' and a Account Holder's assent is given merely by his or her use of the website and nothing more.") (internal citations omitted); *Uber Techs.*, 868 F.3d at 75 ("Some online agreements require the Account Holder to scroll through the terms before the Account Holder can indicate his or her assent by clicking 'I agree.'") (citing *Berkson*, 97 F. Supp. 3d at 386, 398 (labeling such agreements "scrollwraps")).

actually view the terms.  (Original Blonstein Declaration ¶ 18.)  Clickwrap contracts are routinely enforced under New York law.  *Whit v. Prosper Funding LLC*, No. 15-00136 (GHW), 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) ("In New York, clickwrap agreements are valid and enforceable contracts.") (quoting *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08-05463 (CM), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011)).

The second, and closely related, aspect courts evaluate is how apparent it was that the contract's terms would apply to the assenting party.  The ultimate inquiry is "whether [a reasonable pe[rson] . . . would have known about the terms and the conduct that would be required to assent to them."  *Uber Techs.*, 868 F.3d at 74–75.  In making this determination, courts look to see if the terms were "reasonably conspicuous," with an emphasis on considerations like the clutter on the page that contained the terms (or a link thereto), whether hyperlinks were in a different color or style of font, and the presence (or absence) of spatial and temporal coupling with acceptance.  *See*, *e.g.*, *Uber Techs.*, 868 F.3d at 74–75 ("[T]he presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her.")

### 2.  Consideration

A contract must also be supported by "consideration."  This requirement is not exacting—each party must simply receive "something of value."  *Apfel v. Prudential-Bache Secs. Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993) (observing that anything with "real value in the eye of the law" can serve as consideration) (quoting *Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953)).  Courts generally will not opine on the adequacy of consideration.  *Id.* ("Absent

fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial

scrutiny.") (citations omitted).

    3.   Modification

A contract that provides for modification may be modified and requires the same

elements as an original contract formation. *Janover v. Bernan Foods, Inc.*, 901 F. Supp. 695,

700 (S.D.N.Y. 1995) ("[T]here is no question that a contract may be modified if the contract

provides for its modification."); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 159

(S.D.N.Y. 2014) (stating that modification of a contract requires the same elements as contract

formation).[25] Under New York law, "[i]n general . . . a written agreement that expressly states it

can be modified in writing cannot be modified orally." *Towers Charter & Marine Corp. v.

Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (applying New York state law). The party

seeking to enforce an alleged contract bears the burden of establishing the contract to be

enforced. *See Paz v. Singer Co.*, 542 N.Y.S.2d 10, 11 (App. Div. 1st Dep't 1989) ("It is black

letter law that the burden of proving the existence, terms and validity of a contract rests on the

party seeking to enforce it.").

With respect to consideration in the context of a contract modification, a service

provider's notice of a change to the terms of service and a customer's choice to continue using

the service is valid consideration. *See Byrne v. Charter Commc'ns*, 581 F. Supp. 3d 409, 419 (D.

Conn. 2022) ("[T]he service provider is required to provide notice of the intended change [to the

terms], and the customer has the choice of accepting the new arrangement or ceasing to use the

services, and these respective promises by the parties together are sufficient to constitute valid

---

[25]     *See also In re Coudert Bros.*, 487 B.R. 375, 393–94 (S.D.N.Y. 2013) ("Under New York law, it is [f]undamental to the establishment of a contract modification [that] proof of each element requisite to the formulation of a contract be shown.") (internal quotation marks omitted).

consideration.") (citing *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159 (5th Cir. 2004)).

### C.    Contract Interpretation

Under New York law, when a contract's terms are unambiguous, courts must apply them as written. *In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."). Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous. *See*, *e.g.*, *W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162 (1990).

A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 570 (2002). Extrinsic evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous. *Innophos, Inc. v Rhodia, S.A.*, 38 A.D.3d 368, 369 (1st Dept. 2007), *aff'd*, 10 N.Y.3d 25 (2008). Conversely, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 28 A.D.3d 175, 177 (1st Dept. 2006) (internal quotation marks and citation omitted).

### III.    DISCUSSION

The issues before the Court are (a) whether the Terms of Use are a contract by which complete title and ownership of Earn Assets transferred from Account Holders to Celsius when the Account Holders deposited cryptocurrency in their Earn Accounts; and (b) if so, whether the Debtors may sell stablecoins in the ordinary course of business or outside the ordinary course of business.

29

For the reasons detailed below, the Court finds, on the evidence before it, that the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors. The Court also finds that stablecoins, like other Earn Assets, are property of the Estates and the Debtors may sell the stablecoins outside of the ordinary course of business to provide liquidity for these Chapter 11 proceedings.

To be clear, this finding does not mean holders of Earn Assets will get nothing from the Debtors.[26] Account Holders have unsecured claims against the Debtors in dollars or in kind (depending on the terms of any confirmed plan). The amount of allowed unsecured claims is subject to later determination in this case (through the claims allowance process) and may potentially include damages asserted by Account Holders, including breach of contract, fraud or other theories of liability.

The Court has read every submission filed in connection with the Amended Motion and appreciates the significant time and effort that creditors, regulators and other parties in interest have undertaken on these very important issues. But based on the unambiguous contract terms, subject to any reserved defenses, the Court finds and concludes that the cryptocurrency assets deposited in Earn Accounts are presumptively property of the estate and not property of the Account Holders.

---

[26] The Court notes that even if the Terms of Use indicated that coins were property of the customers, which they do not, as Debtors' counsel pointed out at the December 5, 2022 hearing "we do not have enough coin to give everybody their coin back in kind." (December 5, 2022 H'rg Tr. 109:21–24). Thus, even if the contract's terms conferred title on customers, customers would still not get back 100% of their coins. The Court is committed to overseeing a fair process that ensures that all creditors are made as whole as possible.

Based on the limited scope of findings sought by the Amended Motion,[27] the Court's decision does not determine the ownership of assets in the Debtors' Custody Program, Withhold Accounts, or Borrow Program or whether any individual Account Holder has valid defenses to the contract between Account Holders and the Debtors. The Court's findings also do not decide the rights of any state or state agencies regarding whether Celsius violated state securities laws by marketing unregistered securities.[28]

### A. Ownership of Earn Assets

Determining ownership of the Earn Assets requires a two-step inquiry regarding (i) whether the Terms of Use formed a valid, enforceable contract between the Debtors and each Account Holder who accepted the Terms of Use, including whether subsequent versions of the Terms of Use constitute a valid, enforceable modification of a contract; and (ii) if the answer to the former questions is in the affirmative, whether the Terms of Use unambiguously transferred title and ownership of Earn Assets from Account Holders to the Debtors when Account Holders deposited their assets into the Earn Program.

### 1. The Terms of Use Formed a Valid, Enforceable Contract

A valid, enforceable contract requires mutual assent (i.e., one party makes an offer and the other party accepts the offer), consideration (i.e., each party exchanges a service or good),

---

[27]    *See* Amended Motion § 16 ("For the avoidance of doubt, this Amended Motion does not seek findings with respect to (x) the ownership of assets in the Debtors' Custody Program, Withhold Accounts, or Borrow Program or (y) whether any Account Holder has valid defenses to the purported contract between Account Holders and the Debtors under the Terms of Use, and all parties' rights are reserved with respect to each of the foregoing.").

[28]    The Court makes no determination as to these security issues but notes that if Earn Assets are determined to be securities, it is likely that Earn Account holders would still be unsecured creditors. Section 510(b) of the Bankruptcy Code subordinates claims "arising from" the purchase or sale of a security to the claims of general unsecured creditors. 11 U.S.C. § 510(b). Thus, here to the extent that creditors argue that they have recission claims for the unlawful sale of security, these claims would likely squarely fall within the broad reach of section 510(b)'s claim "arising from" the purchase or sale of a security. 11 U.S.C. § 510(b); *see In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold share of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b).")

and intent to be bound (i.e., both parties intended to enter into the contract). *See Register.com, Inc.*, 356 F.3d at 427. Accounts Holders entered a contract with the Debtors governed by the Terms of Use through a "clickwrap" agreement (*see, e.g.,* Original Blonstein Declaration ¶ 18), which requires a user to manifest assent by clicking a button confirming that they accept the terms, or a button that implies that they have accepted the terms, but do not necessarily require the user to view the terms.

Exhibits to the Supplemental Blonstein Declaration provide screen captures of the sign-up process for users who signed up via the website, for all Terms of Use versions, and the mobile app for the effective period of Terms Versions 5 through 8. (Supplemental Blonstein Declaration, Exhibits A–E.) The Supplemental Blonstein Declaration explains that applicants could not advance to the next page and complete sign up unless they agreed to the Terms of Use. (*Id.* ¶ 6.)

New York Courts overwhelmingly accept "clickwrap" agreements as sufficient to constitute mutual assent. *Uber Techs.*, 868 F.3d at 75 ("Courts routinely uphold clickwrap agreements for the principal reason that the Account Holder has affirmatively assented to the terms of agreement by clicking 'I agree.'"). The Restatement (Second) of Contracts further supports the validity and enforceability of a clickwrap contract in Comment B, "Assent to known terms," where it recognizes the common knowledge that many users never read the full terms of a clickwrap agreement before checking an "agree" box. Restatement (Second) of Contracts, § 211 cmt. b. It explains, in relevant part:

> Customers do not in fact ordinarily understand or even read the standard terms. They trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated. *But they understand that they are assenting to the terms not read or not understood*, subject to such limitations as the law may impose.

(*Id.* (emphasis added).)

Here, the Original Blonstein Declaration provides testimony demonstrating that 99% of Account Holders completed this sign-up process and affirmatively assented to the contract terms contained in the Terms of Use effective at the time of sign-up. (Original Blonstein Declaration ¶ 14.)[29] The Court finds that Account Holders understood that they were assenting to a contract governed by the Terms of Use even if the Account Holders chose to read some or none of the provisions. The Court empathizes with the frustrations Account Holders may feel if they did not read or understand the specific terms of the Terms of Use. Frankly, though, the rules provide needed certainty and predictability required for modern commerce in the digital era. The law in the Second Circuit is clear that clickwrap contracts such as the Terms of Use are valid and binding. The Debtors have sufficiently shown the mutual assent element of contract formation.

With respect to consideration, the Terms of Use clearly spell out the "benefit of the bargain": "Our Earn Service allows you to earn a financing fee from Celsius, referred to as 'Rewards,' in the form of Digital Assets . . . in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof." (Terms Version 8 § 4.D.) The Ryals Objection argues that the Debtors' consideration is illusory because the Terms of Use allow the Debtors to opt-out of fulfilling their end of the bargain.[30] However, the Debtors put

---

[29]     Of the approximately 600,000 Account Holders listed on the Debtors schedules, 89% created accounts by first accepting Terms Version 5 or later, while 10% first accepted Terms 4 or earlier. (Original Blonstein Declaration ¶ 14.) The Debtors lack records for 1% of Account Holders. (*Id.*)

[30]     Ryals Objection ¶¶ 13–15 ("If the Terms of Use are determined to govern the relationship of the parties, it is evident from the language that any ultimate obligations of the Debtors' were illusory in nature . . . The Debtors . . . drafted the Terms of Use in such a way to create options and circumstances under which the Debtors could walk away from any obligation.); *id.* ("A contract lacks consideration when the obligation of one party is illusory, meaning only one side is bound to perform." (citing *Curtis Props. Corp. v. Greif Cos.*, 212 A.D.2d 259, 628 N.Y.S.2d 628, 632 (1st Dep't 1995)).

33

forth evidence that the Debtors' consideration was the payment of proceeds from Earn Assets to Account Holders as "rewards."[31] The Ryals Objection concedes that the Debtors fulfilled this promise (Ryals Objection ¶ 15), and no party submits evidence that the Debtors did not do so.

Nor does any party provide evidence that Celsius and its Account Holders, as a class or as an individual, lacked intent to be bound by the contract terms. Certain Creditor Responses argue that the Account Holders did not intend certain effects of the contract,[32] but no objection argues that *all* Account Holders lacked intent to enter a contract governed by the Terms of Use. Moreover, many responses to the Amended Motion attempt to hold Celsius to a different reading of the contract terms, i.e., that Account Holders retained title of Earn Assets under the Terms of Use. That certain Account Holders disagree with the Debtors' reading of the Terms of Use is a contract interpretation issue discussed *infra* at III.A.3.

For the foregoing reasons, the Debtors have convincingly argued that the three elements required to form a valid, enforceable contract were satisfied by the Account Holders' acceptance of the Terms of Use via the clickwrap agreement.

> 2. Updated Terms of Use Constituted Valid, Enforceable Contract Modifications

Modification to a contract requires the same elements—mutual assent, consideration, and intent to be bound—that are required to form an original contract. Each version of the Terms of Use allowed the Debtors' modification of the contract terms and provided that the Account

---

[31]    *See supra*, Terms Version 8 § 4.D. ("Our Earn Service allows you to earn a financing fee from Celsius, . . . in exchange for entering into open-ended loans of your Eligible Digital Assets . . . .").

[32]    *See, e.g.,* Altunbay Objection.

Holders' continued use of the platform following an update constituted consent to the updated Terms of Use.[33]

The Terms of Use, beginning with Terms Version 1, provide that (i) the Debtors can unilaterally modify the Terms of Use without notice and (ii) the Account Holders' continued use of the platform following an update constitutes consent to the amended Terms of Use. (*See* "Terms Affidavit Modification Provisions," Terms Affidavit Ex. A-1 at "Changes to Terms," Ex. A-2 § 31, Ex. A-3 § 32, Ex. A-4 § 32, Ex. A-5 § 32, Ex. A-6 § 31, Ex. A-7 § 31, and Ex. A-8 § 31.) The Terms Affidavit and Original Blonstein Declaration provide evidence that the Debtors could modify the contract and that Account Holders' continued use of the platform constituted acceptance of the updated Terms of Use, even if the Account Holders did not affirmatively accept the updated terms. (*See id.*; Original Blonstein Declaration ¶ 15.)

Notwithstanding the language in the Terms of Use permitting modification by the Debtors, the Debtors specifically required all Account Holders to affirmatively accept Terms Version 6, thus replacing the existing contract for any Account Holders who opened an account before Terms Version 6 became effective. (*See* Original Blonstein Declaration ¶ 16.) The Supplemental Blonstein Declaration provides evidence showing the affirmative consent that Celsius required Account Holders to give to continue using the platform when Terms Version 6 became effective, as well as the communications distributed for the updates to Terms Versions 7 and 8. (Supplemental Blonstein Declaration ¶¶ 4–15, Ex. F, G.)

Acceptance of Terms Version 6 occurred on the Debtors' platform. (*See* Original Blonstein Declaration ¶ 18.) Regardless of whether an Account Holder accessed the platform

---

[33]    *See* Amended Motion ¶ 36 ("Each historical iteration of the Terms of Use provided that the Debtors could amend the Terms of Use by posting them to their website, that the amended terms would replace the prior terms, and that continued use of the Debtors' services following such posting would be deemed consent to the updated terms.").

from a mobile device or a computer, an in-application pop-up window appeared, stating in large letters: "We have updated our Terms." (*See Id.* ¶ 18, Exhibit C.)  The pop-up then noted that "[i]t's tempting to skip reading Terms, but it's important to establish what you can expect from continuing using our product. These are not all of the changes, please read the updated Terms in full." (*See id.*)  This text was followed by a few bullets highlighting key changes and a hyperlink reading "Read the full Terms," which linked to the full Terms of Use.  (*Id.*)  Below the hyperlink, the pop-up contained three check boxes adjacent to statements, one of which was "I have read and agree to the new Terms." (*Id.*)  In addition, the acceptance button itself included the word "Agree." (*Id.*)

This process requires an Account Holder to view a pop-up stressing the importance of reading the updated Terms of Use and required two clicks (one check box, one "Accept").  The pop-ups contained hyperlinks to read the updated Terms of Use, and Account Holders were informed of the impact of declining the updated Terms of Use.  The pop-ups appear clean and compact, and contained pertinent information in close proximity with a clearly-bounded or full-screen window.  Together, these characteristics meet the standard for "clear and conspicuous." *See, e.g.*, *Uber Techs.*, 868 F.3d at 74–75 ("[T]he presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her." (internal citations omitted)).

If an Account Holder did not affirmatively accept the updated Terms Version 6 within two weeks, the Account Holder's account was suspended until such time as the Account Holder affirmatively accepted the latest version of the Terms of Use.  (*Id.* ¶ 18.)

It is not until Terms Version 8 that the Terms of Use provide for modification in writing. (*Id.*, Ex. A-8, "Introduction.")  Therefore, as certain of the Creditor Responses correctly point out, the evidence does not support Debtors' argument that the Terms of Use provided for modification in writing, therefore prohibiting oral modification as a matter of law.  (*See* Amended Motion ¶ 47 ("Under New York law, '[i]n general . . . a written agreement that expressly states it can be modified in writing cannot be modified orally.'" *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990).)  Nonetheless, because modifications to a contract require the same three elements as an original contract, the modifications alleged by the Creditor Responses lack evidence.

Multiple Creditor Responses argue that the Debtors modified the Terms of Use through advertisements, media uploaded to Celsius's social media channels, and the oral statements of Alex Mashinsky.  (*See, e.g.* Gallagher Objection at 6.)  As a threshold matter, this media was not submitted to the Court as evidence and the Court may consider only evidence admitted into the record.  The Court provided a chance for objectors to submit evidence.  None did.[34]  Even if this media was submitted as evidence, advertisements and other statements like those identified by certain creditors generally do not constitute offers, and an offer is a necessary predicate for any "amendment" to the Terms of Use.[35]  *See Leonard v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 122–24 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 88 (2d Cir. 2000) ("The general rule is that an advertisement

---

[34]     "Do any of the objectors wish to offer evidence in support of their objections? . . . Hearing no response, the Court determines that the objectors have rested as well." (December 5, 2022 H'rg Tr. 103:20–23.)

[35]     New York law also strictly limits the use of extrinsic evidence to prove the proper interpretation of a contract.  *See, e.g.*, *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008) ("New York's parol evidence rule generally bars admission of extrinsic evidence to vary or contradict the terms of a fully integrated writing.").

does not constitute an offer.") (internal quotation marks omitted).  No Creditor Response asserts

that this media satisfied the three elements of contract formation or modification—these

responses hew closer to contract interpretation, rather than modification, arguments.

The Court concludes that updates to the Terms of Use constituted valid modifications of

the contract that an Account Holder entered when they created an account with Celsius.

### 3. The Terms of Use Unambiguously Transfer Ownership of Earn Assets to the Debtors

Having established that a valid contract was formed between the Debtors and its Account

Holders, the Court's next inquiry is if the Terms of Use are unambiguous with respect to whether

Account Holders retained ownership or transferred ownership of cryptocurrency assets by

depositing the assets into Earn Accounts.  A contract is unambiguous if "on its face [it] is

reasonably susceptible of only one meaning."  *Greenfield v. Philles Records*, 98 N.Y.2d 562, 570

(2002).  Under New York Law, contracts are interpreted and enforced in accordance with their

plain meaning and their clear and unambiguous terms.  *In re Condado Plaza Acquisition LLC*,

620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020); *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 825

(Bankr. S.D.N.Y. 2010) ("[T]he ultimate objective in interpreting an agreement is to determine

"the intention of the parties as derived from the language employed.") (quoting *Tom Doherty*

*Assocs. Inc. v. Saban Entm't Inc.*, 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994)).

Terms Version 1 does not contain any clauses regarding Celsius taking rights of

ownership upon deposit of Earn Assets.  (*See generally* Terms Affidavit, Ex. A-1.)  Terms

Versions 2–4 contains the following text that discusses ownership, but not transfer of title:

> In consideration for the rewards earned on your Account and the use of our
> Services, you grant Celsius the right, subject to applicable law, without
> further notice to you, to hold the Digital Assets available in your account in
> Celsius' name or in another name, and to pledge, re-pledge, hypothecate,
> rehypothecate, sell, lend, or otherwise transfer or use any amount of such

Digital Assets, separately or together with other property, with all attendant rights of ownership . . . .  You acknowledge that with respect to assets used by Celsius pursuant to this paragraph.

(i) You may not be able to exercise certain rights of ownership.

(Terms Affidavit, Ex. A-4 § 14.)

Terms Version 5 introduced the transfer of title clause that has been the subject of scrutiny in this matter.  Every version of the Terms of Use beginning with Terms Version 5 includes a clause that Account Holders "grant Celsius . . . all right and title to such Digital Assets, including ownership rights" (the "Transfer of Title Clause").  (Terms Affidavit, Ex. A-5 § 14, A-6 § 13, A-7 § 13, A-8 § 13.)  Account Holders who agreed to Terms of Use Version 5 or later, whether by signing up for the first time or by continuing to use the platform with an existing account, entered a contract which contained unambiguous and clear language regarding transfer of title and ownership of assets in Earn Accounts.  At the hearing on this matter, Blonstein testified that 90% of Account Holders representing 99% of Earn Assets had assented to Terms Version 6 or later.  (December 5, 2022 H'rg Tr. 103:3–7.)  Thus, the Court finds that title to and ownership of all Earn Assets unequivocally transferred to the Debtors and became property of the Estates on the Petition Date.

The crux of many objections to the Amended Motion is that Celsius's ubiquitous use of the word "loan," "lending," and other variations sits in direct conflict with the singular clause transferring all title and rights of ownership to the Debtors.  These responses argue that this creates an ambiguity within the four corners of the contract.  But the use of the term "loan," or variations of that term, do not contradict transfer of ownership of cryptocurrency assets to Celsius.  The Account Holders argue that a layperson's understanding of the term "loan" means the Account Holder retains ownership of their Earn Assets but temporarily allows the use of the

assets by the Debtors[36]—but the Court cannot ignore the plain and clear language in the Transfer of Title Clause.

Further, even if the Court found that Account Holders loaned digital assets to Celsius, Account Holders would still be unsecured creditors.  It is blackletter law that a loan of money or property to another creates a debtor-creditor relationship.  *In re Masterwear Corp.*, 229 B.R. 301, 310 (Bankr. S.D.N.Y. 1999) ("Under New York law, a bank and its depositor stand in a debtor-creditor relationship that is contractual in nature.  The bank owns the deposit, the depositor has a claim to payment against the bank, and the bank has a corresponding obligation to pay its depositor.  Accordingly, a bank's temporary freeze of an account, without more, is 'neither a taking of possession of [the depositor's] property nor an exercising of control over it, but merely a refusal to perform its promise.'") (internal citations omitted).  And absent a perfected security interest in tangible or intangible property, in the event of the debtor's bankruptcy, the creditor holds only an unsecured claim.  *See In re Motors Liquidation Company*, 430 B.R. 65, 96 (S.D.N.Y. 2010) ("Indeed, by definition, an unsecured creditor has no particularized property interest in the Debtors' estates."); *see also* 4 COLLIER ON BANKRUPTCY ¶ 506.03[1] (16th ed. 2022)  ("As a threshold matter, a claim cannot be a "secured claim" for purposes of section 506(a) unless it is secured by a "lien" on some specific item of property in which the estate has an interest, or, alternatively, is a claim that is subject to a right of setoff.").

But, more importantly:

> By current definition, cryptocurrency is not money because it is not a medium of exchange created, authorized, or adopted by a domestic or foreign government, or by an intergovernmental organization or by

---

[36]    The Vermont Objection observes that the Terms of Use uses the term "loan" to describe the transaction between the Account Holder and the Debtors even in the clause purportedly transferring ownership to Celsius: "You grant Celsius . . . for the duration of the period during which the Digital Assets are *loaned* to us . . . all right and title to such Digital Assets, including Ownership rights."  (Vermont Objection (citing Terms Versions 6–8 (emphasis added).)

> agreement between two or more countries. Moreover, since cryptocurrency, NFTs and other digital assets are intangible and therefore not capable of possession, a security interest currently can be perfected only by the filing of a financing statement in the digital asset as a general intangible.

Lorraine S. McGowen, Transferring Digital Assets (Including Cryptocurrencies) Under Proposed Amendments to the Uniform Commercial Code, The Quarterly Journal of INSOL International, 4TH Quarter 2022, at 16 (discussing proposed amendments to the Uniform Commercial Code, creating a new Chapter 12 to govern the transfer (whether as a sale or as a financing) of digital assets, including cryptocurrency, digital tokens and non-fungible tokens).

Thus, even if the parties' contract purports to provide the creditor with a security interest in property, unless the security interest is perfected under applicable non-bankruptcy law, a trustee can assert strong-arm power under section 544(a) of the Bankruptcy Code to avoid the lien. 11 U.S.C. § 544(a). *See also In re Castle Ventures, Ltd.*, 167 B.R. 758, 765 (Bankr. E.D.N.Y. 1994) ("However, section 544(a) of the Code, also referred to as the 'strong arm' clause, allows a trustee in bankruptcy to avoid liens and security interests against the debtor's estate which were not properly perfected under state law prior to the debtor's bankruptcy filing.").

Here, the language in the Terms of Use transferring all ownership interest to Celsius in the cryptocurrency assets deposited in the Earn Accounts makes it very clear that no ownership interest or lien in favor of the Account Holders was intended.[37] And certainly no lien in favor of the Account Holders was perfected. *U.S. v. Joyeros*, 410 F. Supp. 2d 121, 125 (E.D.N.Y. 2006) ("General, unsecured creditors lack a particularized interest in *specific* assets. [A]lthough general creditors can claim an interest in their debtors' estates, they cannot claim an interest in

---

[37]    *See* Terms of Use Version § 4.D (not granting a security interest to users and, to the contrary, providing that "once such Eligible Digital Assets are received by Celsius . . . they shall be Celsius' property, in every sense and for all purposes.")

any *particular* asset that makes up that estate." (internal citation omitted) (emphasis added)); *see also In re Castle Ventures, Ltd.*, 167 B.R. at 765 ("If an unperfected security interest is avoided by the trustee, the secured creditor loses the lien and is reduced to the status of a general unsecured creditor.").

To read the Terms of Use such that "loan" overrides the unequivocal language transferring title and ownership of assets deposited into Earn Accounts to Celsius would be to read the Transfer of Title Clause out of the contract entirely. As the Committee notes, "it is a bedrock principle of contract interpretation that courts should not adopt an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should seek to read contractual provisions in harmony." (Committee Objection ¶ 6.)

The Court can read "lend" in harmony with the Transfer of Title Clause, and the transfer of title and the creation of a loan are not mutually exclusive concepts. As an example, the Committee notes that, in the securities context, it is common for a loan of securities to a broker to also constitute a transfer of title thereto (or the incidents of ownership thereof) so that the broker can sell, lend, hypothecate, or rehypothecate the securities. (Committee Objection ¶ 6.) In that instance, title to the securities is transferred to the securities broker, and the securities broker has a contractual obligation to return equivalent securities (but not the exact same securities) to the initial transferor. (*Id.*)

Therefore, notwithstanding the frequent use of the word "loan" in the Terms of Use and the colloquial interpretation of a "loan" as a transaction in which the entity making the loan (here, the Account Holder) retains ownership over the asset being loaned (here, the cryptocurrency), the Terms Versions 5 and later are consistent and clear: Account Holders

granted Celsius "all right and title to such Eligible Digital Assets, including ownership rights."

(Terms § 13.)

B.      **Creditors' Rights with Respect to Defenses to Contract Formation and Breach of Contract Claims are Reserved for the Claims Resolution Process**

Many of the Creditors' Responses consist of (i) contract interpretation arguments that

rely on extrinsic evidence,[38] which, as discussed *supra* at II.C., the Court may not consider; or

(ii) individual circumstances that present colorable contract defense claims that may have merit

in the claims resolution process, but do not bear on the question of title and ownership presented

in the Amended Motion.  Even valid contract defenses would not necessarily give rise to

Account Holders claims to ownership of the cryptocurrency assets they deposited.

A common concern raised by Creditor Responses is that statements by former Celsius

CEO, Alex Mashinsky, influenced Account Holder decisions to join Celsius, keep coins on

Celsius's platform, and deposit additional assets.  State responses further note that Celsius may

have violated state securities laws, rendering the entire contract void for all Account Holders.

These parties could have colorable defenses to contract formation as individuals and as a group.

The Court takes seriously potential violations of state law and non-bankruptcy federal

law, as well as the litany of allegations including, but not limited to, fraudulent inducement into

the contract, fraudulent conveyance, breach of contract, and that the contract was

unconscionable.  These allegations may (or may not) have merit, and the creditors' rights with

respect to such claims are explicitly reserved for the claims resolution process.  But importantly,

as a prerequisite to those claims, the Court first must establish that a contract was formed and

must interpret the contract terms.  In other words, a hypothetical determination that the Debtors

---

[38]      Moreover, the objecting parties did not submit evidence at the December 5, 2022 hearing.  The evidence admitted includes the Ferraro Declaration, Campagna Declaration, Original Blonstein Declaration, Supplemental Blonstein Declaration, and the Terms Affidavit.  No other evidence was offered.

breached the contract with an account holder or that Alex Mashinsky's statements fraudulently induced a creditor to open an account requires a preliminary finding that there was a contract between Celsius and the Account Holders and a determination of each party's rights and obligations under this contract. The Court makes that finding here. Specifically, the Court finds that there was a valid contract between Celsius Account Holders and Celsius and that the contract terms unambiguously transferred all right and title of digital assets to Celsius.

### C. Stablecoins May Be Sold as an Approved Transaction Outside of the Ordinary Course of Business

Because the Court finds that Earn Assets are property of the Estates, it follows that stablecoins, as a type of cryptocurrency among Earn Assets, also belong to the Estates. The Debtors seek to sell stablecoins in the ordinary course of business. The "ordinary course of business" standard was intended to allow a debtor in possession the flexibility required to run its business. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("The framework of section 363 is designed to allow a trustee (or debtor-in- possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight."). "Ordinary course of business" is not defined within the Bankruptcy Code.

In contrast, the Court may approve transactions which are not in the ordinary course of business if the debtor demonstrates a "sound business purpose" for the transaction. *See* 11 U.S.C. § 363(b)(1). It is unnecessary here to determine whether the sale of stablecoins will be in the ordinary course of business—particularly, now, that Celsius may not have any ordinary course of business. The Court finds that the Debtors have shown sufficient cause to permit the sale of stablecoins outside of the ordinary course of business and need not reach the question of whether the Debtors have shown that such a transaction is within the ordinary course of business.

A rare point of agreement among all parties is that the Debtors' liquidity is precipitously running out.[39] The Debtors need to generate liquidity to fund these Chapter 11 cases and continue down the path either of a standalone plan reorganization, a section 363(b) sale, or even a liquidation plan. The Debtors project that additional liquidity will be needed in early 2023. The Debtors demonstrate a sound business justification for selling stablecoins, and the Court agrees that it is appropriate to grants authority to do so.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Earn Assets in Earn Accounts constitute property of the Estates, and that the Debtors may sell stablecoins outside of the ordinary course of business. The Court does not take lightly the consequences of this decision on ordinary individuals, many of whom deposited significant savings into the Celsius platform. As has been said repeatedly in this opinion, creditor's rights with respect to various defense to and breach of contract claims are reserved. Creditors will have every opportunity to have a full hearing on the merits of these arguments during the claims resolution process.

**IT IS SO ORDERED.**

Dated:     January 4, 2023
        New York, New York

                         *Martin Glenn*

                         MARTIN GLENN
             Chief United States Bankruptcy Judge

---

[39]     *See, e.g.,* U.S. Trustee Objection; Campagna Declaration at 19. To the extent the U.S. Trustee argues that the Debtors' do not face a liquidity crisis and have not established cause to sell stablecoin, that objection is overruled.

Gzj kdkv'D

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## AMENDED FINAL ORDER (I) ESTABLISHING CERTAIN NOTICE, CASE MANAGEMENT, AND ADMINISTRATIVE PROCEDURES AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Amended Final Order"), (a) approving and implementing the notice, case management, and administrative procedures annexed hereto as **Exhibit 1** (the "Case Management Procedures") and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order* of Reference from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Case Management Procedures, as applicable.

creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Case Management Procedures, as amended, set forth in **Exhibit 1** attached hereto, are approved and shall govern all applicable aspects of these chapter 11 cases, except as otherwise ordered by this Court.

3. The first four Omnibus Hearings are scheduled as follows:

- 10:00 a.m. on the 1st day of September;
- 10:00 a.m. on the 6th day of October;
- 11:00 a.m. on the 1st day of November; and
- 10:00 a.m. on the 30th day of November.

4. The Debtors' Claims and Noticing Agent is authorized to establish the Case Website, available at https://cases.stretto.com/Celsius, where, among other things, electronic copies of all Bankruptcy Court Filings will be posted and viewable free of charge.

5. Any party requesting a conference with this Court shall file such request with an email copy to the Court's chambers, copying counsel for the other parties involved.

6. Subject to General Order M-543, all hearings and conferences scheduled with this Bankruptcy Court will be conducted telephonically or by Zoom pending further order by this

2

Bankruptcy Court.  Requests to receive a Zoom link will not be made by emailing the Court. Further information on the use of Zoom for Government can be found at the Court's website at https://www.nysb.uscourts.gov/zoom-video-hearing-guide.[3]

7.    Any notice sent by the Debtors or any other party to the Master Service List or the 2002 List (both lists as defined in the Case Management Procedures attached hereto), or to any parties required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Procedures, or further order of this Court, shall be deemed sufficient and in compliance with thereof.

8.    As soon as practicable after the entry of this Amended Final Order, a copy of the Case Management Procedures shall be served by the Debtors on each of the parties on the Master Service List.  In addition, shortly after the end of each calendar month, the Claims or Noticing Agent or counsel to the Debtors shall serve a copy of the Case Management Procedures upon any party filing a 2002 Notice Request (as defined therein) within such calendar month.  To help ensure that all parties who may participate in these chapter 11 cases are aware of the terms of the Case Management Procedures, the Debtors will post the Case Management Procedures on the Case Website.

9.    Any notice sent by the Debtors or any other party in interest shall be deemed to comply with the requirements set forth in section 342(c)(1) of the Bankruptcy Code.

---

[3]    The Court shall provide a Zoom link to those persons who have made an eCourtAppearance by 4 PM the business day before the hearing.  Any party appearing at, listening to, or observing the Hearing, must make an electronic appearance, an eCourtAppearance, by using the eCourtAppearance portal located on the Court's website, https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl, or by clicking the "eCourtAppearances" tab on Judge Glenn's page of the Court's website at, http://www.nysb.uscourts.gov/content/chief-judge-martin-glenn.  After the deadline to make appearances passes, the Court will send Outlook invitations to those persons who made eCourtAppearances, using the email addresses submitted with those appearances.

10.     All time periods set forth in this Amended Final Order or in the Case Management Procedures shall be calculated in accordance with Bankruptcy Rule 9006(a).

11.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

12.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Amended Final Order are immediately effective and enforceable upon its entry.

13.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Amended Final Order in accordance with the Motion.

14.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Amended Final Order.

**IT IS SO ORDERED.**

Dated:  October 25, 2022
        New York, New York

                                            _____/s/ Martin Glenn_____
                                            MARTIN GLENN
                                            Chief United States Bankruptcy Judge

# **Exhibit 1**

## **Case Management Procedures**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## <u>CASE MANAGEMENT PROCEDURES</u>

On July 13, 2022 (the "<u>Petition Date</u>"), the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>"). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On August 17, 2022, the Court entered a final order [Docket No. 528 (the "<u>Final Order</u>," ECF Doc. # 528) approving these case management procedures (the "<u>Case Management Procedures</u>") set forth herein pursuant to sections 102(1), 105(a), and 105(d) of the Bankruptcy Code, rules 2002(m), 9007, and 9036 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rule 9074-1 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>"), and General Order M-543, dated March 20, 2020 (the "<u>General Order M-543</u>"). On October 25, 2022 the Court entered an amended final order (the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

"Amended Final Order"). Anyone may obtain a copy of the Amended Final Order, as well as any Court Filing (as defined herein) filed with the Court in these chapter 11 cases, by: (a) accessing the website maintained by Stretto (the "Claims and Noticing Agent"), at https://cases.stretto.com/Celsius (the "Case Website"); (b) contacting Stretto directly at 410 Exchange, Ste. 100, Irvine, California 92602, by telephone at (855) 473-8665 (Toll-Free) or +1 (949) 271-6507 (International), or by email at TeamCelsius@stretto.com; or (c) accessing the PACER system on the Court's website at http://www.nysb.uscourts.gov for a nominal fee.

Pursuant to the Amended Final Order, all notices, motions, applications, briefs, memoranda, affidavits, declarations, objections, responses, and other documents filed in these chapter 11 cases are subject to, and will not be deemed properly served unless they are served in accordance with, these Case Management Procedures. Additionally, while the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules apply to these chapter 11 cases, to the extent there is a non-binding conflict between the foregoing and these Case Management Procedures, these Case Management Procedures shall govern in all respects. Accordingly, all parties in interest are strongly encouraged to review these Case Management Procedures in their entirety and consult their own legal counsel with respect to any of the matters discussed herein before filing any documents in these chapter 11 cases.

## Case Management Procedures

### I. Hearing Procedures.

1. ***All Matters to Be Heard at Omnibus Hearings***. The Court will schedule periodic omnibus hearings (the "Omnibus Hearings") to consider all notices, motions, applications, and other requests for relief, briefs, memoranda, affidavits, declarations, replies, and other documents filed in support of such papers seeking relief (collectively, the "Requests for Relief"), and all objections and responses to such Requests for Relief (collectively, the "Objections," and together

with the Requests for Relief and all other filed documents, the "Bankruptcy Court Filings") pursuant to the following procedures:

1. ***Initial Omnibus Hearings***.  The first four Omnibus Hearings are scheduled as follows:

- 10:00 a.m. on the 1st day of September;

- 10:00 a.m. on the 6th day of October;

- 11:00 a.m. on the 1st day of November; and

- 10:00 a.m. on the 30th day of November.

2. ***Subsequent Omnibus Hearings***.  At or before the Omnibus Hearing held on November 30, 2022, the Debtors may request that the Court schedule additional Omnibus Hearings.  The Court may schedule such Omnibus Hearings and, upon scheduling, Stretto shall post the dates of the additional Omnibus Hearings on the Case Website.  Parties may contact Stretto for information concerning all scheduled Omnibus Hearings.

3. ***Proposed Omnibus Hearing Agenda***.  Two business days before each Omnibus Hearing, Debtors' counsel shall file a proposed agenda with regard to the matters scheduled to be heard at such Omnibus Hearing (the "Proposed Hearing Agenda").  The Proposed Hearing Agenda, which shall be prepared in consultation with counsel for the official committee of unsecured creditors (the "Committee"), may include notice of matters that have been consensually adjourned to a later Omnibus Hearing in lieu of parties filing a separate notice of adjournment; *provided*, that for all matters adjourned to a later Omnibus Hearing or some other future date, the Debtors will also electronically file (but need not serve) a notice of adjournment with respect to such matters.

4. ***Content of Proposed Hearing Agenda***.  The Proposed Hearing Agenda will include, to the extent known by Debtors' counsel:  (a) the docket number and title of each matter

3

scheduled to be heard at such Omnibus Hearing, including the initial filing and any objections, replies, or documents related thereto; (b) whether the matters are contested or uncontested; (c) whether the matters have settled or are proposed to be continued; (d) a suggestion for the order in which the matters should be addressed; and (e) any other comments that will assist the Court.

5.     ***Evidentiary Hearings***.  With respect to any Court Filing, if Objections are filed, the Omnibus Hearing shall not be deemed an evidentiary hearing at which witnesses may testify unless the Proposed Hearing Agenda provides otherwise, provided that parties in interest may make a request to the Court by email (and by copying the opposing party) that such hearing be an evidentiary hearing.  Additionally, any Court Filing requesting or requiring the Court to make a factual finding must be supported by competent evidence (*e.g.*, declarations, affidavits, and/or exhibits).

6.     ***Remote Appearances***.  In accordance with General Order M 543 dated March 20, 2020, hearings will be conducted remotely using Zoom for Government.  Parties wishing to appear at hearings need to make an electronic appearance no later than 4:00 p.m. (prevailing Eastern Time) one business day before the hearing through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.[2]

7. ***Matters that May Be Heard at Non-Omnibus Hearings***.  Subject to consultation with the Court's chambers, the U.S. Trustee, and counsel to the Committee, hearings in connection with applications for professional compensation and reimbursement, pre-trial conferences, asset sales,

---

[2]     The Court shall provide a Zoom link to those persons who have made an eCourtAppearance by 4 PM the business day before the hearing.  Any party appearing at, listening to, or observing the Hearing, must make an electronic appearance, an eCourtAppearance, by using the eCourtAppearance portal located on the Court's website, https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl, or by clicking the "eCourtAppearances" tab on Judge Glenn's page of the Court's website at, http://www.nysb.uscourts.gov/content/chief-judge-martin-glenn.  After the deadline to make appearances passes, the Court will send Outlook invitations to those persons who made eCourtAppearances, using the email addresses submitted with those appearances.

and trials related to adversary proceedings, approval of a disclosure statement, confirmation of a plan, and any other Court Filing may be scheduled for dates other than the Omnibus Hearing dates; *provided, however*, that initial pre-trial conferences scheduled in connection with adversary proceedings involving the Debtors shall be set on the next available Omnibus Hearing date that is at least 45 days after the filing of the complaint unless a party establishes good cause for holding an initial pre-trial conference on an earlier date; *provided further*, that hearings on all other Requests for Relief, not referenced in this paragraph or requiring emergency relief, filed by any party must be scheduled for an Omnibus Hearing.

## II.  Filing and Service Procedures.

8.     All Bankruptcy Court Filings filed in these chapter 11 cases shall be filed electronically with the Court on the docket of *In re Celsius Network LLC*, Case No. 22-10964 (MG), in accordance with *all* General Orders of the Court, including General Order M-399 and all orders that address the COVID-19 pandemic (General Orders 540–545), by registered users of the Court's electronic case filing system (the "Electronic Filing System").  Further, pursuant to Local Rule 9070-1, all Bankruptcy Court Filings (other than proofs of claim) shall be:  (a) until further order of the Court, delivered via email to the chambers of the Honorable Martin Glenn, United States Bankruptcy Court for the Southern District of New York no later than the next business day following the date on which such Court Filing is electronically filed; and (b) at least one hard copy shall be delivered by first class mail or by email to the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 201 Varick Street, Suite 1006, New York, New York 10014, Mark.Bruh@usdoj.gov, Shara.Cornell@usdoj.gov, or Brian.Masumoto@usdoj.gov, Attn: Mark Bruh, Shara Cornell, and Brian S. Masumoto.

A.    **The Service List.**

9.    ***Parties Entitled to Service***.  All Bankruptcy Court Filings (other than proofs of claim) shall be served on the following lists of parties (together, the "Service List"), according to the following notice procedures:

    a.    ***Master Service List***.  Stretto shall maintain a master service list (the "Master Service List").  The Master Service List shall be made available by (i) accessing the Case Website, (ii) contacting the Claims and Noticing Agent directly, or (iii) contacting the Debtors' counsel directly.  The Master Service List shall include the following parties:

        i.    the Debtors and their counsel;

        ii.    the U.S. Trustee;

        iii.    the Committee and their counsel;

        iv.    holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis);

        v.    the United States Attorney's Office for the Southern District of New York;

        vi.    the Internal Revenue Service;

        vii.    the attorneys general in the states where the Debtors conduct their business operations; and

        viii.    any party that has requested notice pursuant to Bankruptcy Rule 2002.

    b.    ***2002 List***. Stretto shall maintain a list of all parties that have filed a request to receive service of Bankruptcy Court Filings pursuant to Bankruptcy Rule 2002 (the "2002 List").

        i.    ***Filing Requests for Documents Requires Email Address***. A request for service of Bankruptcy Court Filings pursuant to Bankruptcy Rule 2002 (each, a "2002 Notice Request") filed with the Court shall be deemed proper only if it includes the following information with respect to the party filing such request:  (a) name; (b) street address; (c) name of clients, if applicable; (d) telephone number;  (e) facsimile number;  and  (f) email address, or the Certification described immediately below.

6

ii.  ***Certification Opting Out of Email Service***.  Any party filing a 2002 Notice Request who does not maintain (and cannot practicably obtain) an email address and therefore cannot receive service by email must include in the 2002 Notice Request a certification to that effect (each, a "<u>Certification</u>").  A Certification shall include a statement certifying that the party (a) does not maintain an email address and (b) cannot practicably obtain an email address at which the party could receive service.  Such party will thereafter receive paper service in accordance with the Case Management Procedures.

iii.  ***Email Address Required***.  If a 2002 Notice Request fails to include an email address or a Certification, the Debtors shall forward a copy of the Case Management Procedures to such party within five business days of requesting an email address.  If no email address or Certification is provided in response to such request, such party shall not be added to the 2002 List or served with copies of Bankruptcy Court Filings unless such Bankruptcy Court Filings directly affect such party.

iv.  ***Changes in Information***.  Each party submitting a 2002 Notice Request is responsible for filing with the Court an updated 2002 Notice Request as necessary to reflect changes to any notice information and must serve a copy of such updated 2002 Notice Request upon the Debtors.

c.  ***Affected Entities***.  All entities with a particularized interest in the subject matter of a specific Court Filing, including the entity filing the Request for Relief, are "<u>Affected Entities</u>" and shall be served with all Bankruptcy Court Filings relating to that interest.

10.  ***Maintenance of the Service List***.  At least every 15 days during the first 60 days of these chapter 11 cases, and at least every 30 days thereafter, Stretto shall update the Service List by making any additions and deletions and post the updated Service List on the Case Website.

**B.  Filing and Service of Bankruptcy Court Filings Generally.**

11.  ***Electronic Filing and Service***.  All Bankruptcy Court Filings shall be filed electronically with the Court using the Court's Electronic Filing System and served via email, other than service of a summons and complaint in an adversary proceeding or documents filed under seal or parties who have filed the Certification in Paragraph (11)(b)(ii) hereof, or as provided in Paragraph 14 hereof, which shall be deemed to constitute proper service for all parties who are

7

sent such email service; *provided*, *however*, that Bankruptcy Court Filings shall be served on the Master Service List by email and by first class mail. Subject to paragraph (11)(b)(ii) hereof, each party that files a notice of appearance and a 2002 Notice Request shall be deemed to have consented to electronic service of all Bankruptcy Court Filings.

    a.    ***Email Subject Line***.  With respect to the service of any Court Filing, the subject line of the email shall include (i) the Debtors' case name and number *In re Celsius Network LLC*, Case No. 22-10964 (MG), (ii) the name of the party filing such Court Filing, and (iii) the title of the Court Filing being served.  If the title of the Court Filing is too long to fit within the subject line of the email, the subject line shall contain a shortened version of such title, and the text of the email shall contain the full title of such Court Filing.

    b.    ***Email Attachments***.  All Bankruptcy Court Filings served by email shall include the entire document, including any proposed forms of order and exhibits, attachments, or other materials, in PDF, readable by Adobe Acrobat or other equivalent document reader programs commonly available without cost.  The relevant Court Filing shall either be attached to the email in a format specified above or the email shall contain a link to such filing in such format.  In addition, all service by email will include a reference to the docket number of the attached document, as well as a link to the website of the Claims and Noticing Agent.  Notwithstanding the foregoing, if a Court Filing cannot be attached to an email (because of its size, technical difficulties, or other concerns), the filing party may serve the Court Filing by U.S. mail, including the proposed forms of order and any exhibits, attachments, and other relevant materials; *provided* that the Court Filing is served by hand or overnight delivery on the Service List.

    12.    ***Paper Service of Certain Affected Entities***.  To the extent an Affected Entity's email address is not available, the Debtors (or any other party filing a Court Filing) shall serve such Affected Entity with paper copies by first class mail or private mail service.

    13.    ***Waiver of Filing Deadlines***.  If any Court Filing is filed and served electronically via the Electronic Filing System, the filing deadlines requiring three additional days' notice set forth in rule 6(e) of the Federal Rules of Civil Procedure (made applicable to adversary proceedings by Bankruptcy Rule 7005(b)(2)(D)), and Bankruptcy Rule 9006(f) shall not apply.

14.    ***Form of Papers***.  Unless granted prior Court permission, motions, applications, and objections are limited to 40 pages and replies and statements are limited to 15 pages. All Bankruptcy Court Filings (other than exhibits) shall be double-spaced, twelve-point font, with one-inch margins.

15.    ***Certificates of Service***.  Certificates of service for all Bankruptcy Court Filings, including the Service List, need only be filed with the Court.

16.    ***Right to Request Special Notice Procedures***.  Nothing in these Case Management Procedures shall prejudice the right of any party to seek an amendment or waiver of the provisions of the Case Management Procedures from the Court upon a showing of good cause including, without limitation, the right to seek emergency *ex parte* relief or relief upon shortened notice.  Such requests should be made pursuant to the Local Rules and the directions on chambers' website.

17.    ***Section 342 Notice Requirements***.  Any notice sent by the Debtors or any other party in interest shall be deemed to comply with the requirements set forth in section 342(c)(1) of the Bankruptcy Code.

**C.    Filing and Service of Requests for Relief.**

18.    ***Requests for Relief to Be Heard at Omnibus Hearing***.  In accordance with Local Rule 9006-1(b), except as set forth in paragraph 19, in the event that a party files and serves a Request for Relief at least 14 days before the next Omnibus Hearing, the matter shall be set for hearing at such Omnibus Hearing.  If a Request for Relief is served by overnight delivery, it must be filed and served at least 15 calendar days before the next Omnibus Hearing.  If a Request for Relief is served by U.S. mail only, it must be filed and served at least 17 calendar days before the next Omnibus Hearing.  All applications for reimbursement of fees and expenses by professionals retained by the estate must be filed and served at least 21 calendar days before the next Omnibus

Hearing. If a Request for Relief is filed by a party other than the Debtors and purports to set a hearing date inconsistent with these Case Management Procedures, the Request for Relief shall be heard, without the necessity of a Court order, at the first Omnibus Hearing after the applicable notice period has expired.

19.  **Pro Se Filers**.  Before filing a Request for Relief, a *pro se* party must reach out to chambers at mg.chambers@nysb.uscourts.gov to obtain a hearing date.  Any *pro se* Requests for Relief that are filed without first obtaining a hearing date will not be scheduled for hearing on the Court's calendar.

20.  **Emergency Scheduling Procedures**.  If a movant or applicant determines that a Request for Relief requires emergency or expedited relief, the movant or applicant shall contact the attorneys for the parties that would be directly affected by such relief by telephone and email and request that the Request for Relief be considered on an expedited basis.  If such party or parties disagree with the movant's or applicant's request for emergency or expedited relief, the movant or applicant shall (a) inform the Court of the disagreement by email, and (b) arrange for a chambers conference, telephonic or in-person, to discuss the disagreement.  If the Court agrees with the movant or applicant regarding the necessity for expedited consideration, the movant or applicant may schedule an expedited hearing.  The Court's normal practice when scheduling an expedited hearing is to require the movant (1) to email the motion to shorten to chambers and (2) if the motion sufficiently supports the request, to schedule the hearing for both (a) a request for expedited relief, and (b) the underlying Request for Relief for the same day.

21.  **Notices of Requests for Relief**.  A notice shall be affixed to the front of each Request for Relief and shall set forth:  (a) the title of the Request for Relief; (b) the time and date of the objection deadline; (c) the parties on whom any objection is to be served; and

(d) the Omnibus Hearing date at which the party intends to present the Request for Relief. The notice may also include a statement that the relief requested therein may be granted, pursuant to Local Rule 9074-1(b)(1)(K), without a hearing if no objection is timely filed and served in accordance with the Case Management Procedures (each, a "Notice of Presentment"). Subject to section E of these Case Management Procedures, if the notice filed with a Request for Relief includes a Notice of Presentment, after the objection deadline has passed and if no objection has been filed and served in accordance with these Case Management Procedures, counsel to the party who filed the Request for Relief may file a certification that no objection has been filed or served on them, and may request that the Court grant the relief and enter an order without a hearing. Submission of an order after the presentment period has elapsed without objection must be emailed to the Court and include the underlying Request for Relief, the certificate of service, an electronic version of the proposed order in Microsoft Word format, and a cover note including a representation that (a) the movant sought relief by Notice of Presentment and (b) the objection period has passed and no objections were filed.

22. ***Service of Requests for Relief***. For any Court Filing for which particular notice is required to be served on all creditors and parties with a particular interest in the relief sought by any Request for Relief, including under Bankruptcy Rules 2002(a)(2) and (3), 4001, 6004, 6007, and 9019, parties need serve all such Bankruptcy Court Filings only on the Service List and in accordance with the following, unless otherwise ordered by the Court:

      a.     in the case of any use, sale, lease, or abandonment of substantially all of the Debtors' property, on each party asserting an interest in that property;

      b.     in the case of any relief from or modification of the automatic stay, on each party asserting a lien or other encumbrance on the affected property;

      c.     in the case of the use of cash collateral or obtaining of credit, on each party asserting an interest in the cash collateral or a lien or other interest in

property upon which a lien or encumbrance is proposed to be granted, or that otherwise may be directly affected by the relief requested;

d.    in the case of a motion under Bankruptcy Rule 9019, on all parties to the relevant compromise and settlement, or that may be directly affected by such compromise or settlement;

e.    in the case of assumption, assignment, or rejection of an executory contract or an unexpired lease, on each party to the executory contract or the unexpired lease;

f.    in the case of any objection, opposition, response, reply, or further document filed directly in response to another party's Court Filing, on such other party; and

g.    on all parties as required by the Bankruptcy Rules, unless otherwise directed by the Court.

23.    ***Notice Provisions Not Applicable to Certain Matters***.  Except as set forth in these Case Management Procedures or otherwise provided by order of the Court, the notice provisions of these Case Management Procedures shall not apply to notices of the matters or proceedings described in the following Bankruptcy Rules:

a.    Bankruptcy Rule 2002(a)(1) (meeting of creditors pursuant to section 341 of the Bankruptcy Code);

b.    Bankruptcy Rule 2002(a)(2) (any proposed use, sale, or lease of property of the estate other than in the ordinary course of business, to the extent that such use, sale, or lease concerns all or substantially all of the Debtors' assets);

c.    Bankruptcy Rule 2002(a)(4) (hearing on the dismissal of a case or cases or the conversion of a case to another chapter);

d.    Bankruptcy Rule 2002(a)(5) (time fixed to accept or reject a proposed modification of a chapter 11 plan);

e.    Bankruptcy Rule 2002(a)(7) (time fixed for filing a proof of claim pursuant to Bankruptcy Rule 3003(c));

f.    Bankruptcy Rule 2002(b)(1) (time fixed for filing objections to and any hearing to consider approval of a disclosure statement);

g.    Bankruptcy Rule 2002(b)(2) (time fixed for filing objections to and any hearing to consider confirmation of a chapter 11 plan);

h.      Bankruptcy Rule 2002(d) (certain matters for which notice is to be provided to equity security holders);

i.      Bankruptcy Rule 2002(f)(1) (entry of an order for relief);

j.      Bankruptcy Rule 2002(f)(2) (dismissal or conversion of a case to another chapter of the Bankruptcy Code);

k.      Bankruptcy Rule 2002(f)(3) (time allowed for filing claims pursuant to Bankruptcy Rule 3002);

l.      Bankruptcy Rule 2002(f)(6) (waiver, denial, or revocation of a discharge as provided in Bankruptcy Rule 4006);

m.      Bankruptcy Rule 2002(f)(7) (entry of an order confirming a chapter 11 plan); and

n.      Bankruptcy Rule 2002(f)(8) (summary of the trustee's final report and account should a case be converted to chapter 7 of the Bankruptcy Code).

24.      ***Requests for Relief to Include Proposed Order***.  Parties submitting written motions or other Requests for Relief shall be required to include a proposed order with such Request for Relief, which shall be consistent with such Request for Relief.

**D.      Filing and Service of Objections and Replies.**

25.      ***Deadline for Objections***.  Any Objection to a Request for Relief must be filed by the following deadlines (each, as applicable, the "Objection Deadline"):

a.      in the case of a Request for Relief filed 21 or more days before the applicable hearing, 4:00 p.m. (prevailing Eastern Time), seven calendar days before the applicable hearing;

a.      in the case of a Request for Relief filed less than 21 days before the applicable hearing, 4:00 p.m. (prevailing Eastern Time), three calendar days before the applicable hearing;

b.      in the case of a Request for Relief set for hearing on an expedited basis and filed fewer than ten days before the applicable hearing, 12:00 p.m.

      (prevailing Eastern Time) on the business day preceding the applicable hearing; or

    c.    in any case, as otherwise ordered by the Court.

26.    For the avoidance of doubt, the foregoing deadlines apply with equal force regardless of whether the applicable Objection Deadline, as calculated according to the foregoing guidelines, falls on a business day, Saturday, Sunday, or legal holiday.

27.    ***Extension of Objection Deadline***.  An Objection Deadline may be extended only with approval from the Court.  Extensions will be granted only if agreed to by all parties seeking or opposing the relief in question, or, after consent is sought and denied.  To request an extension of an Objection Deadline a party should file a letter on ECF setting out the request.  The letter should represent either that the requesting party has the consent of opposing counsel or that consent was sought and denied.

28.    ***Effect of Failure to File Objection by Objection Deadline***.  Failure to file an Objection by the Objection Deadline may cause the Court to disregard the Objection unless an Objection Deadline extension was granted pursuant to paragraph 27.

29.    ***Service of Objections***.  All Objections shall be filed with the Court, served by the applicable Objection Deadline and sent in accordance with paragraphs 10 and 11; *provided*, that if the Objection Deadline is after the date that is 7 days before the applicable hearing, Objections shall also be served by email, facsimile, hand delivery, or overnight mail even if otherwise stated in the Request for Relief, in each case, by 4:00 p.m. (prevailing Eastern Time) on the business day that is (a) 3 days before the date of the applicable hearing for any Court Filing filed on more than 21 days' notice and (b) 2 business days before the date of the applicable hearing for any Court Filing filed on less than 21 days' notice.

30. ***Service of Replies to Objections***.  If a Court Filing is a reply to an Objection, such reply shall be filed with the Court and served as provided in paragraphs 10 and 11 so as to actually be received by the parties requested to be served hereby at least one day before the Hearing, with a copy to the Court's chambers.

31. ***Settlements***.  In the event that a matter is properly noticed for hearing and the parties reach a settlement of the dispute prior to the scheduled hearing, the parties may announce the settlement at the scheduled hearing.  In the event that the Court determines that the notice of the dispute and the hearing is adequate notice of the effects of the settlement (*i.e.*, that the terms of the settlement are not materially different from what parties in interest could have expected if the dispute were fully litigated), the Court may approve the settlement at the hearing without further notice of the terms of the settlement.  In the event that the Court determines that additional or supplemental notice is required, the Debtors shall serve such notice in accordance with the Case Management Procedures, and a hearing to consider such settlement shall be held on the next hearing date deemed appropriate by the Court.

### E. Granting a Request for Relief Without a Hearing.

32. ***Certificate of No Objection***.  If no Objection to a Request for Relief is filed after the Request for Relief is filed and served in a timely fashion, the movant may email a proposed order granting the Request for Relief to the Court's chambers, in accordance with chambers' procedures and paragraph 22, along with a certificate of no objection ("Certificate of No Objection") stating that no Objection has been filed or served on the movant.  By filing such certification, counsel for the movant represents to the Court that the movant is unaware of any Objection to the Request for Relief and that counsel has reviewed the Court's docket and no Objection appears thereon.

15

33.     ***Order May Be Entered Without Hearing***.  Upon receipt of a Certificate of No Objection as provided in paragraph 33, the Court may enter an order granting the Request for Relief without further pleading, hearing, or request, and once an order granting such Request for Relief is entered, no further hearing on the Request for Relief shall be held.

34.     ***Request for Relief May be Heard at a Hearing***.  After a Certificate of No Objection has been filed, the Request for Relief may be heard at the next Omnibus Hearing if the Court does not enter an order granting the Request for Relief before such Omnibus Hearing.

### F.     Filing and Service of Orders.

35.     ***Service of Orders***.  All parties submitting orders shall serve a conformed copy of any entered order on (a) each Affected Entity, (b) the Debtors, (c) Stretto, (d) the U.S. Trustee, and (e) the Committee within two business days of entry of the applicable order.  Stretto shall post all orders on the Case Website.

### G.     Filing and Service of Adversary Proceedings.

36.     ***Serving Adversary Proceedings***.  All Bankruptcy Court Filings in any adversary proceeding commenced in these chapter 11 cases shall be served upon each Affected Entity and any other parties required to be served under any applicable Bankruptcy Rule or Local Rule.

37.     ***Discovery Rules in Contested Matters and Adversary Proceedings***.  Federal Rules of Civil Procedure 26(a)(1) (initial disclosures), 26(a)(2) (disclosures with respect to expert testimony), 26(a)(3) (additional pretrial disclosures), and 26(f) (mandatory meeting before scheduling conference/discovery plan) are inapplicable in contested matters but are applicable to adversary proceedings arising under these chapter 11 cases.

38.     ***Briefing Schedule in Adversary Proceedings***.  After a hearing date has been set by the Court, unless otherwise ordered by the Court, the parties to the adversary proceeding shall

confer and agree upon a briefing schedule for all adversary matters, which shall be submitted for approval of the Court and shall comply with the Court's pretrial order.

**H.     Other Pleadings.**

39.     ***Joinders***.  Any party seeking to support any Court Filing may file an expression of support of such Court Filing (a "<u>Joinder</u>").  Unless otherwise ordered by the Court, filing a Joinder does <u>not</u> entitle such party to:    (a) be an independent proponent of the Court Filing; (b) independently support or oppose any related Bankruptcy Court Filings; (c) independently settle the underlying Request for Relief that is the subject of the applicable Court Filing; or (d) independently receive a ruling from the Court on the Court Filing.  The Court may deem a Joinder to be a brief in support of the applicable Court Filing, but the Court shall not consider any arguments or factual allegations contained in a Joinder but not in the related Court Filing, and no party shall be required to separately respond to a Joinder.

40.     ***Motion Practice for Lift Stay Actions***.  A motion filed by a non-Debtor party seeking relief from the automatic stay (a "<u>Stay Relief Motion</u>") in accordance with section 362 of the Bankruptcy Code shall be noticed for consideration on the Omnibus Hearing date that is at least 21 days after the Stay Relief Motion is filed and notice thereof is served upon the Debtors. Unless otherwise ordered by the Court, the objection deadline shall be the later of (a) 14 calendar days after the filing and service of the Stay Relief Motion or (b) three calendar days prior to the hearing scheduled with respect thereto.

41.     ***Continuation of Automatic Stay.***     Notwithstanding section 362(e) of the Bankruptcy Code, if a Stay Relief Motion is scheduled in accordance with the Case Management Procedures for, or adjourned to, a hearing date 30 days after the filing of the Stay Relief Motion, the moving party shall be deemed to have consented to the continuation of the automatic stay in

effect, pending the conclusion of, or as a result of, a final hearing and determination under section 362(d) of the Bankruptcy Code, and shall be deemed to have waived its right to assert the termination of the automatic stay under section 362(e) of the Bankruptcy Code.

42. **_Motions for Summary Judgment_**. Pursuant to Local Rule 7056-1, no motion for summary judgment may be made without first seeking a pre-motion conference. A request for such conference should be made by email, filed, and served in accordance with the Case Management Procedures, setting forth the issues to be presented under the summary judgment motion.

43. **_Motions for Reargument_**. Motions for reargument must identify with particularity the matter for reconsideration in accordance with Local Rule 9023-1. If, after review of the motion, the Court determines that it wishes a response, and/or hearing, it will notify the applicable parties accordingly.

44. **_Motions for Temporary Restraining Orders_**. Parties seeking a temporary restraining order (a "<u>TRO</u>") must comply with the requirements of Federal Rule of Civil Procedure 65(b). Any request for a TRO must be preceded by an email and a telephone call to chambers, advising chambers of the nature of the controversy, the need for emergency relief, why a noticed hearing for a preliminary injunction would be insufficient, when a hearing on the TRO application is needed, and when the motion papers will be forthcoming. Except in those rare cases where advance notice of the TRO application would vitiate the purpose of a TRO (and where that can be established by affidavit), immediate telephonic notice of the application must be provided to all parties reasonably expected to be affected by entry of the TRO or provisions therein. In addition, the motion papers on any TRO application must be hand delivered, emailed, or faxed to any such parties at the same time that the papers are provided to chambers.

45.    ***Automatic Extension of Certain Time Periods***.  If a Request for Relief to extend the time to take any action is filed prior to the expiration of the time period provided by the Bankruptcy Code (including any Request for Relief pursuant to section 1121 of the Bankruptcy Code), the Bankruptcy Rules, the Local Rules, or any order of the Court, the time to so take action shall be automatically extended until the Court considers and rules upon the Request for Relief.

## III.    Additional Case Management Procedures.

46.    ***Adequate Notice***.   Notice and service accomplished in accordance with the provisions set forth in the Case Management Procedures shall be deemed adequate in all respects pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

47.    ***Computation of Time***.  Unless otherwise specified, all time periods referenced in the Case Management Procedures shall be calculated in accordance with Bankruptcy Rule 9006(a).

48.    ***Effect of the Case Management Procedures***.  The Bankruptcy Rules and the Local Rules shall continue to apply to all proceedings in these chapter 11 cases, except to the extent that any provision of the Case Management Procedures by its terms supersedes or is inconsistent with such non-binding rules.   In the event of any inconsistency between the Case Management Procedures and the Bankruptcy Rules and the Local Rules, the Case Management Procedures will control.

49.    ***Promulgation of the Case Management Procedures***.  As soon as practicable after the entry of the proposed Order, a copy of the Case Management Procedures shall be served by the Debtors on each of the parties on the Master Service List.  In addition, shortly after the end of each calendar month, Stretto or counsel to the Debtors shall serve a copy of the Case Management Procedures upon any party filing a 2002 Notice Request within such calendar month.  To help ensure that all parties who may participate in these chapter 11 cases are aware of the terms of the

19

Case Management Procedures, the Debtors will post the Case Management Procedures on the Case

Website.

Exhibit C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) **FOR PUBLICATION** |
| | ) |
| CELSIUS NETWORK LLC, *et al.*, | ) Chapter 11 |
| | ) |
| Debtors. | ) Case No. 22-10964 (MG) |
| | ) |
| | ) (Jointly Administered) |

<u>**MEMORANDUM OPINION AND ORDER ON THE DEBTORS' SEALING MOTION**</u>

*A P P E A R A N C E S :*

KIRKLAND & ELLIS LLP
*Attorneys for the Debtor*
601 Lexington Avenue
New York, NY 10022
By:    Joshua Sussberg, Esq.

WHITE & CASE LLP
*Attorneys for the Creditor Committee*
111 S Wacker Dr Suite 5100
Chicago, IL 60606-5055
By:    Michael Andolina, Esq.
       Aaron Colodny, Esq.
       Samuel P Hershey, Esq.
       Gregory F Pesce, Esq.
       David Turetsky, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014
By:    Shara Cornell, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Celsius Network LLC's (collectively with its affiliated

debtors, the "Debtors") *ex parte* motion for entry of an order authorizing the Debtors to redact

the following personally identifiable information from the Debtors' Creditor Matrix, Schedules and Statements, petitions, affidavits of service, and any other documents publicly filed on the docket:

> (i) the home addresses and email addresses of any citizens of the United States located in the United States, including the Debtors' employees, individual shareholders, and individual customers, and

> (ii) the names, home addresses, and email addresses of any citizens of the United Kingdom or European Economic Area member countries and any individual whose citizenship is unknown.

("Sealing Motion," ECF Doc. # 344 ¶ 3.) In support of the Sealing Motion, the Debtors submit a declaration of Holden Bixler ("Mr. Bixler"), Managing Director of Alvarez & Marsal North America, LLC. ("Bixler Decl.," Motion, Ex. F.)

The Official Committee of Unsecured Creditors (the "Committee") filed a joinder to the Sealing Motion. ("Committee Joinder," ECF Doc. # 399.) There were also joinders filed by the Ad Hoc Group of Withhold Account Holders (ECF Doc. # 633) and the Ad Hoc Group of Custodial Account Holders (ECF Doc. # 642).

In connection with the Sealing Motion, the Debtors are also seeking to redact the names of certain creditors listed on the schedules of the Debtors' professional retention applications (collectively, the "Retention Applications.")[1]

The U.S. Trustee filed timely objections to the Sealing Motion ("Sealing Objection," ECF Doc. # 607) and to the Retention Applications ("Retention Objection," ECF Doc. # 601, and together with the Sealing Objection, the "U.S. Trustee Objections"). The Debtors filed an omnibus reply to the U.S. Trustee objections. ("Reply," ECF Doc. # 638.)

---

[1]  ECF Doc. ## 360, 361, 363, 392, and 410.

2

The Debtors submitted additional sealing motions which are resolved by this memorandum opinion ("Memorandum Opinion"). On August 19, 2022, the Debtors filed a creditors matrix motion (the "Creditors Matrix Motion," ECF Doc. # 18) seeking entry of a final order granting requested redactions of personally identifiable information. On August 24, 2022, the Committee filed a motion ("White and Case Sealing Motion," ECF Doc. # 602) seeking to redact and seal the names and identifying information of (i) those named in a parties in interest list provided by the Debtors for the purposes of running conflicts; and (ii) potential lenders. On August 30, 2022, the Debtors filed a motion ("Anonymization Motion," ECF Doc. # 639) authorizing the Debtors to (i) redact individual names; and (ii) implement an anonymized identification process.

While the Debtors' initial Sealing Motion only sought to seal the home addresses and email addresses (but not names) of U.S. citizens (*see* Sealing Motion ¶ 3), the Anonymization Motion expanded the sealing request to include all individual names, as well as physical addresses and email addresses.

On September 12, 2022, Debtors filed a supplemental reply ("Debtors' Supplemental Reply," ECF Doc. # 782) in support of the Sealing Motion and the Anonymization Motion and the Committee filed a supplemental joinder ("Committee's Supplemental Joinder," ECF Doc. # 785) to the Sealing Motion.

A hearing was held on the Sealing Motion on September 1, 2022 (the "September 1 Hearing"). At the conclusion of the hearing, the Court encouraged parties to resolve the sealing disputes, and scheduled a further hearing for September 14, 2022 (the "September 14 Hearing"). The parties failed to reach agreement after the September 14 Hearing, and the Court took the Sealing Motion under submission.

For the reasons provided in this Memorandum Opinion, the Court:

- **GRANTS** the Sealing Motion, in part, to authorize the Debtors to redact home addresses and email addresses of any *individual* creditors.

- **DENIES** the Sealing Motion in part, to the extent it seeks to redact (i) names of individual creditors, and (ii) names, email addresses, and physical addresses of business entities that are creditors.

- **GRANTS** the Sealing Motion, in part, to the extent it seeks to redact *individual* creditors' home addresses and email addresses in the Debtors' Creditor Matrix and to authorize the Debtors to file a redacted Creditor Matrix without creditors' home addresses and email addresses.

- **DENIES** the Sealing Motion to the extent it seeks to impound the names of individual creditors in the Creditor Matrix Motion.

As a result of the Memorandum Opinion, the Court also:

- **SUSTAINS** the Retention Objection and requires the Debtors to file unredacted Retention Applications.[2]

- **GRANTS** the White and Case Sealing Motion, in part, only to the extent that the redactions comply with the redactions permitted by this Memorandum Opinion's decision regarding the Sealing Motion and the redaction of the home and email addresses of individual creditors.

- **DENIES** the White and Case Sealing Motion, in part, to the extent it seeks to redact the names of individuals or any information surrounding business entities.

- **DENIES** the Debtors' Anonymization Motion.

## I. <u>BACKGROUND</u>

### A. General Background

On July 13, 2022 (the "Petition Date"), each of the Debtors voluntarily filed a Chapter 11 petition in this Court.  (Sealing Motion ¶ 10.)  As described in the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions*

---

[2]     At the September 14 Hearing, with the U.S. Trustee's agreement, the Court granted the Retention Applications that included redacted information, but all professionals agreed to submit unredacted information to the extent the Sealing Motions are denied.  Therefore, all professionals must file unredacted information to the extent required herein within fourteen (14) days after the date of this Memorandum Opinion and Order.

*and First Day Motions* ("Mashinsky Declaration," ECF Doc. # 23), the Debtors commenced

these Chapter 11 cases to stabilize their business and consummate a comprehensive restructuring

transaction that maximizes value for stakeholders.  (*Id.*)

The Debtors are operating their business and managing their property as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the United States Bankruptcy Code (the

"Bankruptcy Code").  (*Id.* ¶ 11.)  On July 27, 2022, the U.S. Trustee appointed the Committee.

(ECF Doc. # 241.)  On August 18, 2022, the U.S. Trustee filed a motion to appoint an examiner

in the Debtors' cases, which was heard on September 14, 2022.  ("Examiner Motion," ECF Doc.

# 546.)  The Examiner Motion was granted in an Order entered that day.  (ECF Doc. # 820.)  The

U.S. Trustee has not yet appointed an Examiner.

On July 19, 2022, the Court entered the Creditor Matrix Order authorizing the Debtors to

redact from the Creditor Matrix, Schedules and Statements, and other documents filed with the

Court individuals' personally identifiable information on an interim basis.  (ECF Doc. # 55.)

Also on July 19, 2022, the Court entered the Schedules and Statements Order extending the

Debtors' time within which they must file Schedules and Statements to August 12, 2022.  (ECF

Doc. # 57.)  On August 11, 2022, the Debtors filed a motion seeking to further extend the time

within which they must file Schedules and Statements to September 12, 2022, which was

granted.  (ECF Doc. # 431.)

**B.  Sealing Motion**

The Debtors seek authority to redact the following information from any paper filed with

the Court:

> (i) the home addresses and email addresses of any citizens of the United States
> located in the United States, including the Debtors' employees, individual
> shareholders, and individual customers, and

(ii) the names, home addresses, and email addresses of any citizens of the United
Kingdom or European Economic Area member countries and any individual whose
citizenship is unknown.

(the "Confidential Information," Sealing Motion ¶ 3.) The Debtors state that they have provided

and/or will provide an unredacted Creditor Matrix, Schedules and Statements, and related

documents to the Court, the U.S. Trustee, and counsel to the Committee, and that any party in

interest may make a request to the Debtors or to the Court to obtain the unredacted versions of

the filings. (*Id.*)

The Debtors advance three arguments for why the Confidential Information should be

redacted notwithstanding the public policy interest in public access to court records in

bankruptcy. First, the Debtors argue that their customers' home addresses and email addresses

constitute confidential "commercial information" under section 107(b) of the Bankruptcy Code.[3]

(*Id.* ¶ 24.) The Debtors submit that if this information is publicly disclosed their competitors

would gain a "significant competitive advantage by having access to the complete list of the

Debtors' worldwide customer base," which "would significantly decrease the value of the

customer list as an asset in any future potential asset sale." (*Id.*; *see also* Bixler Decl. ¶ 5 ("The

Debtors' customer list is one of the Debtors' key assets that will be necessary to maintain to

maximize recoveries for stakeholders.").) Mr. Bixler states that there is limited to no public

information available identifying individuals or entities that hold crypto assets because retaining

anonymity is one of the key features of holding crypto assets. (Bixler Decl. ¶ 5.) Therefore, it is

---

[3]     Section 107(b) of the Bankruptcy Code provides, in relevant part:

On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own
motion, the bankruptcy court may:

1)   protect an entity with respect to a trade secret or confidential research, development, or
*commercial information*;

11 U.S.C. § 107(b) (emphasis added).

6

expensive and time consuming for crypto companies like the Debtors to identify, attract, enroll,

and activate potential customers.  (*Id.*)  The significant investment required to build a customer

base "make[s] it a valuable asset of the Debtors."  (*Id.*)  The Debtors also cite to a recent

cryptocurrency chapter 11 case, *In re Cred Inc.*, No. 20-12836 (JTD) (Bankr. D. Del. Dec. 21,

2020), in which the Honorable John T. Dorsey entered an order, over the objection of the United

States Trustee for the District of Delaware, that permitted the debtors to redact the names,

mailing addresses, and email addresses of their customers on any publicly filed documents.  (*Id.*

¶ 22.)  In overruling the objection, Judge Dorsey stated that "there is at least some credible

argument that the . . . customer list of the – of the debtors is – has some intrinsic value, and that

disclosure of that list could affect the ability of the debtors to market and sell that list as a part of

their going toward a plan of reorganization here."  (*Id.* citing *In re Cred Inc.*, Hr'g Tr. at

113:20–25; 114:1–16, ECF Doc. # 277).)[4]

Second, the Debtors argue that the home addresses, email addresses, and names (where

applicable) of the Protected Parties (defined below) contained in the Creditor Matrix and

Schedules and Statements is personal information that may be protected under section 107(c)(1)

of the Bankruptcy Code.[5]  (*Id.* ¶ 33.)  The Debtors submit that "[t]he privacy and security of

personally identifiable information in the crypto industry is particularly important given the

---

[4]    Cited portions of the hearing transcript in *In re Cred Inc.*, No. 20-12836, are attached to the Sealing Motion
as Exhibit G.

[5]    Section 107(c) of the Bankruptcy Code provides:

(1) The bankruptcy court, for cause, may protect an individual, with respect to the following types
of information to the extent the court finds that disclosure of such information would create undue
risk of identity theft or other unlawful injury to the individual[:]

(A) *Any* means of identification (as defined in section 1028(d) of title 18) contained in a
paper filed, or to be filed, in a case under this title.

(B) *Other information* contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c)(1) (emphasis added).

extreme high-risk and high-upside common in this sector." (*Id.*)  The Debtors' customers are particularly concerned with the security and privacy of their personally identifiable information because such information could potentially result in a customer becoming the target of identity theft, blackmail, harassment, stalking, and doxing (which is a form of cyberbullying).  (*Id.* ¶¶ 13, 34.)  The Debtors state that their customers' personally identifiable information that they collect in connection with customer accounts is subject to the Debtors' privacy policy[6] and the "Debtors' ability to continue to protect customers' personal information is critical to maintaining their customer's safety, loyalty, and business." (*Id.* ¶ 13.)  Additionally, the Debtors assert that many of their customers, employees, directors, and officers (collectively referred to as the "Protected Parties") fear for their safety and their families' safety if their home addresses, email addresses, and/or names are published on the public court docket.  (*Id.* ¶¶ 14, 35, 37–38; *see also* Sealing Motion, Ex. B (Reddit Posts Threatening Alex Mashinsky), Ex. C (Reddit Threads of Customers Concerned with Privacy), and Ex. D (Email Correspondences Regarding Personally Identifiable Information).)

Third, the Debtors argue that because many of their customers reside in jurisdictions all over the world, disclosing their names, addresses, and other personal data risks violating the United Kingdom General Data Protection Regulation ("UK GDPR"), and the European Union General Data Protection Regulation ("EU GDPR"), which would expose the Debtors to potential civil liability and significant financial penalties.  (Sealing Motion ¶¶ 2, 30–33.)  The UK GDPR and EU GDPR require a legal basis for any processing (which includes the transferring or disclosing) of information relating to identified or identifiable individuals (which includes names, home addresses, and email addresses of individuals and individual business contacts) or

---

[6]        A copy of the Debtors' privacy policy is annexed to the Sealing Motion as Exhibit E.

personal data. (*Id.* ¶ 30.) The Debtors state that the only possible legal basis that may apply for disclosing the personal data here would be the "legitimate interests" ground (Article 6(1)(f) UK GDPR and EU GDPR).[7] (*Id.*) This ground, however, will only apply where the processing is necessary for the relevant purpose, and such processing will not be necessary where there is a less intrusive way of achieving that purpose. (*Id.*) Additionally, the "legitimate interests" ground will not apply if, when balanced against each other, the rights and freedoms of the relevant individuals override the legitimate interest in question. (*Id.*)

### C. The Joinders to the Sealing Motion

The Committee agrees that the relief requested in the Sealing Motion is necessary to protect "confidential commercial information" under section 107(b) of the Bankruptcy Code. (Committee Joinder ¶ 4.) According to the Committee, the potential disclosure of account holders' personally identifiable information to competitors, claims traders, and other interested parties would likely erode account holders' trust, which "would likely chill market interest in, or the amount of value provided to account holders through a potential sale, new equity investment or sponsorship of another restructuring transaction." (*Id.*)

The Committee also contends that there is cause under section 107(c) of the Bankruptcy Code to protect individual account holders' personally identifiable information from being publicly disclosed. (*Id.* ¶¶ 5–6.) The Committee and the Ad Hoc Groups submit that public disclosure of personally identifiable information would make individual account holders more vulnerable to identify theft and make account holders' crypto assets more susceptible to criminal theft. (*Id.* ¶ 6; *see also* ECF Doc. # 633 ¶ 2 ("The Debtors' public disclosure of customers' email

---

[7]      The Debtors submit that the legal basis of "compliance with a legal obligation" (Article 6(1)(c) UK GDPR and EU GDPR) would not be applicable in this situation because the legal obligation must exist under UK or EU law, which is not the case in the context of these Chapter 11 cases. (Sealing Motion ¶ 30.)

addresses . . . would put customer accounts at greater risk from hackers.  It would also make

customer all-too-easy targets for identity theft, phishing attacks and other scams."); ECF Doc. #

642 ¶ 2 ("[P]ublishing the contact information consisting of home addresses and email addresses

of the Debtors' customers publicly on the docket . . . puts individuals at risk of identity theft,

fraud or other serious harm.").)

The Committee's Supplemental Joinder asserts that Section 107(c) permits redactions for

cause where there would be "unlawful injury to the individual or the individual's property."

(Committee Supplemental Joinder ¶ 1.)  The Committee's Supplemental Joinder also asserts that

the "public record is replete with incidences of cryptocurrency theft from unsuspecting users"

and the "threat of unlawful injury cannot be overlooked."  (*Id*. ¶ 6.)  Further, the Committee

argues that redacting only addresses is insufficient "as there is a repository of data containing

account holder information from other platforms on the dark web."  (*Id*. ¶ 9.)

The Committee also has concerns about impoundment, mainly that the "Court would

have to formulate the methods to administer the impoundment" and "who would be permitted to

access the data notwithstanding the impoundment."  (*Id*. ¶ 11.)  Further, depending on how

impoundment is implemented by the Court, the Committee argues the "public would potentially

have less information with respect to the Schedules and Statements in an impoundment than it

would if the names were replaced with code numbers.  (*Id*.)

### D.  U.S. Trustee Objection to the Sealing Motion

The U.S. Trustee objects to the Sealing Motion, arguing that the Debtors "do not and

cannot rely on any exceptions to the general rule that bankruptcy proceedings should be open,

public and transparent" and have offered "nothing more than vague statements supporting the[ir]

request" to redact the Confidential Information.  (U.S. Trustee Objection at 1.)  The U.S. Trustee

is concerned that if the Motion is granted "the ability of interested parties to evaluate the Debtors

and their bankruptcy process and to communicate and find each other will be significantly curtailed," and it would lead to a slippery slope of other information the Debtors may seek to redact.  (*Id.*)

Additionally, the U.S. Trustee argues that the confidential information the Debtors seek to redact is neither confidential nor commercial information.  The U.S. Trustee argues that the Debtors' own privacy policies support the argument that customers' information is not confidential because it allows customers names and contact information to be shared with third party "business partners" and, therefore, is not confidential.  (*Id.* ¶¶ 18–19 (citing https://www.celsius.network/privacy-policy and Global Data Protection & Privacy Policy ("Privacy Policy") at 10).)

The U.S. Trustee also argues that the Debtors make only conclusory statements regarding why the information they seek to redact is commercial information.  (*Id.* ¶ 20 (citing *In re Motors Liquidation Co.*, 561 B.R. 36, 44 (Bankr. S.D.N.Y. 2016) ("[S]tatements made by lawyers in briefs are not evidence.").)  The U.S. Trustee contends that the information is not truly commercial in nature because the Debtors are not seeking to redact all creditors' names and identifying information and are instead requesting that identifying information be redacted for only certain creditors, "but information with respect to another group will be fully disclosed because of where such creditors live."  The Debtors have "made no showing that disclosure of the identities of some of its creditors are 'reasonably [] expected to cause the entity commercial injury.'"  (*Id.* ¶ 24 (quoting *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006).)

According to the U.S. Trustee, under United States bankruptcy law, that bankruptcy proceedings are public should prevail over foreign privacy law (the UK GDPR and EU GDPR).

In support, the U.S. Trustee cites to *San Antonio Express-News v. Len. Blackwell (In re Blackwell)*, in which the district court reversed and vacated the bankruptcy court's order that sealed the identities of the debtor's creditors, finding that:

> the parties' expectations under the laws of various other jurisdictions is not at issue here. [The broader investment group that the debtors were a part of] maintains its offices in the United States and thus it was foreseeable that the laws of the United States could be applied to at least some disputes these parties could have contemplated at the time they made their investments.

263 B.R. 505, 510 (W.D. Tex. 2000).

Finally, the U.S. Trustee contends that the Debtors' arguments that creditors might be subject to violence if their identities were revealed amounts to anecdotal evidence, which does not rise to the level of evidence necessary to overcome the presumption for open and public bankruptcy. (*Id.* ¶ 28 (citing *United States v. Continental Airlines, Inc. (In re Continental Airlines, Inc.),* 150 B.R. 334, 340–41 (D. Del. 1993) (refusing to seal documents based on "nothing more than the mere possibility" that they contained defamatory information); *In re Analytical Systems, Inc.,* 83 B.R. 833, 836 (Bankr. N.D. Ga.1987) (stating that "possible embarrassment" to a party "is not a sufficient basis to justify sealing court records in the face of the express and important policy of public access to court records").)

### E. Replies to the U.S. Trustee's Objection to the Sealing Motion

In their Reply, the Debtors respond to the U.S. Trustee's arguments. First, they argue that the Debtors' ability to disclose Personal Information under the Privacy Policy to limited third parties in specific circumstances does not mean that such Personal Information is not confidential commercial information. (Reply ¶ 9.) Second, the Debtors clarify that their position is that the home addresses and email addresses of all individual customers is confidential commercial information under section 107(b) of the Bankruptcy Code, but they are not relying on section 107(b) to redact certain individuals' names—that relief "is rooted firmly in section

12

107(c)." (*Id.* ¶ 13.)  The Debtors also clarify that they are not stating that the UK GDPR and the

EU GDPR supersede the Bankruptcy Code; rather, instead, they argue that these laws support the

Debtors' arguments under section 107(c).  (*Id.* ¶ 19.)

The Debtors' Supplemental Reply reiterates that the Court should permit the names, in

addition to the home addresses and email addresses, of EU and UK citizens, and those

individuals whose citizenship is unknown, to be redacted in these chapter 11 cases.  (Debtors'

Supplemental Reply ¶ 11.)  The Debtors assert that the penalties associated with violations of the

EU GDPR and UK GDPR and the need for a "legitimate interest" to disclose information

publicly serve as evidence that publicly disclosing this information online creates an undue risk

of harm to these individuals.  (*Id.*)  The Debtors further argue that the information is confidential

commercial information under section 107(b) of the Bankruptcy Code and redacting it will

prevent competitors from being able to "poach the Debtors' customers."  (*Id.* ¶ 19.)  The Debtors

also assert that, in the alternative, the Court should impound all lists of individual home

addresses, individual email addresses, and individual customer names and account balances

under Bankruptcy Rule 1007(j).  (*Id.* ¶ 21.)

## F.  Debtors File Additional Motions

### 1.  *White and Case Sealing Motion*

The Committee filed applications seeking to retain White & Case LLP ("W&C") as

counsel to the Committee, M3 Advisory Partners L.P. as financial advisor to the Committee

("M3"), Perella Weinberg Partners L.P. ("PWP") as investment banker to the Committee, and

Elementus Inc. ("Elementus," and together with W&C, M3, and PWP, the "Committee

Advisors") as blockchain forensics advisors to the Committee.  (White and Case Sealing Motion

ECF Doc. # 602 ¶ 1.)  The Debtors provided the Committee Advisors with a parties in interest

13

list for the purposes of running conflicts and preparing the Committee Advisors' retention applications. (*Id.* ¶ 7.) In their retention applications, the Committee Advisors' attach the parties in interest list and disclose connections with certain parties in interest which are account holders or creditors of the Debtors whose identity is not otherwise known at this time (the "Confidential Individuals"). (*Id.*)

Additionally, the Debtors and their advisors are currently evaluating their liquidity needs, have been considering whether to incur potential debtor-in-possession ("DIP") financing, and are engaged in ongoing discussions with potential lenders (collectively, the "Confidential Potential DIP Lenders" and together with the Confidential Individuals, the "Confidential Parties") in connection with their evaluation of whether to incur DIP financing. (ECF Doc. # 602 ¶¶ 9–10.)

The Committee seeks authority under section 107(b) of the Bankruptcy Code to redact and file under seal the names and identifying information of the Confidential Parties. No objections were filed.

### 2. *The Anonymization Motion*

The Debtors seek authority to redact (i) individual names from any documents filed publicly on the docket, including in the Debtors' Schedules and Statements, to the extent such names are provided in connection with account balances and (ii) implement an anonymized process by which to identify individuals in connection with account balances on any documents filed publicly on the docket, including in the Debtors' Schedules and Statements. (Anonymization Motion at 1–2.) As already stated, this motion seeking authority to redact individual names substantially expanded the request for relief in the Sealing Motion, which only sought to redact physical addresses and email addresses.

The majority of the Debtors' creditors are also their customers.  (*Id.* ¶ 11.)  These customers have accounts with Celsius and deposited different types and amounts of cryptocurrency, in different programs, on the Celsius platform.  (*Id.*)  Unlike many platforms with user accounts the Debtors do not assign account numbers to customer accounts, but rather identify and link customer accounts to customer email addresses.  (*Id.*)  As a result, the Debtors currently do not have a way to identify individual customers in connection with their account balances other than by using the individual customer's name, social security number (or other individual tax identifier), and/or email address.  (*Id.*)

The Debtors seek to redact individual customer names, regardless of where such individual customers are located, in any instance when individual customer names would be disclosed in connection with customer account balances.  (*Id.*)  Rather than using individual customer names, the Debtors request permission to identify individual customers with anonymized identification numbers in lieu of names.  (*Id.* ¶ 3.)

## II.    LEGAL STANDARD

### A.  Presumption and Public Policy in Favor of Public Access to Court Records

There is a strong presumption and public policy in favor of public access to court records. *See, e.g.*, *Nixon v. Warner Commc'n, Inc.*, 435 U.S. 589, 597–98 (1978); *Neal v. The Kansas City Star (In re Neal),* 461 F.3d 1048, 1053 (8th Cir. 2006); *Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d 1, 6 (1st Cir. 2005); *Food Mgmt. Grp.*, 359 B.R. 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007).  The right of public access is "rooted in the public's First Amendment right to know about the administration of justice." *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 26 (2d Cir. 1994) (stating that public access "helps safeguard the integrity, quality, and respect in our judicial system, and permits the public to keep a watchful eye on the workings of public

15

agencies") (citations omitted).  "The public interest in openness of court proceedings is at its
zenith when issues concerning the integrity and transparency of bankruptcy court proceedings
are involved."  *Food Mgmt. Grp., LLC*, 359 B.R. at 553.  The presumption of open access to
court records is codified in section 107 of the Bankruptcy Code.  *See* 11 U.S.C. § 107(a).
Nevertheless, Congress implemented statutory exemptions to prevent disclosure of certain
information in a bankruptcy case.  *See In re Orion Pictures Corp.*, 21 F.3d at 27.  Nonetheless,
"Courts have zealously upheld the public's right to access and narrowly construed the
exceptions."  *In re Anthracite Cap., Inc.*, 492 B.R. 162, 176 (Bankr. S.D.N.Y. 2013).
Information that "might 'conceivably' or 'possibly' fall within a protected category is not
sufficient to seal documents."  *Id.* (citing *In re FiberMark, Inc.*, 330 B.R. 480, 506 (Bankr. D. Vt.
2005)).  Ultimately, the "decision whether to seal bankruptcy court records lies within the
discretion of the bankruptcy court."  *In re FiberMark, Inc.* at 506.

### B. The Statutory Exemptions

#### 1. Section 107(b) and Bankruptcy Rule 9018

In limited circumstances, section 107(b) of the Bankruptcy Code requires a bankruptcy
court to seal documents that would normally be available to the public.  *Id.*  Section 107(b)
states, in pertinent part:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy
> court's own motion, the bankruptcy court may—
>
> > (1) Protect an entity with respect to a trade secret or confidential research,
> > development, or *commercial information*.

11 U.S.C. § 107(b) (emphasis added).  Rule 9018 of the Federal Rules of Bankruptcy Procedure
establishes the procedures to invoke section 107(b).  In relevant part, Rule 9018 provides:

> On motion or on its own initiative, with or without notice, the court may make any
> order which justice requires (1) to protect the estate or any entity in respect of a

trade secret or other confidential research, development, or commercial information
. . . contained in any paper filed in a case under the Code.

FED. R. BANKR. P. 9018.

The moving party bears the burden of showing that the information is confidential under
section 107(b). *See In re Food Mgmt. Grp., LLC*, 359 B.R. at 561. The exception to the general
right of access in section 107(b) is narrow. *See In re Orion Pictures Corp.*, 21 F.3d at 27.
However, "congress has established a special rule for trade secrets and confidential research,
development, and commercial information" and so once a court determines that a party in
interest is seeking protection of information that falls within one of these categories, "the court is
*required* to protect a requesting party and has no discretion to deny the application." *Id.*
Additionally, section 107(b) of the Bankruptcy Code does not require a party seeking its
protections to demonstrate "good cause." *Id.* at 28.

"Commercial information," as used in section 107(b)(1) of the Bankruptcy Code, is
defined as "information which would cause 'an unfair advantage to competitors by providing
them information as to the commercial operations of the debtor.'" *See In re Orion Pictures
Corp.*, 21 F.3d at 27 (quoting *Ad Hoc Protective Comm. for 10 1/2 % Debenture Holders v. Itel
Corp. (In re Itel Corp.)*, 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)). Commercial information need
not rise to the level of a trade secret to qualify for protection under section 107(b), but the
information must be "so critical to the operations of the entity seeking the protective order that
its disclosure will unfairly benefit the entity's competitors." *In re Barney's, Inc.*, 201 B.R. 703,
708–09 (Bankr. S.D.N.Y. 1996) (citing *In re Orion Pictures Corp.*, 21 F.3d at 28).

Courts have held that confidential commercial information may include information
related to a debtor's customer lists. *See In re Cred, Inc.*, No. 20-12836 (JTD) (Bankr. D. Del.
Dec. 21, 2020) (sealing confidential information, including names, mailing addresses, and email

addresses of customers in connection with the creditor matrix and schedules and statements); *In re Altegrity, Inc.*, No. 15-10226 (LSS), 2015 WL 10963572, at *3 (Bankr. D. Del. July 6, 2015) (finding that the debtor's "primary assets" included independent contractors and holding that the identities of independent contractors were commercial information under section 107(b)); *In re Faucett*, 428 B.R. 564, 568 (Bankr. W.D. Tex. Oct. 12, 2010) (holding that computer "screen shots" disclosing the identity of entities' customers was commercial information because they might give competitor an advantage); *In re Nunn*, 49 B.R. 963, 965 (Bankr. E.D. Va. 1985) (finding that where a customer list is the only "real asset" of a debtor such customer list is entitled to protection under section 107(b)).

In cases where protection is required, the form of protection that must be granted is not commanded by the statute. The Court has discretion when deciding how to protect commercial information. *See Gitto*, 422 F.3d at 9 ("It is true that § 107(b)(2) speaks of protection in general terms rather than of wholesale sealing, and that courts must therefore exercise some discretion in determining what form of protection to grant."). Redacting documents to remove only protectable information is preferable to wholesale sealing. The policy favoring public access supports making public as much information as possible while still preserving confidentiality of protectable information. *In re Borders Grp., Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597–98 (1978)).

2. *Section 107(c)*

Section 107(c) of the Bankruptcy Code provides:

(1) The bankruptcy court, *for cause*, may protect an individual, with respect to the following types of information *to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual*[:]

(A) Any means of identification (as defined in section 1028(d) of title 18) contained in a paper filed, or to be filed, in a case under this title.

18

(B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c)(1) (emphasis added).

Section 107(c) of the Bankruptcy Code protects "means of identification" from being

publicly disclosed.  11 U.S.C. § 107(c)(1)(A).  Means of identification includes "any name or

number that may be used, along or in conjunction with any other information, to identify a

specific individual[.]"  18 U.S.C. § 1028(d)(7).  Collier explains that "[s]ection 107(c) gives the

court broad discretion to protect an individual with respect to any information, including

identifying information, in a paper filed or to be filed with the court to the extent that the court

finds that disclosure of the information would create an undue risk of identity theft or unlawful

injury to the individual or the individual's property."  2 COLLIER ON BANKRUPTCY ¶ 107.04 (16th

ed.).  Stated differently, "[t]he types of information that can be protected by the court are

unlimited" and go beyond the types of identification referenced in Bankruptcy Code section

107(c)(1)(A), especially in light of the broad language in Bankruptcy Code section 107(c)(1)(B)

authorizing protection of "other information."  *Id.*

### 3.  *Bankruptcy Rule 1007(j)*

Bankruptcy Rule 1007(j) provides:

> On motion of a party in interest and for cause shown the court may direct the
> impounding of the lists filed under this rule, and may refuse to permit inspection
> by any entity.  The court may permit inspection or use of the lists, however, by any
> party in interest on terms prescribed by the court.

FED. R. BANKR. P. 1007.  Bankruptcy Rule 1007(j) permits the Court to protect information

"from disclosure to competitors or others who might make inappropriate or unfair use of the

information."  9 COLLIER ON BANKRUPTCY P 1007.10 (16th ed. 2022).

A court may direct the impounding of any lists filed under Bankruptcy Rule 1007 and

prohibit any entity from inspecting those lists.   For an order impounding a list, cause must be

shown upon a motion of a party in interest.   Parties in interest may gain access for inspection or use of the impounded lists with permission from the court and upon terms prescribed by the court.  A party in interest is deemed to include the debtor, the trustee, an indenture trustee, creditors, equity security holders, or committees of creditors or equity security holders appointed pursuant to 11 U.S.C. § 1102.

Bankruptcy Rule 1007(j) does not expressly define the term "list" for purposes of classifying what documents or information may be impounded.  Documents identified as a "list," as opposed to a schedule or statement under Bankruptcy Rule 1007, include lists of creditors, lists of equity security holders, lists of creditors with the twenty largest unsecured claims, and lists of known holders of legal or equitable title in real property that may be filed in a Chapter 9 bankruptcy case.  *See* Impoundment of Lists, 1 Bankruptcy Desk Guide § 8:77.

The federal procedure form related to Rule 1007 states: "The court may direct the impoundment of any lists filed under Fed. R. Bankr. P. 1007 and prohibit any entity from inspecting those lists."  4A FED. PROC. FORMS § 9B:93.  For an order of impoundment to issue, cause must be shown on a motion of a party in interest.  *Id.*  Parties in interest may gain access for inspection or use of the impounded lists with permission from the court and on terms prescribed by the court.  *Id.*

Rule 1007(j) permits a court to impound the lists to be filed under the Rule, prohibiting inspection or qualifying inspection or use on terms prescribed by the court.  Impoundment of lists, BANKR. PROC. MANUAL § 1007:5 (2022 ed.).  This further amplifies the court's general obligation to maintain public records but to seal secret, confidential, scandalous or defamatory matters under Rule 9018.  *Id.*

20

Rule 1007(j), by its terms, does not set forth the standard for an order impounding a list, nor does it explain when redaction rather than wholesale sealing is appropriate. Section 107(b) and caselaw interpreting it favor redaction, if possible, rather than sealing the entirety of anything containing information entitled to protection under section 107. Bankruptcy Rule 1007(j) adds little guidance in the context of this case. The issue remains whether some or all of the information the Debtors seek to seal is entitled to protection under section 107(b) or (c).

Satisfying this standard requires more than conclusory assertions unsupported by evidence. And, as already stated, because the exception to the general right of access is narrow, for "commercial information" to be entitled to protection, the party seeking protection must show that the information is so critical to the operations of the entity that disclosure will unfairly benefit the entity's competitors. *In re Barney's, Inc.*, 201 B.R. at 708–09. If protection is sought under section 107(c), it will not do simply to speculate that disclosure "may," as opposed to "would" as the statutory language requires, create undue risk of identity theft or other unlawful injury.

## III.   DISCUSSION

The Debtors seek authority to redact the following information from any paper filed with the Court:

> (i) the home addresses and email addresses of any citizens of the United States located in the United States, including the Debtors' employees, individual shareholders, and individual customers, and

> (ii) the names, home addresses, and email addresses of any citizens of the United Kingdom or European Economic Area member countries and any individual whose citizenship is unknown.

(Sealing Motion ¶ 3.)[8]

---

[8]    As already stated, and as discussed in Section F, below, the Debtors expanded their sealing requests to include customer names as well as home and email addresses.

The Debtors carry the burden of showing there is a sufficient basis to overcome the presumption and public policy in favor of public access to court records.  *See In re Food Mgmt. Grp., LLC*, 359 B.R. at 561.  In their effort to meet their burden, the Debtors rely on two statutory exemptions: (i) the redaction of home and email addresses of individual customers is warranted as confidential commercial information under section 107(b), and (ii) the redaction of names, home addresses, and email addresses of Protected Parties is warranted under section 107(c)(1).  The Court considers each in turn.

### A. Home Addresses and Email Addresses of the Debtors' Customers Are Not Commercial Information Under Section 107(b)(1)

The Debtors and Committee both argue that customers' personally identifiable information is confidential "commercial information" under section 107(b) of the Bankruptcy Code.  (Motion ¶ 24; Joinder ¶ 4.)  The Second Circuit has defined commercial information as information critical to the commercial operations of a debtor that, if disclosed, would cause an unfair advantage to competitors.  *See In re Orion Pictures Corp.*, 21 F.3d at 27.  The Debtors argue that their customers' home and email addresses meet this definition.  The Debtors explain that they "operate in a highly competitive market and the publication of the home addresses and email addresses" would "enable competitors to target the Debtors' customers and undermine the Debtors' ability to reorganize."  (Motion ¶ 24.); *see also* Committee Joinder ¶ 3 ("[Customers] are the lifeblood of Celsius.").)

The Debtors' larger problem is that before and after the Debtors filed their chapter 11 cases, the Debtors froze all customer accounts, refusing to permit any withdrawals of crypto assets.  That step appears to have been appropriate, at least to the extent that crypto assets are property of the estate, but as the flood of *pro se* filings on the docket demonstrate, it has not won many fans among Debtors' customers.  As Debtors' counsel acknowledged during the first day

hearing, the Debtors' business model substantially changed before the bankruptcy filings because of actions by state and federal securities law regulators, who allege that the Debtors' business model involved the impermissible sale of unregistered securities.

The Debtors also fail to address with evidence whether creditors who deposited crypto assets with the Debtors also maintain accounts with the Debtors' competitors. The Debtors Terms of Use do not require exclusivity. As explained in the next section below, and as the Court made clear during the argument of the sealing motions, at least for *individuals* who maintained accounts with the Debtors, the Court believes that Debtors should redact home addresses, telephone numbers and email addresses, but not the creditors names, from any Court filings, to protect the individuals from harassment and identity theft. For good cause shown on motion of any party in interest, the Court will consider releasing unredacted information.[9]

Next, Mr. Bixler explains that it is expensive and time consuming for crypto companies to identify, attract, and enroll potential customers. (Bixler Decl. ¶ 5.) While that may be true, the Court does not believe that is sufficient evidence to support sealing of the *names* of all creditors. The Court finds and concludes that by sealing individual customers' home and email addresses to protect those customers under section 107(c), the Debtors will also gain protection of whatever commercial value may flow from that information, even though that is not the basis for the Court's conclusion that such information should be protected from disclosure. But to be clear, the Court is only granting that protection with respect to addresses of *individual* customers, not for corporate, LLP or LLC customers. Section 101(41A) of the Bankruptcy Code defines

---

[9]     For example, at the Hearing on the Sealing Motions, counsel for the Texas security law regulator explained that regulatory agencies may seek disclosure of such redacted information in furtherance of their ongoing investigations of alleged securities laws violations by the Debtors or others.

"personally identifiable information" to mean information provided by "an individual to the debtor"; it does not include information provided by business entities.  11 U.S.C. § 101(41A).

The Court recognizes that in sustaining the U.S. Trustee's objection to sealing, the Court declines to follow decisions in several other recent bankruptcy cases, including one in this district.  *See In re Voyager Digital Holdings, Inc., et al*., No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 8, 2022) (ECF Doc. ## 112, 113) (authorizing debtor in another crypto case to redact the names of "Confidential Parties," including customers, in addition to authorizing the debtors to redact home addresses of individuals listed on the creditor matrix or other documents filed with the court, and the names and addresses of individuals protected by the GDPR; *In re Cred, Inc.*, No. 20-12836 (JTD) (Bankr. D. Del. Dec. 21, 2020) (sealing confidential information including the names, mailing and email addresses of customers); *see also In re Altegrity, Inc.*, No. 15-10226 (LSS), 2015 WL 10963572, at *3 (Bankr. D. Del. July 6, 2015) (holding that the identities of the debtor's independent contractors were commercial information under section 107(b) where "[the debtor] has expended considerable effort and money to develop its network of Independent Contractors, and the Independent Contractors are highly susceptible to solicitation).

The strong public policy of transparency and public disclosure in bankruptcy cases requires very narrow exceptions and only on strong evidentiary showings.  The Court concludes that the Debtors' evidentiary showing is insufficient to justify the wholesale sealing of creditors identities.  As explained above, Court grants the sealing motions permitting redaction of home and email addresses of individual creditors under section 107(c).

### B. Names of the Debtors' Customers Are Not Commercial Information Under Section 107(b)(1)

Absent the emails and physical addresses linked to the individual creditor names, the Court finds that Debtors' evidentiary showing with respect to the names of over 300,000

individual creditors[10] does not meet the standard for confidential "commercial information" under section 107(b)(1). To be "commercial information" under section 107(b), the publication of the information must cause an unfair advantage to competitors. *See In re Orion Pictures Corp.*, 21 F.3d at 27. Including the names of over 300,000 individual creditors without home or email addresses does not provide a viable means for solicitation, assuming that alone would be enough to justify protection. The decision in *In re Faucett*, 438 B.R. 564, 568 (Bankr. W.D. Tex. 2010), specifically notes that the screen shots implicated "are useful to a competitor, however, only to the extent that an actual customer's identity is revealed." Names alone are simply not enough to facilitate a competitor's theft. Celsius has stated that it has over 1.7 million registered users and approximately 300,000 active users with account balances of more than $100, with account holders in more than 100 countries. (Mashinsky Declaration ¶¶ 1, 9.) Identifying the individual account holders by name, without physical and email addresses, is insufficient information to expose customers to risks of identity theft or personal danger. Sealing information such as that sought by the Debtors from public disclosure risks transforming the open and transparent bankruptcy process into something very different, which the Court is loath to do without a strong showing of real and not speculative risks.

Ultimately, this Court is unconvinced that the names alone without any of the other identifying information constitutes commercial information. In this case, the customer names alone, without their addresses and emails, would not unequivocally identify people. *See Motors Liquidation*, 561 B.R. at 44 (holding that the identities of the owners of 10% or more of the equity interests of a party in an adversary proceeding are not confidential commercial information and denying motion to seal).

---

[10]    Mashinsky Declaration ¶ 9.

The Court **SUSTAINS** the U.S. Trustee's Objection in reference to individual names only, and **DENIES** the Motion, in part, regarding the sealing of the home and email addresses of individual creditors.

    C.  **The Redaction of Individual Creditor Emails and Addresses is Warranted Under Section 107(c) of the Bankruptcy Code, but the Redaction of Names of the Debtors' Individual Customers and Information Related to Business Entities is Not Warranted Under the Bankruptcy Code, nor is it Required by Privacy and Data Protection Regulations.**

          1.  *The Redaction of Emails and Physical Addresses of Individuals is Warranted under Section 107(c)*

The Debtors argue that the public disclosure of the home address and email addresses of the Protected Parties can put them "at a real risk of becoming the target of identity theft, blackmail, harassment, doxing, and stalking." (Motion ¶ 33.) The U.S. Trustee argues that the Debtors have not put forward sufficient evidence that individuals were specifically targeted for harassment and violence, and "anecdotal evidence does not rise to the level of evidence necessary to overcome the strong presumption of Congress for open and public bankruptcy proceedings." (U.S. Trustee Objection ¶ 28 (citing *United States v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 150 B.R. 334, 340–41 (D. Del. 1993) (refusing to seal documents based on "nothing more than the mere possibility" that they contained defamatory information).) The Debtors provide some anecdotal evidence with statistics of identity theft, stalking, and intimate partner violence. The Debtors also attach examples in Exhibit B to the Motion of online threats made on the life of the Debtors' CEO Alex Mashinsky.[11] (Motion, Ex. B.) The Court

---

[11] Threats to safety of CEO Mashinsky are, of course, unacceptable. But threats to Mashinsky do not support a finding that the personal safety of account holders have been threatened or that account holders are exposed to risks of physical injury. The docket in this case is filled with letters from irate *pro se* creditors who accuse Mashinsky of a very long history of misrepresentations to account holders, enticing them to deposit their crypto assets with Celsius with assurances, right upon until the filing of the bankruptcy petitions, that their assets are safe, and that Celsius was able to meet account holder requests for the return of their funds. Alleged misrepresentations by Mashinsky, and whether Celsius was engaged in the unlawful sale of securities, will undoubtedly be the subject

finds public disclosure of the home and email addresses of the Debtors' employees, directors, and officers would create undue risk of unlawful injury under section 107(c). The Court **GRANTS** the Motion, in part, to authorize the redaction of the home addresses and email addresses of the Debtors' employees, directors, and officers.

The Court further finds that there is cause under Section 107(c) of the Bankruptcy Code to protect individual account holders' personally identifying information, but only with respect to email and physical addresses. Such information, in combination with their names, could make individual account holders more vulnerable to identify theft and render account holders' crypto assets more susceptible to criminal theft. (Committee Joinder ¶ 6; *see also* ECF Doc. # 633 ¶ 2 (stating that "public disclosure of customers' email addresses . . . would put customer accounts at greater risk from hackers. It would also make customers all-too-easy targets for identity theft, phishing attacks and other scams."); ECF Doc. # 642 ¶ 2 ("[P]ublishing the contact information consisting of home addresses and email addresses of the Debtors' customers publicly on the docket . . . puts individuals at risk of identity theft, fraud or other serious harm.").)

The Court **GRANTS** the Motion, in part, to authorize the redaction of the home addresses and email addresses, but not the names, of the individual account holders.

---

of investigations by the Examiner or the Creditors Committee, as well as in the ongoing investigations by state and federal securities regulators.

27

2. *The Redaction of Information of Business Entities, as Opposed to Individual Creditors, is Not Warranted under Section 107(c)*

The Court does not interpret "individual" in section 107(c) to encompass business entities.  The type of information protected under section 107(c) includes information "that may be used, alone or in conjunction with any other information, to identify a specific individual."  *In re Barbaran*, No. 06-00457-ELG, 2022 WL 1487066, at *4 (Bankr. D.D.C. May 9, 2022) (citing *In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 748 (Bankr. D. Del. 2018) (citing 18 U.S.C. § 1028(d))).

Further, under 11 U.S.C. § 101(41A), personally identifiable information is either "(A) provided by an ***individual*** to the debtor with obtaining a product or a service from the debtor primarily for personal, family, or household purposes" and is an individual's name, address, phone number, social security number, or account numbers for a credit cards; or is "(B) identified in connection with 1 or more of the items of information specified in subparagraph (A)" and is "(i) a birth date, the number of a certificate of birth or adoption, or a place of birth" or "(ii) any other information concerning an identified ***individual*** that, if disclosed, will result in contacting or identifying such ***individual*** physically or electronically."  11 U.S.C.A. § 101 (41A) (emphasis added).

 The Court **DENIES** the proposed redaction of all information, including names, email addresses and physical addresses to the extent the sealing requests apply to business entities and not individuals.

3. *The Redaction of the Names of Individual Creditors, located in the United States and Abroad, is Not Warranted under Section 107(c)*

The Debtors place special emphasis on the requests for the authorization to redact the names, email addresses, and home addresses of any citizens of the UK or European Economic Area member countries.  (Sealing Motion ¶ 30.)  The Debtors submit that disclosing their names

as well as their addresses risks violating the UK GDPR and the EU GDPR, which would expose the Debtors to potential civil liability and significant financial penalties.  (Motion ¶¶ 30–33.) The U.S. Trustee objects, arguing that foreign law should not "prevail over the well-settled principle of American law that bankruptcy proceedings are public."  (U.S. Trustee Objection ¶ 27.)  Ultimately, the Debtors provide no legal authority explicitly dictating why the UK GDPR and the EU GDPR should apply to the bankruptcy cases of the Debtors filed in the United States, or specifically, why the foreign laws would take precedence in a situation where United States law requires the disclosure of the information.

Section 107(c) provides the Court with discretion to protect an individual with respect to any identifying information to the extent the Court finds that disclosure of such information would create an undue risk of unlawful injury to the individual.  11 U.S.C. § 107(c).  However, the Debtor has failed to show that public disclosure of UK or EU citizens personal data in violation of the UK GDPR or EU GDPR would constitute an unlawful injury *to those individuals* because the financial penalties (injury) would be imposed against the Debtors under those laws. The Court, in turn, will not treat the UK and EU citizens differently than the United States citizens implicated in this case filed in New York.

Further, the Court remains unconvinced, beyond speculation, that the disclosure of names alone (without email or physical addresses) presents an imminent risk of harm.  As noted by the U.S. Trustee at the September 14 Hearing, "over 250 creditors have already filed claims with names and addresses.  Over 350 Letter letters have been filed on the docket with names. Appearances in this court case and at the 341 meetings have names."  (Hearing Tr. 73:21–25). Yet there "has been no showing . . . that any of the individuals that have self-identified have been

the target of any acts the Committee or the Debtors argue is imminent upon disclosure." (*Id.* 74:1–4.)

The Court **GRANTS** the Motion, in part, to authorize the Debtors to redact home addresses and email addresses of any individuals (including those located in the U.K. or European Economic Area member countries).  The Court **DENIES** the proposed redaction of the names of the individuals.

### D.  The Retention Objection is Sustained

The Debtors are seeking to redact the names of certain creditors listed on the schedules of the Debtors' Retention Applications.[12]  As this Court has previously stated, "documents which are part of the court record should not remain under seal absent the most compelling reasons."  *In re Motors Liquidation Co*., 561 B.R. at 41 (citing *In re FiberMark, Inc*., 330 B.R. at 503–04 (internal citations omitted)).  Disclosure of names in retention applications serves an essential purpose in evaluating conflicts.  "[P]ublic access allows other parties and the public to identify any person or entity with a substantial financial interest—whether passive or active—in the outcome . . . and draw their own conclusions about any potentially disqualifying conflicts—a purpose that cannot be served if redacted statements are filed."  *Id.* at 38.)  The information Debtors seek to seal simply does not fall within the exceptions allowed under the Bankruptcy Code.

The Court **SUSTAINS** the Retention Objection and **DIRECTS** all professionals to submit unredacted versions of the Retention Applications.

---

[12]    ECF Doc. ## 360, 361, 363, 392, and 410.

### E.  The Court Will Grant in Part and Deny in Part the White and Case Sealing Motion

The Committee incorporates the arguments for sealing personally identifiable information set forth in the Sealing Motion and Committee Joinder with respect to Confidential Individuals.  The Court **GRANTS** the White and Case motion with respect to the Confidential Individuals only to the extent that the redactions comply with redactions permitted by this Memorandum Opinion's decision regarding the Sealing Motion.  In other words, the Committee is permitted to redact the home addresses and email addresses of the Confidential Individuals contained in the parties in interest list, but it may not redact the names of Confidential Individuals.  (White and Case Sealing Motion ¶ 7.)

The Committee submits that the Confidential Parties that may participate in the Debtors' DIP financing process constitutes confidential commercial information that is required to be protected under section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018.  (*Id.* ¶ 14.) The Court agrees.  This is, indeed, confidential commercial information that is important to the successful search for and negotiation of debtor in possession financing.  It is indeed common practice to shield from public view the names of parties with whom the Debtors have solicited interest and negotiated DIP Financing.  That information must be shared by the Debtors with the Committee, the United States Trustee and the Court to assure that a robust process has been undertaken to secure financing on the best possible terms.

### F.  The Court Denies Debtors' Anonymization Motion

The Debtors submit that filing any document on the public docket linking names and account balances poses "an undue risk of identity theft or unlawful injury" given the unique nature of cryptocurrency and the heightened risk of cyberattacks due to the difficulties associated with tracking, tracing, and recovering stolen cryptocurrency.  (Anonymization Motion ¶ 20.)

The Debtors further claim that the names of individual customers in connection with their account balances in documents filed publicly on the docket constitutes personal information protected under section 107(c)(1) of the Bankruptcy Code. (*Id.* ¶ 21.)

The Court balances this proposed risk against the policies weighing in favor of public disclosure. Under Rule 3003 of the Bankruptcy Code, the schedule of liabilities filed pursuant to section 521(1) of the Code shall constitute *prima facie* evidence of the validity and amount of the claims of creditors unless they are scheduled as disputed, contingent, or unliquidated. FED. R. BANKR. P. 3003. Creditors are not required to file proofs of claim unless creditors' claims are scheduled as disputed, contingent or unliquidated. (Hearing Tr. 57:22–25; 58:1).

In the September 14 Hearing, the Court noted that there are over 300,000 Celsius customers with over $100 in their bank accounts and emphasized that "the claims allowance process in bankruptcy was designed and works best when creditors file schedules identifying their creditors by name and the claim amount which the Debtors also seek to seal." (58:14–21.) The Court further emphasized that this transparency is "important because creditors can look at the schedule and see whether their claim has been listed, and whether it is an undisputed claim, in which case, they don't have to file a proof of claim." (*Id.*) Enabling parties in interest and the public to see the identity of creditors and the amount of their claims, and then tracking the disposition and treatment of claims during the bankruptcy case, is important to the fairness and public perception of the bankruptcy process. Only in the rarest of cases should these ordinary expectations be upset.[13]

---

[13] The Debtors propose their "Anonymization" process where the Debtors will send individual emails to "every. . . account user, both their web account and their email, that informs them of the amount that their claim has been scheduled and provides them with that number so they can go to Stretto's website and cross check that number on their own and confirm." (*Id.* 59:6–11.)

32

The Court is not persuaded by this proposed solution, in part, because the public

schedules do not merely serve the interests of individual creditors, but, rather, also serve the

interests of creditors and the public in general—all parties and the public share an interest in

complete transparency, with only the rarest of exceptions.  The claims-allowance process, with

broad access of information for all creditors, helps provide confidence in the fairness and

transparency of the bankruptcy process.

For the reasons, the Court **DENIES** the Debtor's requests to seal names in the

Anonymization Motion.

### IV.    <u>CONCLUSION</u>

For the reasons explained above, the Court **GRANTS** the Sealing Motion, in part,

authorizing the Debtors to redact home and email addresses of any individual creditor.  The

Court **DENIES** the Sealing Motion, in part, to the extent it seeks to redact the names of

individual creditors, and the names, email and physical addresses of creditors that are business

entities.

The Court **GRANTS** the Sealing Motion in part to the extent it seeks to redact the

Creditor Matrix—it must identify the names of all creditors, but it may redact the physical and

email addresses of all individual creditors.  All information must be supplied of creditors that are

business entities.

The Court also **SUSTAINS** the U.S. Trustee's objection to redactions of the Retention

Applications.  Unredacted Retention Applications must be filed within fourteen (14) days after

the date of this Opinion and Order.

The Court also **GRANTS** the White and Case Sealing Motion, in part, only to the extent

that the redactions comply with redactions permitted by this Memorandum Opinion's decision

regarding the Sealing Motion and the redaction of the home and email addresses of individual creditors. The Court **DENIES** the White and Case Sealing Motion, in part, to the extent it seeks to redact the names of individuals or any information surrounding business entities.

Lastly, the Court **DENIES** the Debtors' Anonymization Motion.

**IT IS SO ORDERED.**

Dated: September 28, 2022
New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
Chief United States Bankruptcy Judge

# Exhibit D

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER DENYING KWOK MEI PO'S MOTION SEEKING A RULING OF FULL OWNERSHIP OF FUNDS

Pending before the Court is the motion (the "Motion," ECF Doc. # 877) of Kwok Mei Po ("Po"), a Celsius Earn Account Holder,[2] seeking a ruling that she has full title to and ownership of the funds in her blocked or suspended Earn Accounts. Po argues that Celsius improperly blocked or suspended her accounts because, Celsius alleged, Earn Account Holders were only permitted to have a single account ("Single Account Rule") and she and some of her family members had multiple accounts. (Motion at 1.) The Celsius compliance team ("Compliance Team") also suspended her accounts because she purportedly misused the referral program, which violated Celsius's terms of use. (*See* Motion, Exhibit 1.) The Compliance Team notified Po by email on June 20, 2022 that "[r]eferral awards and any interest credited to this account will therefore be cancelled and any deposits not already withdrawn will be returned within the next

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] All capitalized terms not otherwise defined shall have the meanings ascribed to them in the Memorandum Opinion and Order Regarding Ownership of Earn Account Assets (the "Earn Opinion," ECF Doc. # 1822.)

30 days." (*Id.*)  Celsius failed to return the cryptocurrency in the accounts to Po before Celsius

froze all account withdrawals.

Celsius's terms of use, revised on April 14, 2022 (the "Terms Version 8"), provided that

Celsius:

> [Has] the right to suspend, freeze or close your Celsius Account at any time for any
> reason without advance notice, including by blocking your access to the Celsius
> Account or the Services.  If your Celsius Account has a balance when we close it,
> we will repay and return the remaining Digital Assets to you, including accrued
> Rewards earned (if applicable) until the close date, less any applicable Obligations,
> withholding tax and other applicable deductions, unless prohibited by applicable
> law.  In the event of irregular activity, we may hold assets until we close your
> Celsius Account.

(ECF Doc. # 393, Exhibit A-8, § 19.)  Although the Terms Version 8 were effective when the

Compliance Team blocked/suspended Po's accounts, Po disputes whether there was any Single

Account Rule in effect when she opened each of the accounts in question.  Additionally, Po

argues that the Terms of Use make clear that Celsius "had an "obligation to transfer digital assets

to users upon the termination of such loans or repayment of such borrowing in connection with

these services."  (*Id.*, § 2.)

It is not clear whether Po's accounts were "suspended" or "closed," and whether her

suspension was functionally equivalent to "termination" under the Debtors' Terms of Use.  If the

suspension of her accounts constituted termination of the agreement, it is not clear why the assets

were not returned to her before Celsius froze all Earn Account activity.

At a hearing on November 1, 2022, the Court directed the Debtors to submit a

supplemental filing detailing the specifics of each entry in the Debtors' Schedules with respect to

Po's accounts and any legal arguments against her motion.  Per the Court's direction, the Debtors

filed a supplemental objection to the Motion ("ECF Doc. # 1307), which included the declaration

Charles Roberts, Celsius's Deputy Compliance Officer ("Roberts Declaration").

The Roberts Declaration lays out the details of nine accounts (each, an "Account"), four of which were registered under Po's name (Accounts 1–4); one of which never completed registration (Account 5); two of which appear to be registered to Po's mother (Accounts 6 and 7); one of which appears to be registered to her father (Account 8); and one of which appears to be registered to her brother (Account 9). (Roberts Decl. ¶¶ 5–9.) All Accounts are Earn Accounts.[3] (*Id.*)

The Debtors submit that Po violated the Single Account Rule, regardless of the terms of use in place when she created her accounts, because she assented to the rule in the April 2022 Terms of Use by logging in from Accounts 2, 4, 5, 7, 8, and 9. (Roberts Decl. ¶ 17.) However, of that list, only Accounts 2, 4, and 5 belong to Po. Account 7 belongs to her mother, Account 8 belongs to her father, and Account 9 belongs to her brother.

With respect to Po's accounts—1, 2, 3, 4, and 5—the Debtors state that Po accepted the Terms Version 8 for Accounts 2, 4, and 5. (*Id.* ¶ 17.) But the Debtors also state that Account 3—which purportedly *did not* accept the April 2022 Terms of Use—was Po's only active account. (*Id.* ¶ 10.) The Roberts Declaration confusingly represents that Po violated the Single Account Rule that she agreed to from the two accounts that were not active and one account which never completed registration. The other accounts that the Debtor represents accepted the Terms Version 8—Accounts 7, 8, and 9—were each registered to a different person, which complies with the Single Account Rule.

Po has alleged a colorable claim that Celsius breached its contract with Po when it froze or suspended her accounts. Alternatively, Po has alleged a colorable claim that Celsius breached

---

[3]    For the avoidance of doubt, to the extent Po has assets in Custody or Withhold Accounts her rights with respect to such assets are expressly reserved and nothing in this Order is a determination as to her rights with respect these assets.

its contract even if Celsius had the right to freeze or suspend her accounts by failing to return her funds.

On January 4, 2022, the Court entered the *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* (the "Earn Opinion," ECF Doc. # 1822). For the reasons discussed in the Earn Opinion, as an Earn Account holder, the funds in Po's Accounts are property of Celsius's bankruptcy estates. (*See, e.g.,* Earn Opinion at 43 ("These allegations may (or may not) have merit, and the creditors' rights with respect to such claims are explicitly reserved for the claims resolution process.")

Any claim by Po that Celsius breached its contract with her or otherwise committed actionable wrongs by blocking or suspending her accounts would not affect the ownership of cryptocurrency deposited in Po's Earn Accounts. As the Earn Opinion explains, the cryptocurrency deposited in Earn Accounts became property of Celsius. If Po believes she has compensable claims against Celsius (beyond the amount on deposit in her accounts) based on improperly suspending or freezing her accounts, or failing to return funds upon closing her accounts, she can file a proof of claim and assert such claims in the claims-allowance process. But the cryptocurrency in Po's Earn Accounts was and remains property of the estate.

Accordingly, Po's Motion is DENIED.

**IT IS SO ORDERED.**

Dated: January 6, 2023
New York, New York

_____**/s/ Martin Glenn**_____
MARTIN GLENN
Chief United States Bankruptcy Judge

Exhibit E

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re Docket Nos.: 1346, 1508,** |
| | ) | **1510, 1512, 1814, 1816** |

**DEBTORS' OMNIBUS OBJECTION TO CERTAIN
MOTIONS SET FOR THE JANUARY 24, 2023 OMNIBUS HEARING**

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and

together with their non-debtor affiliates, collectively, "Celsius") file this omnibus objection

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

(the "<u>Objection</u>") to certain motions (the "<u>Motions</u>")[2] to be heard at the January 24, 2023 hearing before the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>"). In support of this Objection, the Debtors state the following:

## **Preliminary Statement**

1.     On January 4, 2023, the Court entered the *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "<u>Earn Opinion</u>"), granting the relief requested in the Stablecoin Motion and ruling generally "that the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors." Earn Opinion p. 30.[3]  This "broadly applicable ruling" resolved dozens of pleadings filed in response to the Stablecoin Motion, but left open certain fact-intensive defenses for the claims process. Earn Opinion p. 43.

---

[2]     The Motions are:  (a) *Kulpreet Khanuja's Verified Motion Seeking to Preserve My Right for Determination that My Personal Earn Program Assets Receive the Same Standing as Custody Accounts and Are not Property of these Estates and Request for Hearing* [Docket No. 1346] (the "<u>Original Khanuja Motion</u>"); (b) *Kulpreet Khanuja's Amended Verified Motion Seeking to Preserve My Right for Determination that My Personal Earn Program Assets Receive the Same Standing as Custody Accounts and Are not Property of these Estates and Request for Hearing* [Docket No. 1816] (the "<u>Amended Khanuja Motion</u>"); (c) *Rebecca Gallagher's Motion Seeking a Ruling that Ownership of All the Coins She Deposited into the Celsius Earn Platform Belong to Her and not the Debtors, and that She Retains All Rights of Title Due to Fraudulent Misrepresentation, Oral Modification to the Terms of Service, the Terms of Service Being Ambiguous and not Plain, and because Celsius Was Operating Illegally by Selling Unregistered Securities* [Docket No. 1508] (the "<u>Gallagher Motion</u>"); (d) M*arc Benzaken's Motion Seeking a Ruling from this Court that the Assets in His Earn and Custody Account are not Property of the Estate Under 11 USC § 541* [Docket No. 1510] (the "<u>Marc Benzaken Motion</u>"); (e) *Michael Benzaken's Motion Seeking a Ruling from this Court that the Stablecoins and Assets His Earn Account are not Property of the Estate, that the Assets and Collateral on His Account are also not Property of the Estate, and that All of the Digital Assets Held Within His Earn Account Be Recatergorized [sic] and Treated No Differently than those Assets Held Within His Custody Accounts Under 11 USC § 541.* [Docket No. 1512] (the "<u>Original Michael Benzaken Motion</u>"); and (f) *Michael Benzaken's Amended Motion Seeking a Ruling from this Court that the Stablecoins are not Property of the Esate [sic], that the Assets and Collateral in His Earn Account are not Property of the Estate, and that All of the Assets Held Within His Earn Account Ought Not Be Treated Differently than those Assets Held Within Custody Accounts Under 11 USC § 541.* [Docket No. 1814] (the "<u>Amended Michael Benzaken Motion</u>").

A summary of all of the Motions filed and the Debtors' high-level objections thereto are provided in the objection chart attached hereto as **Exhibit A** (the "<u>Objection Chart</u>").

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Earn Opinion.

2.     The Motions—which were filed in connection with the Stablecoin Motion as affirmative motions rather than responsive pleadings—raise a variety of arguments, many of which are directly addressed by the Earn Opinion, and some of which are fact intensive and best reserved for resolution in connection with the claims process.  To streamline their objections to the Motions, the Debtors have prepared the Objection Chart, which summarizes each of the Motions and categorizes their arguments in accordance with this framework:

- ***"Earn Opinion" Arguments***:  Arguments that were directly resolved in the Debtors' favor in the Earn Opinion and can therefore not serve as a basis for granting the Motions.  The Debtors request that any requests for relief based solely on "Earn Opinion" arguments be denied for that reason.

- ***Fact-Specific Arguments***:  Arguments specific to individual Account Holders' circumstances.  The Debtors provide preliminary objections to such arguments in the Objection Chart (where possible in the absence of discovery) but generally reiterate their earlier position, recognized in the Earn Opinion, that such matters are best resolved in connection with the claims process.  *See* Earn Opinion p. 30 ("Account Holders have unsecured claims against the Debtors . . . [t]he amount of [which] is subject to later determination in this case (through the claims allowance process) and may potentially include damages asserted by Account Holders, including breach of contract, fraud or other theories of liability.").

- ***Custody Arguments***:  Arguments that raise contract interpretation issues not addressed in connection with the Stablecoin Motion, generally arguing that digital assets should have been placed in Custody accounts, rather than Earn Accounts.  The legal merits of such arguments are addressed in greater detail herein.

3.     The January 24, 2023 hearing is not an evidentiary hearing.  *See Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181] <u>Exhibit 1</u> ¶ 5 ("With respect to any Court Filing, if Objections are filed, the Omnibus Hearing shall not be deemed an evidentiary hearing at which witnesses may testify unless the Proposed Hearing Agenda provides otherwise, provided that parties in interest may make a request to the Court by email (and by copying the opposing party) that such hearing be an evidentiary hearing. Additionally, any Court Filing requesting or requiring

the Court to make a factual finding must be supported by competent evidence (*e.g.*, declarations, affidavits, and/or exhibits).”); *see also Order Denying Daniel Frishberg's Request for an Evidentiary Hearing on January 24, 2023* [Docket No. 1828] (denying one creditor's request for the January 24 hearing to be an evidentiary hearing).  For the avoidance of doubt, the Debtors object to the sufficiency of the evidentiary basis for each of the Motions, which generally reference alleged misrepresentations and highlight potentially distinguishing circumstances but do not provide evidence sufficient to support the relief requested or “connect the dots” to provide a full picture of the implications of those facts.  Further, as detailed in the Objection Chart, the contract defenses raised in the Motions fail to meet the heightened pleading standards required of such defenses.[4]  The Debtors recognize that the Motions were filed prior to the release of the Earn Opinion, which established a baseline that Earn Assets are the Debtors' assets and signaled that creditors will likely receive **claims** for any fact-specific defenses or breaches they establish. *See* Earn Opinion p. 43 (“Even valid contract defenses would not necessarily give rise to Account Holders claims to ownership of the cryptocurrency assets they deposited.”); *id.* at 30 (“Account Holders have unsecured claims against the Debtors . . . [t]he amount of [which] is subject to later determination in this case (through the claims allowance process) and may potentially include damages asserted by Account Holders, including breach of contract, fraud or other theories of

---

[4]    To state a claim for fraudulent inducement under New York law, a plaintiff must allege: “a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury.” A claim for fraudulent inducement must satisfy the heightened pleading requirement of Federal Rule Civil Procedure 9(b), which requires that a party “state with particularity the circumstances constituting fraud.”  *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 490 (S.D.N.Y. 2017).  A finding of unconscionability requires evidence of exceptional facts and circumstances.  Under New York law, an unconscionable contract is one which “is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible according to its literal terms.”  *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988).  Unconscionability generally requires that the contract was both procedurally and substantively unconscionable at the time of formation—*i.e.*, “some showing of an ‘absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.’”  *Id.*

liability."). The Debtors make these procedural points not to try to call out *pro se* plaintiffs on technicalities, but to further support the Debtors' position that their estates and all parties in interest will benefit from resolving these matters through a streamlined claims process.

4.      For these reasons, and as more fully set forth herein and in the Objection Chart, the Motions should be denied.

### Background

5.      On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 53]. On July 27, 2022, the U.S. Trustee appointed an official committee of unsecured creditors [Docket No. 241] (the "Committee"). On September 14, 2022, the Court entered an order authorizing the appointment of an examiner [Docket No. 820].

7.      On November 11, 2022 the Debtors filed the *Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1325] (the "Stablecoin Motion"). The Debtors received dozens of responses to the Stablecoin Motion. On December 2, 2022, the Debtors filed the *Debtors' Reply in Support of Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1578].

8.      On December 5, 2022 the Court heard arguments regarding the Stablecoin Motion. On January 4, 2023, the Court issued the Earn Opinion, holding, *inter alia*, "that the Terms of Use

formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors." Earn Opinion p. 30. In the Earn Opinion, the Court reserved ruling on "individual circumstances that present colorable contract defense claims that may have merit in the claims resolution process, but do not bear on the question of title and ownership presented in the Amended Motion," noting that "[e]ven valid contract defenses would not necessarily give rise to Account Holder claims to ownership of the cryptocurrency assets they deposited." Earn Opinion p. 43.

9.      On January 6, 2023, the Court entered the *Order Denying Kwok Mei Po's Motion Seeking a Ruling of Full Ownership of Funds* [Docket No. 1833] (the "Kwok Order"). The Kwok Order resolved Kwok Mei Po's motion [Docket No. 877], which raised breach-based arguments concerning the ownership of assets Ms. Mei Po transferred onto the Debtors' platform. The Kwok Opinion provided:

> "Any claim [] that Celsius breached its contract . . . or otherwise committed actionable wrongs by blocking or suspending [their] accounts would not affect the ownership of cryptocurrency deposited in [their] Earn Accounts. As the Earn Opinion explains, the cryptocurrency deposited in Earn Accounts became property of Celsius. If [a creditor] believes [they have] compensable claims against Celsius (beyond the amount on deposit in [their] accounts) based on improperly suspending or freezing [their] accounts, or failing to return funds upon closing [their] accounts, [they] can file a proof of claim and assert such claims in the claims-allowance process. But the cryptocurrency in [a creditor's] Earn Accounts was and remains property of the estate." *Id.*

## **Objection**

### I.      **The Relief Requested in the Motions Is Contrary to the Earn Opinion and Should Be Denied.**

10.      Subject to the reservation of rights for individuals to assert contract defense claims, the Earn Opinion broadly provides that the Earn Assets are property of the Debtors' estates. Further, the Earn Opinion and the Kwok Order suggest that any breach of the Terms of Use by

Celsius would result in general unsecured claims rather than a remedy that would provide Account Holders with ownership of the Earn Assets. For these reasons, the requests in the Motions for a return of assets should be denied.

      **A.**    **The Terms of Use Are a Valid Contract That Unambiguously Transfer Title and Ownership of Earn Assets to Celsius and Extrinsic Evidence Is Impermissible.**

    11.    The Motions generally assert that Earn Assets are owned by the Account Holders who transferred them to the Debtors. The Earn Opinion establishes the opposite as a baseline— the Debtors have all right and title to the Earn Assets. *See id*. pp. 39–40 ("Terms Version 5 introduced the transfer of title clause that has been the subject of scrutiny in this matter. Every version of the Terms of Use beginning with Terms Version 5 includes a clause that Account Holders "grant Celsius . . . all right and title to such Digital Assets, including ownership rights." Account Holders who agreed to Terms of Use Version 5 or later, whether by signing up for the first time or by continuing to use the platform with an existing account, entered a contract which contained unambiguous and clear language regarding transfer of title and ownership of assets in Earn Accounts. . . . The Account Holders argue that a layperson's understanding of the term "loan" means the Account Holder retains ownership of their Earn Assets but temporarily allows the use of the assets by the Debtors—but the Court cannot ignore the plain and clear language in the Transfer of Title Clause." (internal citations omitted)); *see also id*. p. 44 ("[T]he Court finds that there was a valid contract between Celsius Account Holders and Celsius and that the contract terms unambiguously transferred all right and title of digital assets to Celsius.").

    12.    Further, because the Terms of Use are unambiguous, it is improper to consider extrinsic evidence. *See id*. p. 29 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous.") (citing *W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162

(1990)).  Thus, the requests that the Debtors be required to provide (and that the Court consider)

tax documents when interpreting the Terms of Use should be denied.

### B. Any Breach of the Terms of Use by Celsius Gives the Non-Breaching Party an Unsecured Claim Against the Debtors for Damages, Not a Separate Remedy.

13.     Certain Motions allege that the Debtors breached the Terms of Use, and that as a

result the Debtors invalidated the Terms of Use and forfeited any right and title to the Earn Assets.

But, as described in the Kwok Order (and previewed in the Earn Opinion), a breach of contract

generally only gives rise to a claim for damages.  *See* Kwok Order p. 4 ("Any claim [] that Celsius

breached its contract . . . or otherwise committed actionable wrongs . . . would not affect the

ownership of cryptocurrency deposited in [their] Earn Accounts.  As the Earn Opinion explains,

the cryptocurrency deposited in Earn Accounts became property of Celsius.  If [a creditor] believes

[they have] compensable claims against Celsius (beyond the amount on deposit in [their] accounts)

. . . [they] can file a proof of claim and assert such claims in the claims-allowance process. But the

cryptocurrency in [a creditor's] Earn Account[] was and remains property of the estate.").  Because

the breaches alleged in the Motions were all prepetition, such claims for damages would be general

unsecured claims and are best resolved in connection with a broader claims reconciliation process,

as contemplated by the Earn Opinion.

14.     Similarly, many of the contract formation defenses reserved for the claims process,

if successful, would only lead to general unsecured claims.  *See* Earn Opinion p. 43 ("Even valid

contract defenses would not necessarily give rise to Account Holders claims to ownership of the

cryptocurrency assets they deposited.").

## II. Grandfathered Earn Assets Should Be Treated as All Other Earn Assets.

15.     One of the few arguments in the Motions that is not directly addressed by the Earn

Opinion (or an individualized, fact-specific defense reserved for the claims process) is the

argument that "grandfathered" assets (*i.e.*, Earn Assets transferred to the Debtors prior to April 14, 2022 by Account Holders who were only eligible for Custody services following such date) should have been put in Custody accounts and that such Earn Assets should be placed in a Custody account now.  Such arguments fail as a matter of contract law.

16.     More specifically, Mr. Marc Benzaken alleges that he opened his Earn Account and accepted the Terms of Use on June 7, 2021.  Marc Benzaken Motion p. 4.[5]  Mr. Marc Benzaken further alleges that the only other time prior to the Petition Date that he logged into his account was around December 27, 2021, prior to the creation of the Custody Program.  *Id.*  As a result, Mr. Marc Benzaken argues that he is not bound by Terms Version 8 and that, because he is an unaccredited investor, the Earn Assets he transferred to the Debtors should have been transferred into a Custody account for his benefit when he did not manually accept the updated Terms of Use.

17.     As an initial matter, the Earn Opinion rules that the updates to the Terms of Use were legally valid and binding contract modifications for Account Holders that continued to use the Celsius platform.  *See* Earn Opinion p. 33 ("The Terms of Use, beginning with Terms Version 1, provide that (i) the Debtors can unilaterally modify the Terms of Use without notice and (ii) the Account Holders' continued use of the platform following an update constitutes consent to the amended Terms of Use.  The Terms Affidavit and Original Blonstein Declaration provide evidence that the Debtors could modify the contract and that Account Holders' continued use of the platform constituted acceptance of the updated Terms of Use, even if the Account Holders did not affirmatively accept the updated terms." (internal citations omitted)); *id.* p. 38 ("The Court concludes that updates to the Terms of Use constituted valid modifications of the contract that an

---

[5]     For purposes of this Objection, the Debtors are treating Mr. Marc Benzaken's factual assertions regarding his account creation as true.  For the avoidance of doubt, the Debtors reserve all rights and do not concede the truth of any matter asserted in Mr. Marc Benzaken's Motion.

Account Holder entered when they created an account with Celsius.").  As a result, Mr. Marc Benzaken's assertion that he did not accept Terms Version 8 is disputed.  The Court, however, does not need to resolve this issue because Mr. Marc Benzaken's arguments fail on their face regardless of whether he accepted Terms Version 8 or not.

18.     Mr. Marc Benzaken does not point to any language in the Terms of Use providing that the Debtors were supposed to transfer assets from the Earn Program to the Custody Program in the event that an Account Holder did not accept the updated Terms of Use.  In fact, the plain language of the Terms of Use specifically provide the opposite:  "Beginning April 15, 2022 . . . Any eligible digital asset that you loaned to Celsius through the earn service prior to the modification date will continue to earn rewards pursuant to the terms herein, until such time as any such eligible digital asset is thereafter used in a service other than the earn service (e.g., the Swap service, CelPay service, Borrow service, or voluntarily moved to the Custody service) or otherwise withdrawn from your Celsius account (each an "earn service termination event")."  *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018*, filed on August 8, 2022 [Docket No. 393] Exhibit A-8 § 1.

19.     As detailed in the *Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1584] (the "Blonstein Declaration"), communications to Account Holders provided an explanation of the changes implemented in Terms Version 8 and the consequences of not accepting them.  *See* Blonstein Declaration ¶ 13–14.  If Mr. Marc Benzaken did not affirmatively accept Terms Version 8, he would have been precluded from accessing Celsius' services and from earning rewards but his

account would not have been automatically cancelled or transferred, a fact he was informed of up front. *See id.* ¶ 12 ("Custody-Eligible Users who did not affirmatively accept Terms [] Version 8 were immediately precluded from accessing any of Celsius' services, and their account balances no longer earned rewards."). Instead, Mr. Marc Benzaken's account would remain frozen until he contacted Celsius to either affirmatively agree to Terms Version 8 or, alternatively, to withdraw funds and cancel his account. *See id.* ¶ 14 ("If you do not agree to our updated Terms of Use, please contact Celsius support to withdraw your funds and close your account.") (internal citations omitted).

20.    Notwithstanding the foregoing, Mr. Marc Benzaken's argument is that, in the absence of his manual consent to the Debtors' most recent terms of use (which created the Custody Program), the Debtors should have replaced his contract with an entirely new contract (transferring his account balance to a Custody Program account) rather than maintaining the status quo of his relationship with the Debtors under his existing contract (the Terms of Use). This position is not supported by the Earn Opinion and has no basis in contact law—had the Debtors done what Mr. Marc Benzaken suggests, the Debtors may very well have been in violation of the Terms of Use. As a result, these arguments must fail. But, as the Kwok Order suggests, even if Mr. Marc Benzaken's argument succeeds, the result is a breach of contract by Celsius that grants him a claim for damages to be reserved for resolution in connection with the claims process. *See supra* Part I.B.

### Conclusion

21.    For the reasons set forth herein, including the Objection Chart, the Debtors request that the Court deny the Motions.

[*Remainder of page intentionally left blank*]

11

WHEREFORE, the Debtors request that the Court enter an order denying the Motions.

New York, New York
Dated: January 17, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                      ross.kwasteniet@kirkland.com
                      chris.koenig@kirkland.com
                      dan.latona@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**Exhibit A**

**Objection Chart**

**In re Celsius Network LLC, et al., Case No. 22-10964 (MG)**

**CHART OF MOTIONS AND OBJECTIONS[1]**

*The following chart summarizes the Motions and provides high-level objections thereto in light of the Earn Opinion and Kwok Order.*

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| Rebecca Gallagher ("Gallagher") [Docket No. 1508] (the "Gallagher Motion") | 1. The assets Gallagher deposited belong to her because the Terms of Use are not legally valid due to Alex Mashinsky's fraudulent misrepresentations. Gallagher relied on Alex Mashinsky's fraudulent representations when depositing and storing her digital assets on the Celsius platform. | 1. All creditor rights with respect to claims such as "fraudulent inducement into the contract, fraudulent conveyance, breach of contract, and that the contract was unconscionable" are reserved for the claim resolution process. Earn Opinion p. 43. Further, to state a claim for fraudulent inducement under New York law, a plaintiff must allege: "a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." A claim for fraudulent inducement must satisfy the heightened pleading requirement of Federal Rule Civil Procedure 9(b), which requires that a party "state with particularity the circumstances constituting fraud." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 490 (S.D.N.Y. 2017). The Gallagher Motion fails to meet this heightened standard. |
| | 2. The Company's lies and misrepresentations render the Terms of Use unconscionable. | 2. All creditor rights with respect to claims such as "fraudulent inducement into the contract, fraudulent conveyance, breach of contract, and that the contract was unconscionable" are reserved for the claim resolution process. Earn Opinion p. 43. Further, a finding of unconscionability requires evidence of |

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the Objection or Earn Opinion, as applicable.

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | | exceptional facts and circumstances. Under New York law, an unconscionable contract is one which "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988). Unconscionability generally requires that the contract was both procedurally and substantively unconscionable at the time of formation—*i.e.*, "some showing of an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Id.* The Gallagher Motion fails to meet this heightened standard. |
| | 3. The digital assets Gallagher deposited belong to her because Mashinsky orally modified the Terms of Use in various AMA videos and interviews. | 3. The Court explained in the Earn Opinion that advertisements generally cannot modify a contract. *See* Earn Opinion p. 37 ("These videos are not submitted into evidence and not considered by the court; second, even if these videos are submitted into evidence, advertisement and similar statements generally do not constitute offer and any offer is a necessary predicate for any 'amendment to the terms of use.'"). |
| | 4. The digital assets Gallagher deposited belong to her because the Terms of Use are ambiguous. | 4. The Court ruled in the Earn Opinion that the Terms of Use are unambiguous. *See* Earn Opinion p. 39. ("Terms Version 5 introduced the transfer of title clause that has been the subject of scrutiny in this matter. Every version of the Terms of Use beginning with Terms Version 5 includes a clause that Account Holders "grant Celsius . . . all right and title to such Digital Assets, including ownership rights" (the "Transfer of Title Clause"). (Terms Affidavit, Ex. A-5 § 14, A-6 § 13, A-7 § 13, A-8 § 13.) Account Holders who agreed to Terms of Use Version 5 or later, whether by signing up for the first time or by continuing to use the |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | | platform with an existing account, entered a contract which contained unambiguous and clear language regarding transfer of title and ownership of assets in Earn Accounts."). |
| | 5. The coins Gallagher deposited belong to her because users were forced into accepting the Terms of Use passively, by default and through trickery. | 5. The Court ruled in the Earn Opinion that the pop-up notices met the standard of "clear and conspicuous," so that "updates to the Terms of Use constituted valid modifications of the contract that an Account Holder entered when they created an account with Celsius." Earn Opinion pp. 36, 38; *see also id.* p. 33 ("The law in the Second Circuit is clear that clickwrap contracts such as the Terms of Use are valid and binding. The Debtors have sufficiently shown the mutual assent element of contract formation."). |
| | 6. Celsius does not have a valid legal claim to ownership of Gallagher's digital assets because Celsius states it is not a Bank and does not hold any banking licenses. | 6. The Court ruled in the Earn Opinion that the Terms of Use are a valid contract that transferred right and title of the Earn Assets to Celsius. *See* Earn Opinion p. 44 ("[T]he Court finds that there was a valid contract between Celsius Account Holders and Celsius and that the contract terms unambiguously transferred all right and title of digital assets to Celsius."). |
| | 7. Celsius does not have a valid legal claim to ownership of Gallagher's digital assets because Celsius breached the contract through various actions. | 7. As the Court held for a similarly situated Earn Account holder in the Kwok Order, any claim by Earn Account holders "that Celsius breached its contract . . . or otherwise committed actionable wrongs . . . would not affect the ownership of cryptocurrency deposited in [their] Earn Accounts." Kwok Order p. 4. "As the Earn Opinion explains, the cryptocurrency deposited in Earn Accounts became property of Celsius. If [a creditor] believes [they have] compensable claims against Celsius (beyond the amount on deposit in [their] accounts) . . . [they] can file a proof of claim and assert such claims in the claims-allowance process. But the |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | | cryptocurrency in [a creditor's] Earn Account[] was and remains property of the estate." *Id.* |
| | 8. The Terms of Use are not a valid contract because Celsius did not provide adequate notice and information when modifying the Terms of Use. | 8. The Court ruled in the Earn Opinion that the modifications to the Terms of Use were valid contract modifications. *See* Earn Opinion p. 33 ("The Terms of Use, beginning with Terms Version 1, provide that (i) the Debtors can unilaterally modify the Terms of Use without notice and (ii) the Account Holders' continued use of the platform following an update constitutes consent to the amended Terms of Use. The Terms Affidavit and Original Blonstein Declaration provide evidence that the Debtors could modify the contract and that Account Holders' continued use of the platform constituted acceptance of the updated Terms of Use, even if the Account Holders did not affirmatively accept the updated terms.") (internal citations omitted); *see also id.* p. 38 ("The Court concludes that updates to the Terms of Use constituted valid modifications of the contract that an Account Holder entered when they created an account with Celsius."). |
| | 9. The Terms of Use is an illegal contract because Celsius doesn't have money transmitter licenses and Earn Assets are unregistered securities. | 9. All creditor rights with respect to claims such as "fraudulent inducement into the contract, fraudulent conveyance, breach of contract, and that the contract was unconscionable" are reserved for the claim resolution process. Earn Opinion p. 43; *see also id.* p. 31 ("The Court makes no determination as to these security issues but notes that if Earn Assets are determined to be securities, it is likely that Earn Account holders would still be unsecured creditors. Section 510(b) of the Bankruptcy Code subordinates claims "arising from" the purchase or sale of a security to the claims of general unsecured creditors. 11 U.S.C. § 510(b). Thus, here to the extent that creditors argue that they have recission claims for the unlawful sale of security, these claims would likely |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | | squarely fall within the broad reach of section 510(b)'s claim 'arising from' the purchase or sale of a security. 11 U.S.C. § 510(b); *see In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold share of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b).").). |
| Marc Benzaken<br><br>[Docket No. 1510]<br><br>(the "Marc Benzaken Motion") | 1. Marc Benzaken alleges he set up his account on June 7, 2021, and that he never consented to any other version of the Terms of Use after that day. Thus, he alleges his account is governed by Terms of Use Version 7 and that Terms of Use Version 7 does not transfer ownership of the digital assets to the Debtors. | 1. The Court ruled in the Earn Opinion that the Terms of Use unambiguously transfer right and title to Celsius. *See* Earn Opinion p. 39. ("Terms Version 5 introduced the transfer of title clause that has been the subject of scrutiny in this matter. Every version of the Terms of Use beginning with Terms Version 5 includes a clause that Account Holders "grant Celsius . . . all right and title to such Digital Assets, including ownership rights" (the "Transfer of Title Clause"). (Terms Affidavit, Ex. A-5 § 14, A-6 § 13, A-7 § 13, A-8 § 13.) Account Holders who agreed to Terms of Use Version 5 or later, whether by signing up for the first time or by continuing to use the platform with an existing account, entered a contract which contained unambiguous and clear language regarding transfer of title and ownership of assets in Earn Accounts."). |
| | 2. As an unaccredited investor, failure to accept Terms of Use Version 8 should have led to the transfer of account assets from Earn to Custody. | 2. The Court ruled in the Earn Opinion that the modifications to the Terms of Use were valid contract modifications. *See* Earn Opinion p. 33 ("The Terms of Use, beginning with Terms Version 1, provide that (i) the Debtors can unilaterally modify the Terms of Use without notice and (ii) the Account Holders' continued use of the platform following an update constitutes consent to the amended Terms of Use. The Terms Affidavit and Original Blonstein Declaration provide evidence that the Debtors could modify the contract and that Account Holders' continued use of the |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | | platform constituted acceptance of the updated Terms of Use, even if the Account Holders did not affirmatively accept the updated terms.") (internal citations omitted); *see also id.* p. 38 ("The Court concludes that updates to the Terms of Use constituted valid modifications of the contract that an Account Holder entered when they created an account with Celsius.").<br><br>Marc Benzaken fails to point to any language in the Terms of Use or Blonstein Declaration providing that the Debtors were supposed to transfer assets from the Earn Program to the Custody Program in the event that an Account Holder did not manually accept the updated Terms of Use. *See* Objection ¶ 18–19.<br><br>Further, as the Court held for a similarly situated Earn Account holder in the Kwok Order, any claim by Earn Account holders "that Celsius breached its contract . . . or otherwise committed actionable wrongs . . . would not affect the ownership of cryptocurrency deposited in [their] Earn Accounts." Kwok Order p. 4. "As the Earn Opinion explains, the cryptocurrency deposited in Earn Accounts became property of Celsius. If [a creditor] believes [they have] compensable claims against Celsius (beyond the amount on deposit in [their] accounts) . . . [they] can file a proof of claim and assert such claims in the claims-allowance process. But the cryptocurrency in [a creditor's] Earn Account[] was and remains property of the estate." *Id.* |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | 3. Debtors did not provide reasonable notice of changes to the Terms of Use because login history shows he did not frequent the app or website. | 3. The Court ruled in the Earn Opinion that the modifications to the Terms of Use were valid contract modifications. *See* Earn Opinion p. 33 ("The Terms of Use, beginning with Terms Version 1, provide that (i) the Debtors can unilaterally modify the Terms of Use without notice and (ii) the Account Holders' continued use of the platform following an update constitutes consent to the amended Terms of Use. The Terms Affidavit and Original Blonstein Declaration provide evidence that the Debtors could modify the contract and that Account Holders' continued use of the platform constituted acceptance of the updated Terms of Use, even if the Account Holders did not affirmatively accept the updated terms.") (internal citations omitted); *see also id*. p. 38 ("The Court concludes that updates to the Terms of Use constituted valid modifications of the contract that an Account Holder entered when they created an account with Celsius."). |
| | 4. Asset ownership transfer is a taxable event and therefore Debtors should have provided a Form 1099. The absence of a Form 1099 proves that Celisus did not receive ownership of the digital Assets placed in Earn Accounts. | 4. The Court ruled in the Earn Opinion that the Terms of Use were unambiguous, making it improper to consider extrinsic evidence. *See* Earn Opinion p. 29 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *See, e.g., W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162 (1990); *see id*. p. 30 "[T]he Court finds, on the evidence before it, that the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors."). |
| Michael Benzaken | 1. The clear and unambiguous language of the Terms of Use | 1. The Court ruled in the Earn Opinion that the Terms of Use unambiguously transfer right and title to Celsius. *See* Earn Opinion p. 39. ("Terms Version 5 introduced the transfer of title clause that has been the subject of scrutiny in this matter. Every version of the |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| [Docket No. 1512]<br><br>(the "Original Michael Benzaken Motion")<br><br>[Docket No. 1814]<br><br>(the "Amended Michael Benzaken Motion") | provides that there was no transfer of title of Earn Assets. | Terms of Use beginning with Terms Version 5 includes a clause that Account Holders "grant Celsius . . . all right and title to such Digital Assets, including ownership rights" (the "Transfer of Title Clause"). (Terms Affidavit, Ex. A-5 § 14, A-6 § 13, A-7 § 13, A-8 § 13.) Account Holders who agreed to Terms of Use Version 5 or later, whether by signing up for the first time or by continuing to use the platform with an existing account, entered a contract which contained unambiguous and clear language regarding transfer of title and ownership of assets in Earn Accounts."). |
| | 2. Asset ownership transfer is a taxable event and therefore Debtors should have provided a Form 1099. The absence of a Form 1099 proves that Celsius did not receive ownership of the digital Assets placed in Earn Accounts. | 2. The Court ruled in the Earn Opinion that the Terms of Use were unambiguous, making it improper to consider extrinsic evidence. *See* Earn Opinion p. 29 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *See*, *e.g.*, *W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162 (1990); *see id.* p. 30 ("[T]he Court finds, on the evidence before it, that the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors."). |
| | 3. No ruling should be made on Earn accounts due to the commingling of assets demonstrated in the Interim Examiner Report. | 3. The Court ruled in the Earn Opinion that the Terms of Use are a valid contract that transferred right and title of the Earn Assets to Celsius. *See* Earn Opinion p. 44 ("[T]he Court finds that there was a valid contract between Celsius Account Holders and Celsius and that the contract terms unambiguously transferred all right and title of digital assets to Celsius."). |
| | 4. Because the Earn Program no longer allows withdrawals, assets | 4. All creditor rights with respect to claims such as "fraudulent inducement into the contract, fraudulent conveyance, breach of |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | in Earn should be migrated to Custody Accounts. | contract, and that the contract was unconscionable" are reserved for the claim resolution process. Earn Opinion p. 43.<br><br>Further, as the Court held for a similarly situated Earn Account holder in the Kwok Order, any claim by Earn Account holders "that Celsius breached its contract . . . or otherwise committed actionable wrongs . . . would not affect the ownership of cryptocurrency deposited in [their] Earn Accounts." Kwok Order p. 4. "As the Earn Opinion explains, the cryptocurrency deposited in Earn Accounts became property of Celsius. If [a creditor] believes [they have] compensable claims against Celsius (beyond the amount on deposit in [their] accounts) . . . [they] can file a proof of claim and assert such claims in the claims-allowance process. But the cryptocurrency in [a creditor's] Earn Account[] was and remains property of the estate." *Id.* |
| | 5. Debtors did not provide reasonable notice of changes to the Terms of Use. | 5. The Court ruled in the Earn Opinion that the modifications to the Terms of Use were valid contract modifications. *See* Earn Opinion p. 33 ("The Terms of Use, beginning with Terms Version 1, provide that (i) the Debtors can unilaterally modify the Terms of Use without notice and (ii) the Account Holders' continued use of the platform following an update constitutes consent to the amended Terms of Use. The Terms Affidavit and Original Blonstein Declaration provide evidence that the Debtors could modify the contract and that Account Holders' continued use of the platform constituted acceptance of the updated Terms of Use, even if the Account Holders did not affirmatively accept the updated terms.") (internal citations omitted); *see also id.* p. 38 ("The Court concludes that updates to the Terms of Use constituted valid |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | | modifications of the contract that an Account Holder entered when they created an account with Celsius."). |
| | 6. Michael Benzaken's closed loans should have returned the collateral to his custody account after April 14, 2022. | 6. As the Court held for a similarly situated Earn Account holder in the Kwok Order, any claim by Earn Account holders "that Celsius breached its contract . . . or otherwise committed actionable wrongs . . . would not affect the ownership of cryptocurrency deposited in [their] Earn Accounts." Kwok Order p. 4. "As the Earn Opinion explains, the cryptocurrency deposited in Earn Accounts became property of Celsius. If [a creditor] believes [they have] compensable claims against Celsius (beyond the amount on deposit in [their] accounts) . . . [they] can file a proof of claim and assert such claims in the claims-allowance process. But the cryptocurrency in [a creditor's] Earn Account[] was and remains property of the estate." *Id.* |
| Kulpreet Khanuja ("Khanuja") [Docket No. 1346] (the "Original Khanuja Motion") [Docket No. 1816] (the "Amended Khanuja Motion"). | 1. Earn accounts are customer assets and earning rewards does not convert them to property of Celsius. | 1. The Court ruled in the Earn Opinion that the Terms of Use unambiguously transfer right and title to Celsius. *See* Earn Opinion p. 39. ("Terms Version 5 introduced the transfer of title clause that has been the subject of scrutiny in this matter. Every version of the Terms of Use beginning with Terms Version 5 includes a clause that Account Holders "grant Celsius . . . all right and title to such Digital Assets, including ownership rights" (the "Transfer of Title Clause"). (Terms Affidavit, Ex. A-5 § 14, A-6 § 13, A-7 § 13, A-8 § 13.) Account Holders who agreed to Terms of Use Version 5 or later, whether by signing up for the first time or by continuing to use the platform with an existing account, entered a contract which contained unambiguous and clear language regarding transfer of title and ownership of assets in Earn Accounts."). |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | 2. Khanuja owned the assets because he paid taxes on 1099 forms provided by Celsius. | 2. The Court ruled in the Earn Opinion that the Terms of Use were unambiguous, making it improper to consider extrinsic evidence. *See* Earn Opinion p. 29 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *See, e.g., W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162 (1990); *see id.* p. 30 ("[T]he Court finds, on the evidence before it, that the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors."). |
| | 3. Updates and modifications to the Terms of Use were inconspicuous and obfuscated. | 3. The Court ruled in the Earn Opinion that the modifications to the Terms of Use were valid contract modifications. *See* Earn Opinion p. 33 ("The Terms of Use, beginning with Terms Version 1, provide that (i) the Debtors can unilaterally modify the Terms of Use without notice and (ii) the Account Holders' continued use of the platform following an update constitutes consent to the amended Terms of Use. The Terms Affidavit and Original Blonstein Declaration provide evidence that the Debtors could modify the contract and that Account Holders' continued use of the platform constituted acceptance of the updated Terms of Use, even if the Account Holders did not affirmatively accept the updated terms.") (internal citations omitted); *see also id.* p. 38 ("The Court concludes that updates to the Terms of Use constituted valid modifications of the contract that an Account Holder entered when they created an account with Celsius."). |
| | 4. The Terms of Use had contradictory clauses that should be construed against Celsius to result in Earn Assets being owned | 4. The Court ruled in the Earn Opinion that the Terms of Use unambiguously transfer right and title to Celsius. *See* Earn Opinion p. 39. ("Terms Version 5 introduced the transfer of title clause that has been the subject of scrutiny in this matter. Every version of the |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | by customers who loaned them to Celsius. Also, various statements made by officers of Celsius show that the Terms of Use are ambiguous about the ownership of assets. | Terms of Use beginning with Terms Version 5 includes a clause that Account Holders "grant Celsius . . . all right and title to such Digital Assets, including ownership rights" (the "Transfer of Title Clause"). (Terms Affidavit, Ex. A-5 § 14, A-6 § 13, A-7 § 13, A-8 § 13.) Account Holders who agreed to Terms of Use Version 5 or later, whether by signing up for the first time or by continuing to use the platform with an existing account, entered a contract which contained unambiguous and clear language regarding transfer of title and ownership of assets in Earn Accounts."); *see also id*. p. 40 ("It is blackletter law that a loan of money or property to another creates a debtor-creditor relationship.") (internal citations omitted). |
| | 5.  Celsius breached their contract with Khanuja by deliberately delaying withdrawal of funds from Khanuja's account between May 6, 2022 and June 2, 2022. | 5.  As the Court held for a similarly situated Earn Account holder in the Kwok Order, any claim by Earn Account holders "that Celsius breached its contract . . . or otherwise committed actionable wrongs . . . would not affect the ownership of cryptocurrency deposited in [their] Earn Accounts." Kwok Order p. 4. "As the Earn Opinion explains, the cryptocurrency deposited in Earn Accounts became property of Celsius. If [a creditor] believes [they have] compensable claims against Celsius (beyond the amount on deposit in [their] accounts) . . . [they] can file a proof of claim and assert such claims in the claims-allowance process. But the cryptocurrency in [a creditor's] Earn Account[] was and remains property of the estate." *Id.* |
| | 6.  The Terms of Use are unconscionable. | 6.  All creditor rights with respect to claims such as "fraudulent inducement into the contract, fraudulent conveyance, breach of contract, and that the contract was unconscionable" are reserved for the claim resolution process. Earn Opinion p. 43. |

| Moving Party and Docket No. | Movant's Argument | Debtors' Objection |
|---|---|---|
| | | Further, a finding of unconscionability requires evidence of exceptional facts and circumstances. Under New York law, an unconscionable contract is one which "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988). Unconscionability generally requires that the contract was both procedurally and substantively unconscionable at the time of formation—i.e., "some showing of an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Id.* The Amended Khanuja Motion fails to meet this heightened standard. |
| | 7. Khanuja was fraudulently misled by Celsius to his detriment. | 7. All creditor rights with respect to claims such as "fraudulent inducement into the contract, fraudulent conveyance, breach of contract, and that the contract was unconscionable" are reserved for the claim resolution process. Earn Opinion p. 43. |
| | | Further, to state a claim for fraudulent inducement under New York law, a plaintiff must allege: "a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." A claim for fraudulent inducement must satisfy the heightened pleading requirement of Federal Rule Civil Procedure 9(b), which requires that a party "state with particularity the circumstances constituting fraud." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 490 (S.D.N.Y. 2017). The Amended Khanuja Motion fails to meet this heightened standard. |

Exhibit F

LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ABIGAIL R. RYAN
Texas Bar No. 24035956
ROMA N. DESAI
S.D.N.Y. Bar Number RD8227
Texas Bar No. 24095553
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
layla.milligan@oag.texas.gov
abigail.ryan@oag.texas.gov
roma.desai@oag.texas.gov

ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD
AND THE TEXAS DEPARTMENT OF BANKING

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter: 11 |
| CELSIUS NETWORK LLC, *et al.*[1], | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE TEXAS STATE SECURITIES BOARD
AND THE TEXAS DEPARTMENT OF BANKING TO DEBTORS' AMENDED
MOTION SEEKING ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF
ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF
STABLECOIN IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF**

The Texas State Securities Board (the "SSB") and the Texas Department of Banking (the

"DOB") (together, "Texas"), by and through the Office of the Texas Attorney General, hereby files

this Objection (the "Objection") to the *Debtors' Amended Motion Seeking Entry of an Order (I)*

*Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin*

*in the Ordinary Course and (III) Granting Related Relief* [D.E. 1325]. In support of the Objection,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

Texas respectfully states as follows:[2]

## OVERVIEW

1.      The Debtors improperly seek to establish ownership of assets in the Earn program through an amended motion on an expedited basis, rather than an adversary proceeding pursuant to Bankruptcy Rule 7001. While the Debtors allege an unsubstantiated "urgent" need to establish ownership of the assets in question, procedural safeguards are in place through the Bankruptcy Rules that should be followed to allow all parties in interest to participate and be heard through the bankruptcy process.

2.      Further, the Debtors' expedited motion attempts to establish ownership of Earn Assets through self-serving assertions that certain Terms of Use created a contract right of ownership by the Debtors in the Earn Assets. However, even though the Debtors have the ability to track consumers' electronic agreements to the different Terms of Use, the Debtors have failed to offer any documentation to establish that consumer investors actually *agreed* to the Terms of Use—instead, the Debtors only offer perfunctory statements by interested individuals related to how the company normally processed Terms of Use.

3.      Further, the multiple variations of the Terms of Use filed by the Debtors are confusing and inconsistent at best, and the agreement of the parties to the terms is unclear. Because there may be significant defenses to the issue of whether the Terms of Use were a binding contract, a determination of whether the Terms of Use were a viable, enforceable contract without consideration of those defenses is premature.

4.      Finally, the Examiner continues her review of, *inter alia*, the cryptocurrency holdings of the Debtors. The request to sell certain of these cryptocurrency assets while this examination is pending is inappropriate and untimely. There is no urgency for cash, as Debtors have indicated that

---

[2] Capitalized terms not otherwise defined or provided herein have the meanings ascribed to them in the Motion or D.E. 23 (the "First Day Declaration.").

they have liquidity into the first quarter of 2023, and the sale of stablecoin is not a time-consuming process. The pending sale of stablecoin should not occur until all parties have the benefit of the Examiner's final review and report.

5.      Based on these significant concerns, Texas respectfully requests that the Motion be denied. In the alternative, to the extent that this Court finds that the assets in the Earn program are property of the bankruptcy estate, the Court should direct the Debtors to hold any proceeds from the monetization of the stablecoin in question for the benefit of creditors and address the proceeds in a confirmable Chapter 11 Plan of Reorganization or Liquidation.

## **PROCEDURAL BACKGROUND**

6.      The Debtors commenced these cases on July 13, 2022, (the "Petition Date") and continue to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

7.      The Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* on September 15, 2022.[3]

8.      The Debtors filed the *Debtors' Amended Motion Seeking Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* ("**Motion**") on November 11, 2022.[4] The hearing on the Motion is scheduled to take place on Monday, December 5, 2022.

## **OBJECTION AND BASES THEREFOR**

### A. **The Debtors' Motion is Procedurally Improper and Short-Circuits Due Process.**

9.      Pursuant to Bankruptcy Rule 7001, determination of whether an asset is property of the bankruptcy estate is to be made following the filing of an adversary proceeding.[5]

---

[3] D.E. 187.
[4] D.E. 1325.
[5] Bankruptcy Rule 7001.

10.     In the present case, during a hearing on whether the Debtors should sell a portion of assets in which it claims an ownership interest, the Debtors posited to the Court that ownership of an entire class of assets—the Earn Assets—should be determined by the Court, and that an amended motion would be filed to address the Debtors' contentions. Rather than filing an adversary proceeding, Debtors filed the Motion.

11.     Bankruptcy Rule 7001 governs the Debtors' attempt to determine its interest in the property—specifically the Earn Assets. The need for a formal adversary proceeding to determine whether the Earn Assets are property of the Estate is only bolstered by the Debtors' incomplete and contested responses to Written Deposition Questions and a myriad of issues raised in depositions of its directors and officers.[6]

12.     The Debtors filed the Motion on November 11th, and on an extremely expedited schedule, has attempted to short circuit adversarial rules and guidelines and rush the issue to adjudication before this Court.

13.     Debtors are aware that many, if not most, of the Earn account holders are unsophisticated consumer investors who have not formed an ad hoc committee, or, in most cases, located bankruptcy counsel to assist them in this case. Debtors appear to be using this to their advantage, by attempting to circumvent proper procedure and due process to obtain a favorable outcome.

14.     While Texas cannot and does not represent the individual Earn account holders, Texas does have a vested interest in the protection of its citizenry—specifically, those citizens that may be Earn Account holders affected by the Court's ruling. Therefore, the Debtors' Motion should be denied, and the Earn Account Holders should be granted due process through an adversary proceeding to defend their position as to ownership of the funds.

---

[6] D.E. 1406; D.E. 1389; D.E. 1418.

**B.**  **The Debtors Have Failed to Provide Sufficient Evidence that Celsius Customers Agreed to Terms of Use.**

15.     The Debtors assert that because of certain language included in the Terms of Use in effect on the petition date — and/or terms that were amended over time — it is the owner of Earn Assets. The Debtor cites certain case law related to types of online agreements in the nature of terms of use for software and argues that because users had to click an agreement to access their funds, they agreed to surrender ownership of their crypto assets to the Debtors.

16.     Debtors, however, have failed to show proof of acceptance by the holders of the respective Earn Assets, basing their entire argument on the statement of interested parties, including its Chief Compliance Officer, who merely state that because the company followed a certain process for forcing users to accept revised Terms of Use, all users must have agreed to those terms.[7]

17.     The Declaration of Oren Blonstein includes a reference to the percentage of users who purportedly agreed to various versions of the Terms of Use.[8] However, no actual proof of that agreement, by way of documentation reflecting the date of agreement and identification of the user, has been provided. Until evidence of said agreements has been produced, the Court should deny the Debtors' request to monetize Earn Assets.

**C.**  **A Determination of Whether Terms of Use Create a Binding and Enforceable Contract is Premature.**

18.     The Terms of Use and amendments are confusing and inconsistent at best.  For instance, one version of the Terms of Use referred to by the Debtors for purposes of establishing ownership of the Earn Assets states that "*in consideration for the rewards earned on your Celsius Wallet and the use of our Services, you grant Celsius...ownership rights.*"[9]  Later terms include

---

[7] D.E. 1327, page 6.
[8] D.E. 1327, page 5.
[9] D.E. 393, page 198.

references to assets being _loaned_ to the Debtors and/or _transferred_ to the Debtors.[10]

19.     While the Debtors attempt to narrow the legal issues, _inter alia_, "to whether each applicable version of the Terms of Use forms a binding contract with users," defenses to the alleged contract — including potential allegations of fraudulent inducement, illegality, duress, and impossibility — must be considered by the Court in determining whether the Terms of Use were a viable, enforceable contract.

20.     These defenses, however, have been carved out from the matters at hand, including discovery conducted to date.[11] Texas requests that the Court consider all aspects of the agreements to determine whether the Terms of Use form a viable, enforceable contract, including pertinent defenses thereto. As such, the request by the Debtors of the Court to make the determination as asserted in the Motion at this time should be denied.

**D.  The Examiner Has Not Yet Completed Her Final Report.**

21.     The court-appointed Examiner issued an Interim Report on November 19, 2022, reflecting her investigation to date regarding issues involving the Custody and Withhold accounts.

22.     The Examiner's final report is due to be issued in early December 2022, and should further address her examination of the Debtors cryptocurrency holdings, including a determination as to where the Debtors' cryptocurrency holdings were stored pre-petition and are stored post-petition, and whether different types of accounts are commingled, and an examination as to why there was a change in account offerings beginning April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account".[12]

23.     A determination of ownership of the Earn Assets prior to the issuance of this final report would be premature. Texas urges this Court to hold its final ruling until after the final report is issued

---

[10] D.E. 393, page 273.
[11] D.E. 1325, paragraph 16.
[12] D.E. 923.

and parties have had a chance to review and address her findings.

### E. Should the Court Find Earn Assets are Property of the Bankruptcy Estate, Proceeds Should Be Held for the Benefit of Creditors and Addressed in a Plan.

24.     Should the Stablecoin in question be determined to be property of the bankruptcy estate, the Debtors should not be granted permission carte blanche to dispose of assets of the bankruptcy estate without oversight.

25.     The Motion is unclear as to what the Debtors intend to do with the proceeds from the monetization of the stablecoin other than a very generally, to "fund administrative costs."[13] Texas objects to any language in the proposed order that would allow use of the funds in question to pay administrative costs, and asserts that any proceeds from the Debtors' sale of stablecoin should instead be held for the benefit of creditors and addressed through a confirmable Plan of Reorganization or Liquidation.

## RESERVATION OF RIGHTS

Texas reserves the right to supplement this Objection or to raise additional or further objections to the Motion at or prior to the Hearing or any other relevant hearing.

## PRAYER

WHEREFORE premise considered, Texas requests that the Motion be denied, or, alternatively, should this Court determine that Earn Assets are property of the bankruptcy estate, that the relief granted to the Debtors be limited to selling stablecoin and holding the proceeds of such sale solely for the benefit of creditors of the bankruptcy estate.

---

[13] *See* Motion, para. 4.

Dated: November 29, 2022,             Respectfully submitted,


KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

*/s/ Layla D. Milligan*
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ABIGAIL R. RYAN
Texas State Bar No. 24035956
ROMA N. DESAI
S.D.N.Y. Bar No. RD8227
Texas Bar No. 24095553
Office of the Attorney General of Texas
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 463-2173
Facsimile: (512) 936-1409
layla.milligan@oag.texas.gov
abigail.ryan@oag.texas.gov
roma.desai@oag.texas.gov

ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD
AND
THE TEXAS DEPARTMENT OF BANKING

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on November 29, 2022.

*/s/ Layla D. Milligan*
LAYLA D. MILLIGAN