Kulpreet Khanuja
Pro se Celsius creditor

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ ) | |
| ) | |
| In re: ) | |
| ) Chapter 11 | |
| CELSIUS NETWORK LLC, *et al*., ) | |
| ) Case No. 22-10964 (MG) | |
| Debtors. ) | |
| ) (Jointly Administered) | |
| _____ ) | |

**AMENDED VERIFIED MOTION SEEKING TO PRESERVE MY RIGHT FOR DETERMINATION THAT MY PERSONAL EARN PROGRAM ASSETS RECEIVE THE SAME STANDING AS CUSTODY ACCOUNTS AND ARE NOT PROPERTY OF THESE ESTATES AND REQUEST FOR HEARING**

I, Kulpreet Khanuja, pro se Celsius creditor, hereby file the following amended motion to supplement and replace my verified Motion and Exhibits ("Exhibit A", "Exhibit B" and "Exhibit C") filed on Nov 10th (Celsius Case No. 22-10964 Chapter 11 declaration Doc 1346). I respectfully state as follows:

I have been an account holder at Celsius Network since February 2019. My assets, as of Celsius Network's Bankruptcy filing, were in an 'Earn' account. I serve this motion and request a hearing to ensure that my digital assets (Earn program deposits) are deemed my property (property of creditor/customer) and so that my 'Earn' account receives equal standing (seniority/preference) in bankruptcy proceedings with 'Custody' Accounts. My verification below is based on my personal knowledge and my communications with Debtors.

**<u>Arguments against 'Terms of Use' implying my assets deposited to Celsius Earn program are Debtors' assets.</u>**

1. **No transfer of title, sales or Taxes other than taxes on interest (rewards on customer assets)**

   Digital assets in Earn accounts are customer assets. The deposit of digital assets into Celsius network app for earning rewards does not convert these assets into Debtors' assets. Debtors did not treat my deposits of digital assets as a disposal of property or a transfer of title. Instead, I paid taxes on the earned interest on my deposited assets to the IRS based on the 1099 forms generated **by Debtors**. This tax treatment demonstrated that I retained ownership of the assets and that I was in constructive receipt of interest paid as it was deposited into my account by Debtors.

   a. At my account opening in February 2019, there were no separate 'Earn' or 'Custody' wallets but only personal Celsius wallets. *(Please refer to Celsius' emails in Exhibit A).*

   b. I deposited assets on the Celsius app to earn interest/rewards on a supposedly low risk low return lending program, working very similarly to a securities lending program offered by financial institutions in securities markets. Coming from a professional background in the financial industry, having worked on similar financial and capital market products on Wall Street and having advised financial industry clients to build regulatory and risk management policies and capabilities, I deemed Celsius Lending (Earn product) as a prudent low-risk investment opportunity for our long term digital asset holdings. The counterparty default risk was mitigated by the 1:1 collateral and overcollateralized financial institution counterparties that Debtors promised. All of these features and even Terms of Use are extremely similar to the Securities Lending Terms that I had used in my eTrade account.

   c. The returns (rewards) on my deposited assets (BTC and ETH) were not exorbitant but rather in the range of 3-6%. Debtors' 'Terms of Use' and web AMAs (Ask Me Anything with CEO) indicated that customer assets can be lent out to carefully vetted over-collateralized institutional borrowers. *(Please refer to Debtors' email in Exhibit A denoting BTC and ETH returns of 4.1% and 4.55% respectively for a sample week).*

   d. I paid taxes for the rewards earned on the digital assets deposited at Celsius to IRS for tax years 2019-2021. Celsius itself generated 1099 forms for income earned. My Earn assets should not be now treated as Celsius' (estate) assets for settlement and/or distribution while Custody or other accounts are treated as their own assets and given better treatment  in these bankruptcy proceedings.

*Please refer to the screenshot of Celsius 2021 Tax 1099 form. Additionally, all Celsius annual 1099 forms and Tax Returns to IRS from 2019-2021 can also be provided, if needed.*

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.<br>CELSIUS NETWORK LIMITED<br>THE HARLEY BUILDING<br>77-79 NEW CAVENDISH STREET<br>LONDON W1W 6XB<br>UNITED KINGDOM | 1 Rents | OMB No. 1545-0115 | |
| | 2 Royalties | **2021** | **Miscellaneous Information** |
| | 3 Other income  $18,089.68 | Form 1099-MISC | |
| PAYER'S TIN  RECIPIENT'S TIN<br>98-1528554 | 5 Fishing boat proceeds | 4 Federal income tax withheld | **Copy B**<br>**For Recipient** |
| RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code<br>KULPREET KHANUJA<br>STAMFORD, CT 06905 | 6 Medical and health care payments | | This is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| | 7 Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale | 8 Substitute payments in lieu of dividends or interest | |
| | 9 Crop insurance proceeds | 10 Gross proceeds paid to an attorney | |
| | 11 Fish purchased for resale | 12 Section 409A deferrals | |
| Account number (see instructions)  FATCA filing requirement<br>NMAWLTYNEOWNRAE2JBWX | 13 Excess golden parachute payments | 14 Nonqualified deferred compensation | |
| | 15 State tax withheld | 16 State/Payer's state no.  CT | 17 State income |

Form **1099-MISC**    (keep for your records)    www.irs.gov/Form1099MISC    Department of the Treasury - Internal Revenue Service

2. **Debtors' Terms of Use clearly indicate the assets were a "LOAN" from customers to the debtors.**

The Debtors inconspicuously inserted clauses in successive 'Terms of Use' versions that claim the deposit of assets into Celsius app grants Debtors the ownership of these assets. The Debtors attach to the Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network, LLC providing Terms of Use dating back to February 18, 2018 (the "Mashinsky Declaration") (Doc. No. 393) as evidence of their Terms of Use. Yet there are also contradictory clauses in the Terms of Use (all versions) regarding ownership and withdrawals. Also the Terms of Use in effect at bankruptcy clearly mention the assets were loaned to Celsius and not sold thereby transferring ownership. Any ambiguity should be construed against Celsius as the drafter.

a. Exhibit A-8 are the Terms of Use the Debtors allege were in effect on the Petition Date and the Debtors allege that paragraph 13 provides that Earn Assets were conveyed to the Debtors. However, the Terms of Use themselves assert the contrary. The Terms of Use contain many references to customers "lending" their Earn Assets to the Debtors and also have provisions that would have no effect if the Debtors actually owned the Earn Assets. For example, the Terms of Use attached to the Mashinsky Declaration as Exhibit A-8, at page 525, state the following "ANY ELIGIBLE DIGITAL ASSET THAT YOU LOANED TO CELSIUS THROUGH THE EARN SERVICE PRIOR TO THE MODIFICATION DATE, WILL CONTINUE TO EARN REWARDS. ANY ELIGIBLE ASSET TRANSFERRED TO CELSIUS WILL BE INITIALLY TRANSFERRED TO THE EARN SERVICE AND CONSTITUTE A LOAN FROM YOU TO CELSIUS." Emphasis added.

    i.  In the Earn Terms of Use, there are more than 15 instances of Earn assets LOANED to Celsius. If these were to be treated as assets owned by the Debtors, all these mentions of LOANED to Celsius should have been avoided.

  b.  Even paragraph 13 relied on by the Debtors refers to Earn Assets being loaned to the Debtors, not conveyed. Paragraph 13 states that:

"In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, SUBJECT TO APPLICABLE LAW AND FOR THE DURATION OF THE PERIOD during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus LOAN SUCH ELIGIBLE DIGITAL ASSETS TO US THROUGH YOUR CELSIUS ACCOUNT, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion….." Exhibit A-8 to Mashinsky Declaration at pg. 554 (emphasis added).

    i.  As mentioned above, the paragraph clearly states Earn Assets are 'loaned' from customers to the Debtors

    ii.  The paragraph also states the grant of ownership rights is 'Subject to applicable Law'. Note that none of the laws: New York, New Jersey, Delaware or US Securities laws define a loan as granting ownership to the debtor. The use of the term 'Loan' in the same statements and paragraphs as the terms around ownership conveys doubt on the debtors' claim on the customers' assets.

    iii.  The paragraph also clearly denotes that the grant of ownership is temporary stating "for a specific duration for which the Earn Service is utilized". This is consistent with Securities Lending laws where the ownership is temporarily granted so as the Debtor (borrower) can pledge, re-pledge, hypothecate, rehypothecate, sell or lend the securities to earn

returns/interest on securities. However, the economic control/beneficial ownership of the security is retained with the creditor and the borrower has an obligation to return the creditor's loaned assets when called upon.

iv. Note that UCC in their limited objection to the sale of stablecoin and the ownership of assets too mention the securities lending but their statement is incomplete and interpretation misleading.

UCC's objection (copied below from filing doc 1502) failed to mention that in securities lending it is always a TEMPORARY transfer of title and not permanent.

Secondly, in Securities Lending CERTAIN rights of ownership like 'voting rights' cannot be exercised, not all rights of ownership and economic control of the assets is waived. UCC in their statements carelessly omitted these 2 important distinctions that are misleading and may have an impact on the ruling. If there was permanent transfer of title or all rights of ownership, then the borrower will have no obligation to repay the Creditors.

Finally, UCC's interpretation of contract law in the context of Celsius Terms of Use is misleading. I agree with UCC's statement that courts should not adopt an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should seek to read contractual provisions in harmony. Yet, when reading the contract provisions in harmony, it is crystal clear and irrefutable that the assets were "LOANED" to Celsius and depositors did not convey complete ownership. There are more than 15 instances in Terms of Use for 'Earn' where this is written unequivocally.

It is unconscionable and unreasonable to indicate that investors or depositors will be willing to or happily exchange 100% of their assets for appx. 5-7% returns. As also agreed by interim CEO Mr. Ferraro in his testimony, Celsius customers who deposited their assets were expecting 100% return of their assets+rewards when the agreement was over.

UCC statement in Filing Doc 1502"

*5. Many Account Holders have argued that Version 8 is ambiguous with respect to who holds title to Earn Assets because, on the one hand, it describes the transaction between Account Holders and Celsius as a loan while, on the other hand, it provides that Account Holders transferred title*

*to Earn Assets to Celsius. However, those concepts are not mutually exclusive. For instance, in the securities context, it is common for a loan of securities to a broker to also constitute a transfer of title thereto (or the incidents of ownership thereof) so that the broker can sell, lend, hypothecate, or rehypothecate the securities. In that instance, title to the securities is transferred to the securities broker, and the securities broker has a contractual obligation to return equivalent securities (but not the exact same securities) to the initial transferor.*

*6. More importantly, reading the reference to a "loan" in the Terms of Use to mean that title did not transfer would require the reader to ignore several provisions from the Terms of Use, including provisions regarding the transfer of title and Celsius's ability to sell or otherwise transfer digital assets (including rights of ownership). It is a bedrock principle of contract interpretation that courts should not adopt an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should seek to read contractual provisions in harmony. Under their plain language, and in accordance with established rules of contractual interpretation, the Terms of Use provide the Debtors with title to Earn Assets (including stablecoin) and the authority to sell the Proposed Sale Stablecoin subject to the provisions of the Bankruptcy Code.*

*Please refer to the below screenshots from ToS of comparable Securities Lending agreements (Fidelity, eTrade, Robinhood and TD Securities) where rights of ownership temporarily are granted with regards to earning interest, but the customer still retains economic control/ownership of the asset at all times and the debtor has an obligation to the creditor on loaned assets. Only voting rights are transferred.*

ROBINHOOD                                          E-TRADE





## Do I still own my shares if I participate in FPSL?

Kind of. You can sell your shares or recall the loan at any time. But when a security is loaned, ownership of that security is temporarily transferred to the borrower. This means the borrower gets shareholder voting rights and SIPC insurance for those shares.

However, you still have economic control over them (confusing, we know). For example: the loaned shares are still visible in your account, and you can sell them or terminate the loan any time.

On the backend, your broker would return the collateral to the borrower, and the borrower would return the shares to the broker (but that all happens behind-the-scenes).



## Paid Lending Program?

When you enroll your eligible accounts in E*TRADE's Fully Paid Lending Program, you agree to allow E*TRADE to borrow your fully-paid-for securities (i.e. positions not purchased on margin) in exchange for potential income. We then loan your shares to other investors and market participants through the securities lending market if they become lendable due to high borrowing demand (often due to short selling).



### Sell at any time

You retain full ownership rights and may sell your shares or leave the program at any time. Keep any gains (or losses) while the stock is on loan.

FIDELITY

 7:20

How does lending affect my ownership of the securities?

Under the securities lending agreement you maintain full economic ownership of the securities on loan and may sell or recall loans at any time.[3] However, you do relinquish your ability to exercise voting rights if shares are on loan over a proxy record date.

Will I still receive cash dividends while securities are on loan?

How can I monitor my securities on loan?

What determines the lending rate?

Will the lending rate change over the life of the loan?

Does Fidelity receive compensation for use of my loaned securities?

What are the risks associated with fully paid lending?

Can you tell me more about the collateral provided?

Fidelity will provide you with collateral that is held at a third-party custodial bank. The bank will serve as your collateral agent and hold your collateral in cash or cash-equivalent form. The collateral will be equal to at least 100% of the value of the shares on loan.

Fidelity will adjust the collateral each day to account for mark to market and

Feedback

 7:17

borrow certain eligible securities until either you or Fidelity elect to close the loan.



**Earn incremental income**
Receive income from Fidelity on any borrowed securities. Income accrues daily and is credited to your account monthly.



**Maintain full economic ownership**
Remain exposed to the market while your securities are on loan. Sell your shares or recall the loan at any time.



**Monitor activity online**
Securities on loan, lending interest rates, and program activity can be viewed on your Fidelity.com Positions page, along with your current portfolio valuations.

Feedback

Ready ~~to get started?~~*

TD AMERITRADE

**7:08** 🌙   ◀ Search

With the Fully Paid Lending Income Program, you can lend your securities to TD Ameritrade each month to potentially earn additional income.  There is no added cost to participate and risk is mitigated because the loan is backed by 102% cash collateral.



## Potential benefits of the program

- Additional monthly income potential

- No action required after successful enrollment*

- No additional cost to participate

- Maintain ownership of your shares

- Opt out of the program at any time

- Loans are back backed by 102% of cash collateral held at a 3rd party bank, aimed at reducing risk

- Easily keep tabs on earnings in your account with statements

**7:09** 🌙   ◀ Search

## Important considerations

It's important to note that there are risks of Fully Paid Lending Income

- **Typical Investment Risk:** All inherent investment risks apply and share performance is subject to market fluctuation.

- **SIPC:** The SIPC doesn't cover shares on loans, which are secured by 102% collateral provided by TD Ameritrade and held at a third party bank. You can withdraw on this collateral in the unlikely event of a default in which TD Ameritrade does not return borrowed securities.

- **Tax Implications:** After you lend out a dividend-paying security, you'll receive cash-in-lieu of your regular dividend payment. It's important to remember that dividend income is taxed at a different rate.

- **Waived Voting Rights:** Your shares will be lent out and you will temporarily forfeit your voting rights to the borrower. However, if you'd like to reclaim them before the record date, it's easy to regain your voting privileges.

- **Market Dictates Demand:** Whether or not your securities are borrowed depends on their volume and lending market demand. Interest rates and demand will vary by security over time

3. **The testimony and deposition of Debtors' representatives, the interim Chief Executive Officer, Mr. Chris Ferraro, and the Chief Compliance Officer, Mr. Oren Blonstein, raised further questions around their complicity in the Celsius misrepresentations and mismanaged operations. Also raises doubts on their understanding of the Terms of Use contrary to their conclusive written declarations.**

Note that the deposition of both Mr. Ferraro and Mr. Blonstein was centered around the Terms of Use. They both admitted to being prepped by Celsius counsel and also they read the Terms of Use, same as in their written declarations. They were presented by the Celsius counsel as the key witnesses to answer any questions regarding Terms of Use and ownership. Any attempt to not answer or dodge relevant in-scope questions, not keeping copies of the Terms of Use, or not being able to recall must be construed as their inability or unwillingness to answer.

Mr. Chris Ferraro, who joined Celsius as the head of FP&A (Financial Planning and Analysis), acknowledged that he was responsible for budget forecasting including preparing the 13-week forecast at the end of March 2022 and the May 2 2022 budget. As an FP&A head and in his broader role around Balance Sheet Management, it is unfathomable that he did not have a view into the assets-liability mismatch on Celsius' balance sheet that came to the surface just a few weeks later. He also mentioned he was not responsible for the Terms of Use review, but it is again unfathomable considering that new Terms of Use that accompanied the creation of custody accounts would undeniably result in movement of assets from certain account types to others and ultimately impact Celsius' assets and liabilities since as per the debtors, the rights and obligations for these accounts differ. For e.g. movement of assets from Earn to Custody accounts. The asset movement will have a hugely consequential impact on the 13-week forecasts and budgets that Mr. Ferraro was leading so it is surprising when he was not required to participate in the new product launches and the Terms of Use governing those.

Mr. Ferraro also conclusively said, to him, all the terms of use (all versions) were clear regarding asset ownership transfer to Celsius. Yet, there is no mention of transfer of ownership of assets until Terms of Use Ver 5. When pressed further, he mentioned he read but did not memorize the previous Terms of Use. But in that case, his written declarations on Terms of Use, especially regarding ownership of the assets, is dubious at best since he made similar claims in his written declarations.

In the deposition session and testimony, Mr. Chris Ferraro's responses to questions around Celsius' Terms of Use strongly indicate Celsius executives' ambiguity in understanding

their own terms of use. Also contrary to his written declarations, the testimony solidified that the assets were loaned to Celsius not transferred with ownership.

a. Mr. Ferraro acknowledged that customers of Earn products expected their deposited assets + rewards back when using Earn service. Mr. Ferraro's comments also cleared his previous assertion that customers deposited their assets and transferred ownership of assets to Celsius in exchange for rewards. Any claims of Celsius ownership of these assets is counter to this understanding and statements from Mr Ferraro.

Find the below excerpt (verbatim) from Mr. Ferraro's deposition transcript around customer expectation from Earn Product and Celsius's obligation to customers.

> "·Q.· · Mr. Ferraro, you mentioned to Mr. Hershey that, per your knowledge, customers deposited their assets and transferred ownership of assets to Celsius in exchange for rewards. Say, if a customer deposited, say, 100 Bitcoins and was paid 5 percent in rewards, would the customer expect 105 Bitcoins back or just 5 Bitcoins back?
>
> A.· · The obligation would be the Bitcoin you deposited, plus your rewards.
>
> Q.· · 105.· So you would say the customers would not be happy exchanging their 100 Bitcoins for 5 Bitcoins in return?
>
> A.· · I don't know why –
>
> Q.· · They'd get 105.
>
> A.· · Yeah, I think that's how the back office system works.· That's -- we would accrue rewards to your obligation, and your obligation in this example would be 105 and the claim would be 105."

b. When asked about the withdrawal of assets, Mr. Ferraro explained that customers loaned the assets to Celsius so Celsius had an obligation to return these assets. When further asked about the definition of Loans and whether these included ownership rights, Mr. Ferraro likened the Earn agreement to a "lien".

There are major flaws in the debtors' claims of ownership in light of these explanations.

- Firstly, any form of loan does not transfer ownership of assets to the debtor.
- Secondly if Celsius owned the assets, they would not have any obligation to return those assets to customers.

- Finally, a 'lien' is legally defined as "A legal right or interest that a creditor has in property of a debtor, having the effect of security for the payment of the debt." So, a lien is always the Creditor's claim on Debtors' property, not the other way round. The debtors claiming lien on creditors assets is contrary to the legal definition of a 'Lien'. Nor can the debtors claim ownership rights on creditors' assets.

Find the below excerpt (verbatim) from Mr. Ferraro's deposition transcript around Loan, Lien and Celsius's obligation to customers.

> " ·Q.· · Now, Celsius' terms of use clearly state that customers can withdraw their digital assets at any time.· Now, this is from all versions, including the versions you reference, terms of use Versions 6 and 8.· It says you can withdraw your digital assets at any time. Now, if these were Celsius' assets and not our assets, why would you allow your customers to withdraw them?
>
> A.· · We have --
>
> MR. McCARRICK:· Object to form. You can answer.
>
> THE WITNESS:· Sorry.
>
> A.· · WE HAVE AN IOU TO THE CUSTOMER. THE CUSTOMER HAS LOANED US THE DIGITAL ASSETS. So upon withdrawal in a normal, ordinary course, the user can request the obligation to be returned to them." (emphasis added)
>
> ---------------
>
> ·Q.· · No, not one-to-one the same.· But rates do impact the loans, as you said.· And you have a decent understanding of that. In loans have you ever seen transfer of ownership?
>
> MR. McCARRICK:· Objection to form. You can answer.
>
> A.· · I -- I've seen the loan between Celsius and its customers in reading the terms of use.
>
> Q.· · No, I'm talking others.· I'm talking about in general.· Have you ever seen a definition of loan saying transfer of ownership?
>
> MR. McCARRICK:· Objection to form.

*You can answer.*

*A.· · Off the top of my memory, I was in -- you've got to remember that I was in ·consumer lending.· So when somebody -- when somebody borrows against their house, the bank will put a lien on their house. When somebody borrows against for a car, the bank will put a lien on a car. That's my understanding of --*

*Q.· · Is a lien the same as transfer of ownership?*

*A.· · That's --*

*MR. McCARRICK:· Objection to form. You can answer.*

*A.· · It's a different instrument.· It's a different terms of use."*

Mr. Oren Blonstein, in his testimony, when asked about the Terms of Use mention of customer deposits as a Loan to Celsius, acknowledged how the customers may interpret the Terms of Use differently. As a Chief Compliance Officer, his own understanding was ambiguous on Celsius' Terms of Use in response to the US Trustee and creditor deposition questions. Mr. Blonstein also mentioned that in his role as either the Product Innovation head or as Chief Compliance Officer, he did not review the 'Terms of Use'. As a Chief Compliance Officer, he also did not play any role in Consumer Protection or reviewing the Terms of Use from a consumer protection standpoint.

a. As part of the Money Service Business registration at both Federal and State level, Celsius was required to file a document called "Flow of Funds Structure". This registration requirement and the document asks that the business clearly indicate the flow of client funds to each account and identify the owner of the account.

b. This Flow of Funds structure would have explained how Celsius depicted the flow of customer assets into accounts, from deposit to rewards to withdrawals, and whether ownership of these accounts was deemed customers' or Celsius'. A formal request for the document was made but Celsius is yet to furnish the Flow of Funds document to us. Mr. Blonstein who as the Chief Compliance Officer will be responsible for these registrations acknowledged that any registration or renewal he would have reviewed and signed off on such documents but had no recollection of it.

Find excerpts from the transcript below regarding the "Flow of Funds Structure"
document.

> *Q. Actually, I did some lookup and you were registered as an MSB in
> Connecticut state where my account was. Anyway, as part of this
> registration, there is a requirement to submit document called flow of funds
> structure. Are you aware of such document?*
>
> *MS. BRIER: Object to form. Outside the scope. Go ahead.*
>
> *THE WITNESS: Sorry. I am.*
>
> *BY MR. KHANUJA:*
>
> *Q. Okay. This document asks, like, the -- basically is asking, like, the
> business clearly indicates the flow of client forms to each account and
> identify the owner of the account. Do you agree?*
>
> *MS. BRIER: Objection. Same --*
>
> *BY MR. KHANUJA:*
>
> *Q. I'm asking this because the terms of service governs the ownership of the
> forms in the account. And Celsius is arguing that, you know, the assets in
> the account are basically in a customer account -- not customer assets, but
> rather Celsius assets. So I'm trying to understand how Celsius explain in
> filings to the regulators and specifically to this document called flow of
> funds structure.*
>
> *MS. BRIER: Object to form. Outside the scope and foundation. You can
> answer to the extent you know.*
>
> *THE WITNESS: Yeah, I would love to see the document from Connecticut,
> you know, because I don't see how that could be submitted without my
> review and approval, if it was during my period during the chief compliance
> officer. So I don't have any recollection of seeing it, signing it, reviewing it,
> creating it, anything. So, yeah -- and so it's hard for me to speak to what
> would have been depicted there. And just for -- just to -- you know, in the
> effort of transparency, we were in the process of undertaking to apply for
> many money transmitter – more money transmitter licenses across many
> states, because we wanted to expand our offering of the swap service, which
> we did see as money transmission in some states. And we were in the*

*process of developing flow of funds diagrams. and -- and, you know, we had – actually we had signed engagement letters with law firms to help us acquire those licenses and make sure we operated in full compliance. But we just -- we didn't get there. We ran -- you know, were in the process of kicking that off in the late spring 2022.*

c. Chief Compliance Officer, Mr Blonstein, acknowledged how his focus was on interactions with the regulators but didnt review the Terms of Use from a consumer protection standpoint. This is a direct breach of fiduciary responsibility whether regulators enforced it on the Debtors or not. In addition it also demonstrates the poor policies, policy review procedures and controls at Celsius if the Terms of Use were not reviewed by the office responsible for compliance with policies and consumer protection.

Find below excerpts from the transcript regarding Chief Compliance Officer's scope of Terms of Use and consumer protection.

*Q. But people who were on-boarded as customers to Celsius since September 2021, they on-boarded using terms of service, and those would fall under your purview as the chief compliance officer?*

*A. Yes.*

*Q. Okay. And you still, you know, maintain that you were not required to review the terms of service of the products under your purview, which were solely owned at that time?*

*MS. BRIER: Object to form.*

*THE WITNESS: There was --*

*BY MR. KHANUJA:*

*Q. September 2021 through April 2022. Until the launch of custody.*

*A. Yeah, I mean, just again, I'm not saying this is right or wrong -- right? – but just to make sure that you understand how I was looking at this, terms of use are relationship between the company and the customer. There's no -- you know, to my understanding, there was no regulator that enforced terms of use. There's no enforce -- there's no agency that says your terms of use has to include this but can't include that. In contrast, the -- you know, the FinCen and some of the state -- state – state regulators where we had*

*lending licenses, they specifically call out things that we are required to do, you know, that we're obligated to do where officers and directors, you know, can face jail time, personal fines, things like that. So that's where I focus my efforts, because we had a regulatory team and a legal team with a lot more experience to -- you know, and expertise in drafting terms of use.*

d.   Similar to Mr. Ferraro, Mr Blonstein also said, to him, all the terms of use (all versions) were clear regarding asset ownership transfer to Celsius. Yet, there is no mention of transfer of ownership of assets until Terms of Use Ver 5. Considering the same, his written declarations on Terms of Use, especially regarding ownership of assets is dubious at best.

Please refer Exhibit C for a summary of changes through Ver 1-5 of Terms of Use.

e.   Mr. Blonstein mentioned when he joined Celsius as a customer, he was clear the Terms of Service indicated relinquishing ownership of assets in exchange for rewards *(note that it is incorrectly stated as divorce instead of rewards in transcript)*. But the Terms of Use Version 2 that was applicable at the time of his joining the platform (Mar 2020) itself does not mention transfer of ownership. The Version 2 explicitly states that "Celsius will hold the Digital Assets available in your account in Celsius' name". Holding customer's assets in Celsius' name can in no situation be interpreted as relinquishing ownership rights, least so by a Chief Compliance Officer of a registered financial institution. Note that Celsius' own Custody solution is where Custody is being provided by a third party that is holding Celsius Custody assets. I am certain Celsius did not construe these as relinquishing ownership of their Custody assets.

Find below excerpts from the transcript regarding relinquishing ownership rights.

*Q. I'm sorry. You joined the Celsius platform as a customer in spring 2020?*

*A. That's correct.*

*Q. And you mentioned when you joined, the terms of service was clear to you that you would relinquish ownership of your assets in exchange for a divorce?*

*(note that it is incorrectly stated as divorce instead of rewards in statement above)*

*MS. BRIER: Object to form.*

*THE WITNESS: Yeah, I mean, just to say it in my own words, I remember reviewing it and being aware of it and making the decision anyway to send my assets to the company.*

*BY MR. KHANUJA:*

*Q. Okay. I was reviewing the previous versions of terms of use.* UNTIL SEPTEMBER 2020 -- 30TH OF SEPTEMBER 2020, THE TERMS OF USE DO NOT MENTION TRANSFER OF OWNERSHIP RIGHTS AT ALL.

SO UNTIL THEN, TERMS OF SERVICE VERSION 4 WOULD BE APPLICABLE. IN VERSION 4, WHAT IT MENTIONS IS THAT CELSIUS WILL HOLD OUR ASSETS -- OUR CUSTOMER'S ASSETS IN CELSIUS'S NAME. *You can refer the terms of use Version 4, paragraph 30 or I can pull it from the declaration of Alex Mashinsky with the terms of service document. (emphasis added)*

*MS. BRIER: Objection to form.*

*BY MR. KHANUJA:*

*Q. So would you like me to bring it up? In the interest of time, I'm not bringing that up on the screen.*

*MS. BRIER: Objection to form. And I think, you know, if you want to ask a question about the language, you can ask a question about the language. But answer to the best of your ability, if you can, without it in front of you.*

*THE WITNESS: Yeah, I mean, the -- like, what you described that it would be held in Celsius's name, yeah, different words might have been used. But from my perspective, I understood it. I mean, that's kind of --*

*BY MR. KHANUJA:*

*Q. The next version -- the next version, Version 5 and 6, they specifically mention the transfer of ownership rights and all. But prior to that, it was clear. So I'm just trying to understand what made you so sure that you were*

*relinquishing your assets. I had an account with Celsius since 2019, and I was under the prior versions of terms of use, and to me it was always clear these are my assets.*

*MS. BRIER: Objection to form.*

*THE WITNESS: Yeah. I --*

*BY MR. KHANUJA:*

*Q. So do you know -- I'm sorry. I interrupted. Please continue.*

*A. I was just going to say, you know, without the -- without it in front of me, I can't point to the exact -- like, I'm -- I'm just conveying that, at that time, as a customer.*

f. Mr. Blonstein indicated that the Terms of Use may have been updated many times without any significant changes to the Product itself. In response to a question around no change in product while a material change to the Terms of Use especially around ownership language, Mr. Blonstein was unable to recall or answer. Further, any changes in Terms of Use ver 1 through 5 were not notified to customers but Ver 5 in particular made hugely significant changes to Terms of Use. Please refer Exhibit C for a summary of changes through Ver 1-5 of Terms of Use.

Find below excerpts from the transcript regarding Earn product changes and changes to Terms of Use.

*Q. Now, between when you became a Celsius customer and then an employee, would you say the earn product changed materially --*

*MS. BRIER: Objection to form.*

*BY MR. KHANUJA:*

*Q. -- or change at all?*

*MS. BRIER: Same objection.*

*THE WITNESS: I wasn't managing the earn product. I wasn't -- I wasn't firsthand involved in the deployment activities related to the earn product.*

*You know, I didn't set the interest rates. You know, so I'm not the best person to answer what the material changes were to the earn product.*

*BY MR. KHANUJA:*

*Q. Okay. Let me rephrase my question. What prompted the change in terms of service if -- if the -- if the earn product was more or less the same -- you know, at least to the customers, there was no change in the -- you know, in the experience around that particular product?*

*MS. BRIER: Objection to form.*

*THE WITNESS: Yeah, you know, for most of my career, I've worked at startups. And when terms of use start for a brand-new company, they're usually, like -- you know, if it's a well-funded startup, then they have extensive terms of use and terms of service. If it's kind of a scrappy startup, then they are going to be a little bit more sparse. So it makes sense that those things would evolve over time to become more comprehensive. You know, so it's not -- it's not a surprise to me that the terms of use maybe got more detailed, you know, had more review and input from -- you know, from counsel with -- you know, different or more experience.*

*BY MR. KHANUJA:*

*Q. Okay. Okay. Would you say it's -- you know, the terms of service change wherein initially it's mentioned holding customer's assets and then saying -- granting Celsius the rights to ownership -- from a holding asset to granting rights to ownership, would you say it's a material change in terms of...*

*MS. BRIER: Objection to form.*

*BY MR. KHANUJA:*

*Q. And you can refer to the document again with regards to exact language.*

*A. Yeah, without -- without having the documents in front of me, and I don't -- I'm just not -- not fluent enough in those documents to recall it from memory to comment on that.*

g. Chief Compliance Officer, Mr Blonstein, acknowledged how the Terms of Use could be interpreted differently by customers. He acknowledged to the US Trustee's line of questioning that he was unable to then make a distinction between a loan and ownership of assets. If a Chief Compliance Officer of a registered financial institution is unable to make proper distinctions, then any ambiguity or misinterpretation of Terms of Use by non-accredited investors can be easily understood as it pertains to Celsius' Terms of Use.

Find below excerpts from the transcript regarding Chief Compliance Officer's ambiguity around Terms of Use and ownership of assets.

*Q. Okay. I can skip the next line of some of my questions then. Now, let me ask you this: You responded to the UCC counsel's analogy of a house and car saying when you signed up for Celsius as a customer and you reviewed the terms of use, you didn't think or make a distinction between a loan and [audio distortion]. Did I recollect fine?*

*(Stenographer asks for clarification.)*

*BY MR. KHANUJA:*

*And transfer of ownership.*

*MS. BRIER: Objection to form. Outside the scope. You can answer.*

*THE WITNESS: Yeah, yeah. So, like, just in my capacity as a -- or in my -- just as a customer, that wasn't material to me, because I'm not an attorney. I'm not -- it was -- they're either -- either I have the keys or somebody else has the keys was how I looked at it; so...*

*BY MR. KHANUJA:*

*Q. Okay. Now, when you became the chief compliance officer, you still didn't review the terms of use especially from a customer protection standpoint and found no conflicting statements in terms of use?*

*MS. BRIER: Object to form.*

*THE WITNESS: Yeah, just kind of, like I said -- or like I've said today, just to give you an idea of the scope, when I joined -- when I became the chief compliance officer in the months that followed, I tripled the size of the team. We were onboarding, you know, between 10-, 30,000 customers a week. We*

*had hundreds of thousands of transaction a week. You know, there was a lot of work to be done on the AML and sanctions compliance side. I also had another job, head of innovation. We were launching multiple new products. So I had a lot on my plate. And when I had -- you know, when we have a regulatory team and a legal team with a bunch of very experienced, you know, professionals, I had to just kind of choose what I focused on, and that's what I did. And it wasn't the terms of use.*

*BY MR. KHANUJA:*

*Q. Okay. So I won't belabor on that point more. Let's me ask you just one last question on that. But then, you know, you weren't able to make a distinction between a loan and transfer of ownership as you mentioned. Now, if that is unclear and unambiguous, you know -- or rather, I'm sorry. IF THE DISTINCTION IS NOT CLEAR AND UNAMBIGUOUS TO A CHIEF COMPLIANCE OFFICER OF A REGULATED FINANCIAL INSTRUCTION -- I AM SORRY, NOT REGULATED – REGISTERED FINANCIAL INSTITUTION AS AN MSB, DO YOU THINK IT WILL BE AMBIGUOUS TO UNACCREDITED INVESTOR OR UNSOPHISTICATED INVESTORS OR EVEN SOPHISTICATED INVESTOR BUT WHO ARE NOT AS LEGAL SAVVY AS THE CHIEF COMPLIANCE OFFICER? (– emphasis added)*

*MS. BRIER: Objection to form. Misstates testimony and calls for a legal conclusion.*

*THE WITNESS: YEAH. YOU KNOW, IT'S HARD -- IT'S HARD TO ANSWER THAT ON BEHALF OF OTHER PEOPLE. I -- OBVIOUSLY, I UNDERSTAND YOUR POINT. I'M -- I FOLLOW THE -- YOU KNOW, THE COMMENTS FROM OUR CUSTOMERS AND STUFF LIKE THAT. I UNDERSTAND THE FRUSTRATIONS. I UNDERSTAND HOW PEOPLE FEEL ABOUT IT. BUT, YEAH, JUST COMMENTING ON HOW PEOPLE MAY HAVE INTERPRETED IT, I'M NOT THE RIGHT PERSON TO ANSWER THAT. (emphasis added)*

**4. Call option on assets LOANED to Celsius and ability to WITHDRAW at all times.**

Celsius' Terms of Use clearly state that customers can call their loan and also withdraw their digital assets at any time. If these were Celsius' assets, these would not be accessible

for customers to withdraw. Why would Celsius allow its own assets to be withdrawn from its accounts by anyone? Instead the Terms of Use acknowledge the obligation of Celsius to repay/return customer's assets at any time.

Please refer to the paragraph 11 from Exhibit A-8 to Mashinsky Declaration pertaining to withdrawals:

**Withdrawals**
"Subject to these Terms, for any of your Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you), <u>YOU HAVE A CALL OPTION ON ALL LOANS MADE TO CELSIUS</u> TO DEMAND IMMEDIATE, COMPLETE OR PARTIAL REPAYMENT OF ANY LOAN AT ANY TIME through (i) transfer to a Custody Wallet, if available to you, or (ii) <u>A COMPLETE OR PARTIAL WITHDRAWAL</u> OF ELIGIBLE DIGITAL ASSETS FROM YOUR CELSIUS ACCOUNT BALANCE AT ANY TIME. Such repayment will terminate in whole or in part your loan to Celsius and you shall no longer accrue Rewards on the amount of loans as of the time of your exercise of the call option. Celsius initiates the withdrawal process immediately following a withdrawal request when possible; however, we may require up to three (3) days after you submit your withdrawal request to process the withdrawal." Emphasis added.

**Arguments against Custody accounts getting preferential treatment over Earn accounts.**

5. **Inconspicuously updated 'Terms of Use' to Celsius' advantage; Terms of Use misrepresentation around Asset Ownership rights**

To the extent any 'Terms of Use' were updated and modified, these changes were made in an inconspicuous manner. Any such clauses (or change to clauses) with material impact on customers with respect to, for example, use of the assets, or the transfer of ownership to Celsius', or limitations on exercising certain ownership rights were obfuscated and were never expressly or conspicuously disclosed.

  a. At account opening and initial transfer of our personal digital assets to Celsius Network, 'Terms of Use Version 1' was applicable. The entire 'Terms of Use Version 1' does not have any mention of transfer of ownership rights to Celsius. In fact, Section 14 is entitled, "Consent to Celsius' Use of **Your** Digital Assets." (emphasis added).
  b. Also, the 'Terms of Use Version 1 paragraph 31' expressly stated that the notice of changes to the 'Terms of Use' would be provided with the specific additions, deletions or

subtractions to the 'Terms of Use'. Celsius did not send me any email for 'Change in Terms' until Terms of Use Ver 6. While material changes were introduced in Terms of Use version 5, including language around ownership, Celsius failed to notify and/or highlight distinctly specific additions, deletions or subtractions to the 'Terms of Use' from prior version(s).

c.  At the same time, the CEO and executives acknowledged in video and tweets publicly that the customers retained full ownership of their assets. It should have been imperative on Celsius to communicate expressly and unambiguously any material changes to the Terms of Use not demonstrated through their other forms of customer representations like email notifications, Twitter, AMAs, etc.

*Please refer to the following sources for the video evidence supporting misrepresentations from Alex Mashinsky. In the evidence provided below, Alex Mashinsky explicitly acknowledges that "when the customer deposits their bitcoins, it is not Celsius'. Legally still customers' bitcoins."*
https://twitter.com/astrojoe001/status/1598412824505913344?s=52&t=W0IiiG_4jAPRM1UzFEF6iw

https://www.youtube.com/watch?v=kC-89USzxaM&t=4591s

d.  Table below (also provided in Exhibit C) provides a summary of Terms of Use changes from Ver 1 to Ver 6, specifically the section "Consent to Celsius' use of your Digital Assets". Celsius made many updates, including some material changes to the Terms of Use without proper notification or explicit acceptance from the customers. The below is a snippet of and can also be referred at Exhibit A-8 to Mashinsky Declaration.

   i.  Note that the versions 2 through 5 mention Celsius to HOLD digital assets in customer's accounts in Celsius' name. Also note that 'customers will not be able to exercise 'CERTAIN' rights of ownership. These Terms of Use are consistent with Securities Lending agreements where brokerage firms like Fidelity, Etrade, etc. can hold customers' assets on their behalf while certain rights of ownership like voting rights cannot be exercised during the agreement period.

   ii.  In Terms of Use Ver 5, Celsius sneakily inserted 'all rights and title to such digital assets' without informing the customer.

   iii.  Between Ver 1 through 5, I did not receive any explicit emails regarding change in Terms of Use from Celsius despite a material change w.r.t the ownership and title to assets.

iv. Finally, in the Terms of Use Ver 6, 'all rights and title to such assets' is carried over from Ver 5. There were significant other changes as well but customer notifications failed to mention those. Celsius removed the word CERTAIN and instead 'customers will not be able to exercise rights of ownership.' On the other hand, the Terms of Use also stated assets were LOANED to Celsius.

| | | |
|---|---|---|
| V1 | 2018-Mar 4 2020 | No section on ownership transfer or consent to use of digital assets. |
| V2 | Mar 5 2020 | 14. Consent to Celsius' Use of Your Digital Assets<br>In consideration for the rewards earned on your Account and the use of our Services, **you grant Celsius the right**, subject to applicable law, without further notice to you, **to hold the Digital Assets available <u>in your account</u> in Celsius' name** or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to **exercise <u>certain</u> rights of ownership;** |
| 3 | May 5 2020 | 14. Consent to Celsius' Use of Your Digital Assets<br>In consideration for the rewards earned on your Account and the use of our Services, **you grant Celsius the right**, subject to applicable law, without further notice to you, **to hold the Digital Assets available in your account in Celsius' name** or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without<br>retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk.<br>You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to **exercise <u>certain</u> rights of ownership;** |
| 4 | June 15 2020 | 14. Consent to Celsius' Use of Your Digital Assets<br>In consideration for the rewards earned on your Account and the use of our Services, **you grant Celsius the right**, subject to applicable law, without further notice to you, **to hold the Digital Assets available in your account in Celsius' name**<br>or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or<br>You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to **exercise <u>certain</u> rights of ownership;** |

| | | |
|---|---|---|
| 5 | Sept 30 2020 | **14. Consent to Celsius' Use of Your Digital Assets**<br>In consideration for the rewards earned on your Celsius Wallet and the use of our Services, **you grant Celsius**, subject to applicable law and for the duration of the period during which the Digital Assets are available through your Celsius Wallet, <u>**all right and title to such Digital Assets**</u>**, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own virtual wallet** or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets.<br><br>You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to **exercise <u>certain</u> <u>rights</u> of ownership;** |
| 6 | July 22 2021 | **13. Consent to Celsius' Use of Digital Assets**<br>**In consideration for the Rewards payable to you on your Celsius Account and the use of our Services**, you grant Celsius, subject to applicable law and for the duration of the period during which the **Eligible Digital Assets are <u>loaned to us</u> through your Celsius Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets** in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.<br><br>You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:<br>(i) You will not be able to **exercise <u>rights</u> of ownership;** |

e. Celsius' Terms of Use and its changes especially around claims of ownership represent an 'unconscionable contract', so grossly unreasonable as to be unenforceable according to its literal terms. There was an absence of meaningful choice for the customers ["procedural unconscionability"] together with contract terms which are unreasonably favorable to Celsius ["substantive unconscionability."].

*Please refer to <u>Barreto v. Jec II, LLC, 2017 WL 3172827, at \*4 (S.D.N.Y. July 25, 2017)</u>; <u>Lawrence v. Miller, 11 N.Y.3d 588, 595 (2008).</u> "An unconscionable contract is usually voidable since a party to a contract has the power to validate, ratify or avoid it." <u>Id. at 595 n.4</u>; <u>Zavulunova v. Aminov, 98 N.Y.S.3d 898, 899 (2d Dep't 2019)</u>; <u>Mizrahi v. Mizrahi, 171 A.D.3d 1161, 1163-64 (2d Dep't 2019)</u>; <u>Govindharajan v. Tata Consultancy Servs., Ltd., No. 19-CV-10017 (RA), 2020 WL 4016109, at \*5 (S.D.N.Y. July 16, 2020)</u>*

6. **Unlicensed Custodian / Lender; Misrepresentation around Regulatory Compliance and failure to meet fiduciary responsibilities:**

I believe I was misled on Celsius' regulatory compliance and at the time of creation of Custody accounts (April 15 2022), I was grandfathered into continuing with an Earn account without any option to transfer assets into a Custody account, thus giving Custody account holders an advantage to my detriment. Celsius' email (April 12 2022) regarding the upcoming changes to my account failed to mention that I would have less favorable rights than Custody but instead merely advised I was prohibited from transferring my assets to the new Custody account. Celsius email indicated that the changes were being made in consultation with United States regulators concerning Earn accounts/product. The email also did not mention the 'Cease and Desist' orders from certain jurisdictions leading to the Custody account creation. The emails did not convey the differences between Earn and Custody accounts or that Earn Accounts have higher risks than Custody accounts or could have lower priority in a bankruptcy proceeding.

    a. On April 12, 2022, I received an email from Celsius regarding upcoming changes to Celsius 'Terms of Use', new Custody solution and "how these changes impact you".

    b. Celsius' email indicates that the changes are being made in consultation with United States regulators concerning Earn accounts/product.

    c. Celsius' email had a section explaining the impact of the changes (in BOLD) under the heading **"how these changes impact you"**. But the details within the section obfuscate the most material impacts to my Celsius account. There is no mention of any possible impairment of my ownership rights or risks associated with "New Earn Accounts" or how these "New Earn Accounts" would differ from newly-created Custody accounts.

    d. Celsius' email also states (in BOLD) that my Celsius account assets are ineligible to be transferred to the new Custody product solely based on my state's regulatory requirements.

        i. The Court now knows that thousands of other Earn accounts similar to mine, but held by residents of other states/jurisdictions, were transferred into Custody. As per Celsius, my account remained in Earn solely per regulatory requirements of my state. It is unconscionable that I may have

been burdened with additional risks to the other Earn account holders whose assets were transferred into Custody.

ii.  If there was no explicit approval from Connecticut (tax state on my account) regarding Earn or Custody products, I should have been permitted to withdraw my funds and the account should have moved to "withhold" status in the interim.

iii. It is particularly significant that many of the other accounts/assets transferred from Earn to Custody were internal Celsius accounts (held by employees, executives, investors, etc.) or people with advance inside knowledge of the financial difficulties at Celsius who wrongfully received and apparently may now be enjoying preferential treatment.

iv.  Celsius' email further states (in BOLD) that all assets transferred before April 15th will continue to earn rewards. It fails to mention additional risks or subordination due to the newly-created Custody accounts going forward.



**Celsius**

Tuesday, April 12th, 2022

Dear Kulpreet,

Today, we are writing to give our community advance notice of upcoming changes, which will go into effect on April 15, 2022. These changes provide a path forward for our users in the United States to continue holding coins and earning rewards with Celsius.

As we previously have acknowledged, Celsius has been working closely with regulators around the world. It is our intention to be as transparent with our community as possible. More specifically, we have been in ongoing discussions with United States regulators regarding our Earn product.

As a result, there will be changes to the way our Earn product will work for users based in the United States.

Here's how these changes impact you:

- All coins transferred to Celsius by users in the United States prior to April 15, 2022 will continue to earn rewards. Existing coins will continue to earn rewards from April 15th and onward as long as they remain in their Earn accounts.
- Your Celsius account is currently not eligible for the new Custody solution and will have new limitations, due to regulatory requirements in your state.

- New transfers made by non-accredited investors in your state, will not be accepted by Celsius for you to use. You will need to withdraw any new coins from your account.
- Unless you are a verified accredited investor, you will not be able to access Celsius services including Buy, Swap, CelPay and Borrow until we are able to offer Custody in your state. For additional information on how to become an accredited investor, contact us at https://celsius.network/customer-care or read more.
- Coins posted as collateral against a loan that was taken prior to April 15, 2022 will be returned to the Earn account and resume earning rewards, once the loan is repaid.

Our team is working to expand your access to our Celsius suite of products and services. We will notify you as soon as it becomes available.

Celsius will never stop advocating for financial freedom and we thank our community for their ongoing support. We will continue to provide updates as we engage with regulators and ensure the delivery of our services to our users globally.

If you have questions or require additional assistance, contact us at 1-866-HODL-NOW (1-866-463-5669). Our Customer Care Center is available Monday - Saturday, from 10AM - 11PM EST or contact us at https://celsius.network/customer-care

Sincerely,
The Celsius Team



**Celsius**

**Friday, April 15th, 2022**

Dear Kulpreet,

We are writing to inform you about updates to the Celsius Terms of Use that will take effect on April 15, 2022.

The updates relate primarily to the products and services offered to our US-based clients, including changes to the Earn product and the introduction of a new Custody service. Based on our records, you reside in a state where our Custody service is currently not available, and you will not have access to such service. Read about the updates on the Celsius blog.

We strongly advise you to review our updated Terms of Use. The updated version will be binding and apply to all Celsius users globally, effective as of April 15, 2022. No further action is required.

If you have questions, please contact us at 1-866-HODL-NOW (1-866-463-5669). Our Customer Care Center is available Monday - Saturday, from 10AM - 11PM EST.

Sincerely,
The Celsius Team

e. In the April 15, 2022 'Terms of Use' email, it again only mentions that my account will continue to remain in Earn due to limitations in offering Custody based on my state regulations. The email fails to mention the 'Cease and Desist' orders from certain jurisdictions or states. The April 15 email implies that changes were made in consultation with regulators which created a misleading and false sense of security to account holders like myself.

f. The Custody FAQ on Celsius' website also described the Custody solution as similar to a typical Earn account/product. *Please refer to the Custody FAQ in the Exhibit B.*



Summary:

- The Celsius emails and 'Terms of Use' clearly indicate that as an account holder, my account was transferred to Earn without any other option provided to us.

- Celsius failed to mention that Earn accounts will have less favorable rights than Custody but instead merely advised I was prohibited from transferring my assets to the newly created Custody account.

- The emails did not convey the differences between Earn and Custody accounts or that Earn Accounts have higher risks than Custody accounts or could have lower priority in a bankruptcy proceeding. Nor does the Earn Product Terms of Use mention the adverse impact of Custody account creation to Earn customers, esp. in the context of bankruptcy. On the contrary, Celsius website explained Custody account as changes to Earn product to comply with regulators demand while

continuing to hold and earn rewards on the coins. This indicated to me that Custody solution was merely another form of Earn product for specific states.

○ As an Earn account holder for years, I did not undertake any additional risks to the other account holders whose account were transferred into Custody automatically by Celsius. Finally, as a non-accredited depositor, I should have been made aware of 'Cease and Desist' orders and offered a Custody or Withdrawal option.

*Please refer to Celsius' emails in Exhibit B supporting the above statements.*

*Please also refer to the following screenshot from Celsius website regarding Custody accounts.*

Figure 1: The Custody FAQ on Celsius' website did not mention any differences from typical Earn product.



**Breach of Contract: Unable to switch off HODL mode and initiate withdrawal from Celsius**

7. **Withdrawal and account change (from HODL) delays:**

I believe Celsius may have deliberately delayed withdrawal of funds from my account to my detriment:

a. My Celsius account was in a Celsius feature called 'HODL' mode, which is essentially a mode to keep your assets safe from any hacks or accidental transfers. Withdrawal of assets from HODL required a code that Celsius sent within 24 hours. In late April/early May, I was trying to withdraw my funds from the Celsius platform. I tried multiple times but was not getting the code on my cell phone, which prevented me from disabling HODL mode and ultimately I was unable to process the withdrawals. On May 6 2022, I approached Celsius support by phone regarding withdrawal of assets and was told I could not do so due to some account details and address verification requirements.

    i. Celsius customer support also solicited me to consider upgrading my account to Accredited Earn from Unaccredited Earn which would allow me to take loans against my assets as opposed to withdrawals. A ticket (request) was created to provide details about Accredited Investor.

    ii. After speaking with Celsius support on the phone, I also sent an email to request account changes that would enable code to be sent on my new contact number. At that stage, I believed the code was not getting through to my existing contact number.

    iii. I also sent an email on May 6th to update my personal contact information, including phone number and correspondence address.

b. On May 13 2022, I sent the latest follow up email to Celsius support regarding the address/phone update request specifically.

c. On May 17 2022, Celsius support replied asking for an address proof document. I uploaded the required document the same day and received an email from Celsius confirming the same.

d. Until June 02 2022, Celsius failed to effect the account changes that would enable withdrawals, almost a month since the original request and more than 2 weeks after I provided my address proof document.

e. While the account change request that was preventing withdrawals from my account was delayed from May 6 – June 2, Celsius employees/managers sent me multiple emails soliciting me to become an Accredited Investor with specific steps and services I can use to receive the Accredited certification. These email responses from Celsius employees and their managers were not automated; they were intentional and direct solicitations to upgrade to Accredited Investor status allowing me to take loans against my assets instead of withdrawal or transferring my assets as I had requested.

f. I believe Celsius deliberately and intentionally delayed the update of my account details to prevent me from withdrawing my funds at the time that Celsius was considering bankruptcy, and when insiders were able to make withdrawals.

    a. *Please refer to the emails with Celsius support regarding above communication in Exhibit B.*
    b. *Please also refer to the Celsius explanation of HODL mode and operational procedure for withdrawal from the HODL mode.*
       *https://www.youtube.com/watch?v=sB7W0quAedk*

1. The emails/screenshots attached hereto in this document including in Exhibit A are a true and correct copy of the notices and/or communication with Celsius Network Limited.

## Reservation of Rights

I, as Movant/Declarant, fully reserve all of my rights and claims to fully supplement this Motion. I hereby assert a lack of due process in determining my property rights in this bankruptcy proceeding. I further maintain that the issue of whether my Earn Account assets constitutes property of theses estates is not properly before this Court at this time.

*/s/ Kulpreet Khanuja*
Kulpreet Khanuja
*Pro Se* Celsius Creditor

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on January 02, 2023.

_____
Kulpreet Khanuja, Declarant

# Exhibit A

a. Celsius Account open notification email, confirmation email for first deposit into personal wallet at Celsius, and rates email.



## **Exhibit B**

a. Address and phone number change requested on May 6th 2022. This was required as withdrawals could not be processed otherwise.

b. Celsius merged the request with Accredited Investor request on May 10th.



c. Followup email to Celsius regarding Contact details change on May 13th.

d. Celsius responded on the contact details change for the first time on May 17th (11 days after the request was received.)



**KKhanuja03** <kkhanuja03@gmail.com>
to Celsius ▾

May 13, 2022, 9:48 PM ☆ ↩ 

What is the status of the address and contact details change? I have been waiting for details to be updated for a while now. Extremely Poor support.

Best,
Kulpreet Khanuja

On May 10, 2022, at 2:55 PM, Celsius Network <support@celsius.network> wrote:

•••

**Celsius Network** <support@celsius.network>
to me ▾

May 17, 2022, 6:13 PM ☆ ↩ ⋮ 

##- Please type your reply above this line –##

Your request (#957314) has been updated. To add additional comments, reply to this email.

 **Jasmine Wyche** (Celsius Network)
May 17, 2022, 22:13 UTC

Hello Kulpreet,

Thank you for your feedback, We appreciate your point of view, and again would like to apologize for the slow reply.

In order to change your residency address please provide the following in English:

- Your new address in the following format:
  - Country;
  - State (if relevant);
  - City;
  - Street;
  - Flat number (if applicable);
  - Postal Code.

One of the following documents that shows your full name and the address above:

- A copy of a recent utility bill (cannot be older than 3 months) bearing your name and address shown in the account (examples of utility bills we accept are gas, water, electric, phone, cable bill, etc).
- Latest Property or Municipal Tax Receipt;
- A bank statement (cannot be older than 3 months) bearing your name and an exact address.
- An official rental agreement states your name and address – with both Landlord and Tenant signatures ( issuing date and expiration must be visible on the document).

*Please note: we **cannot** accept mobile phone bills or visas, or stamps in your passport as proof of residence.*

We will **not** process requests based on screenshots or low-resolution scans so please provide either electronic statements or high-resolution scans.

Please upload all files to the following secure link: https://celsius.sendsafely.com/dropzone/app/957314
**\* The files are automatically encrypted before upload and are deleted after 30 days.**

e. Address proof shared on May 17th itself and acknowledgement email from Celsius.

f. Celsius completed the contact details change on June 2nd (almost a month since the initial request and just a few days prior to halting withdrawals.)



Exhibit C

| | | |
|---|---|---|
| V1 | 2018-Mar 4 2020 | No section on ownership transfer or consent to use of digital assets. |
| V2 | Mar 5 2020 | 14. Consent to Celsius' Use of Your Digital Assets<br>In consideration for the rewards earned on your Account and the use of our Services, **you grant Celsius the right**, subject to applicable law, without further notice to you, **to hold the Digital Assets available <u>in your account</u> in Celsius' name** or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to **exercise <u>certain</u> rights of ownership;** |
| 3 | May 5 2020 | 14. Consent to Celsius' Use of Your Digital Assets<br>In consideration for the rewards earned on your Account and the use of our Services, **you grant Celsius the right**, subject to applicable law, without further notice to you, to <u>hold</u> **the Digital Assets available in your account in Celsius' name** or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transferor use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without<br>retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk.<br>You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to **exercise <u>certain</u> rights of ownership;** |
| 4 | June 15 2020 | 14. Consent to Celsius' Use of Your Digital Assets<br>In consideration for the rewards earned on your Account and the use of our Services, **you grant Celsius the right**, subject to applicable law, without further notice to you, **to <u>hold</u> the Digital Assets available in your account in Celsius' name**<br>or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or<br>You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to **exercise <u>certain</u> rights of ownership;** |
| 5 | Sept 30 2020 | 14. Consent to Celsius' Use of Your Digital Assets<br>In consideration for the rewards earned on your Celsius Wallet and the use of our Services, **you grant Celsius**, subject to applicable law and for the duration of the period during which the Digital Assets are available through your Celsius Wallet, <u>**all right and title to such Digital Assets**, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own virtual wallet</u> or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest |

|  |  | such Digital Assets.<br><br>You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to **exercise <u>certain</u> rights of ownership;** |
|---|---|---|
| 6 | July 22 2021 | 13. Consent to Celsius' Use of Digital Assets<br>**In consideration for the Rewards payable to you on your Celsius Account and the use of our Services**, you grant Celsius, subject to applicable law and for the duration of the period during which the **Eligible Digital Assets are <u style="color:red">loaned to us</u> through your Celsius Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets** in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.<br><br>You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:<br>(i) You will not be able to **exercise <u style="color:red">rights</u> of ownership;** |